**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ASCOM HASLER MAILING SYSTEMS, INC.,** | |
| **Plaintiff,** | **Civil Action No. 00-1401 (PLF/JMF)** |
| **v.** | |
| **UNITED STATES POSTAL SERVICE,** | |
| **Defendant.** | |
| **NEOPOST, INC.,** | |
| **Plaintiff,** | **Civil Action No. 00-2089 (PLF/JMF)** |
| **v.** | |
| **UNITED STATES POSTAL SERVICE,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

These cases have been referred to me by Judge Friedman for full case management.

Pending before me is Defendant's Motion to Strike Plaintiff's Expert Designation and to Enlarge

Time for Defendant to Identify Its Expert [#106][1] ("Def. Mot."). For the reasons stated herein, I

will deny defendant's motion to strike plaintiffs' expert designation, but grant its motion for an

enlargement of time for defendant to identify its expert.

---

[1] I will refer only to the docket entry numbers for the lead case in this consolidated action, Neopost, Inc., v. U.S. Postal Serv., No. 00-CV-2089, as the docket entry of October 04, 2006 indicates that all filings should be made under the lead case.

## I. Background

Defendant filed this motion claiming that plaintiffs' expert, Dr. Bruce D. Abramson, should be disqualified "because of [a] conflict of interest created by his prior work on litigation that is significantly related to the present matter," because during his deposition, it was revealed that he had worked for Pitney Bowes in its litigation against the defendant. Ascom Hasler Mailing Systems, Inc. v. U.S. Postal Service, No. 00-CV-1401; 00-CV-2089, __ F.R.D. __, 2010 WL 143709, at *4 (D.D.C. Jan. 14, 2010).  Dr. Abramson had worked on the consultant team that produced the expert report for Pitney Bowes that was used in the litigation and confidential mediation; however, he was not Pitney Bowes's principal expert. Id.  Defendant sought to strike Dr. Abramson because there was a high probability that he had seen the confidential report and information that Pitney Bowes submitted during its mediation with defendant. Id.  I set an evidentiary hearing on the motion to determine what confidential information related to the Pitney Bowes mediation, if any, was made available to Dr. Abramson by defendant because of his participation in the preparation of the Pitney Bowes expert report. Id.

## II. Findings of Fact

From the testimony at the hearing, I make the following findings of fact:

1.     Dr. Abramson is a consultant and operates his own consulting firm, which then coordinates with larger consulting firms, such as Charles River Associates.

2.     Dr. Abramson has been a senior consultant at Charles River Associates (hereinafter referred to as "CRA," recognizing the organization's name has changed several times over the last decade) since late 2004.  He began at CRA as a consultant in 1998, then became a principal, before becoming a senior

consultant.

3.  Dr. Abramson often works on cases that require economic modeling, as this one does, where he determines the value of the income stream from a diverted financial asset.  In preparing his report for this case, he reviewed only documents provided by plaintiffs' counsel, all of which contained Bates numbers.

4.  In or around 1998 or 1999, Dr. Abramson also served as part of an expert consulting team on behalf of Pitney Bowes during its ligation with defendant based on similarly diverted asset streams.  He was not the principal expert for Pitney Bowes; Dr. Overstreet from CRA was hired as the expert.  As part of the team, he coordinated the analysis of the financial stream of possible income from a similar fund that is not at issue in this case.  He did not use any of the information from the analysis he did for Pitney Bowes for the analysis he did in this case, for they are fundamentally different.  To the best of his recollection, Dr. Abramson does not remember reviewing confidential information from defendant in completing his work.  Further, to the best of his knowledge, he did not participate in any manner in the mediation between parties in that case, nor did he prepare materials for the mediation.

5.  Dr. Abramson notes that, if the defendant had submitted a report in the Pitney Bowes litigation, it would have been standard practice for him to review it, but he has no recollection of reading or analyzing it.  Because the case settled, it is possible that the CRA consultants never saw the report or never analyzed it.

6.  Dr. Abramson has no recollection of seeing the expert report commissioned by

3

the Court for the purpose of mediation in the Pitney Bowes litigation. If he had reviewed that report or the defendant's report, he did not delve into the methodology in any appreciable way that he can recall.

7. To the best of his knowledge, Dr. Abramson does not have a copy of Dr. Overstreet's report from the Pitney Bowes litigation in his files, nor does he have any copies of information from the report that might be confidential. He did note that he may have some fragments of methodologies saved on his computer that may have been included in the report. He frequently uses a general template for methodologies he includes in reports that he refers to as "the Janis Joplin's yearbook methodology," because it provides a simple way to understand the modeling methods used.

8. Dr. Overstreet, the principal expert for Pitney Bowes in its prior litigation with defendant, is a Vice President for CRA, which is similar to the rank of equity partner in a law firm. Dr. Overstreet referred plaintiff to Dr. Abramson. Dr. Overstreet spoke in general terms to Dr. Abramson on several occasions regarding the expert report for this case and reviewed Dr. Abramson's report draft.

9. In discussing the expert report with plaintiffs' counsel, Dr. Abramson mentioned that the Pitney Bowes report had a future analysis, but that such an analysis would not be necessary in this case. The expert report would include an analysis of past damages, utilizing a standard methodology.

10. To the best of Dr. Abramson's knowledge, CRA conducted a conflict of interest

check on retaining plaintiffs as clients. No conflicts were found. Further, Dr.

Abramson's own firm, Informationism, Inc., considers whether the interests of a

potential client are adverse to a former or current client. No such adverse interest

was found.

12.     To Dr. Abramson's knowledge, the expert report in Pitney Bowes was turned

over to defendant in the course of discovery and was developed primarily as a

litigation report. Dr. Abramson does not know what, role, if any, the report

played in mediation.

### III. Legal Standard

The District of Columbia Circuit Court of Appeals has not addressed the issue of

disqualification of an expert due to an alleged prior relationship with the opposing party and

there is little case law otherwise. See Hansen v. Umtech Industrieservice Und Spedition, GmbH,

No. 95-CV-516, 1996 WL 622557, at *3 (D.Del. Jul. 3,1996) (noting lack of case law on

disqualification of expert because of prior relationship with party seeking disqualification). In

one case, the district court broke down the typical scenarios from which motions to disqualify

experts typically arise into two categories: (1) "side-switching" cases, "where one expert is

originally retained by one party to litigation, and that expert subsequently switches sides to

consult as an expert for that party's adversary," and (2) cases "where an expert is retained by a

party to litigation, and then the adversary retains an expert who is in some way affiliated with the

expert retained by the first party." See Hansen, 1996 WL 622557, at *3. Neither of these

categories apply to the case at hand. There is said to be, however, a two-part test for determining

whether to disqualify an expert on the ground of a prior relationship with the party seeking

disqualification.  The test requires the court to undertake the following inquiries:

> (1) "[W]as it objectively reasonable for the first party...to conclude that a confidential relationship existed?"

> (2) "[W]as any confidential or privileged information disclosed by the first party to the [expert]?"

Koch Refining Co. v. Jennifer L. Boudreaux MV, 85 F.3d 1178, 1181 (5th Cir. 1996) (citing

Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991) (reviewing cases)).

Only when the answer to both of these questions is affirmative is disqualification

compelled. Id. at 1181 (citing Mayer, 139 F.R.D. at 3).  Further, the party seeking

disqualification bears the burden of establishing both the existence of privilege, in regards to the

information disclosed, and its non-waiver. Id. (citing Nikkal Industries, Ltd. v. Salton, Inc., 689

F.Supp. 187, 191 (S.D.N.Y. 1988)).

## IV. Analysis

### A. Nature of the Relationship Between Dr. Abramson and Defendant

According to defendant, Dr. Abramson is subject to the confidentiality requirements

provided in Local Rule  84.9(a)(1) and (3), which would prevent Dr. Abramson from disclosing

any written or oral communications made in connection with or during any mediation session or

using any information acquired through mediation for any purpose.  See LCvR 84.9(a)(1), (3).

In light of the local rules and the traditional practices of lawyers during settlement

discussions, it was reasonable for the Postal Service to believe that information it made available

to its opponent, Pitney Bowes, solely for the purpose of mediation would be kept confidential

and be used only for the purposes of that mediation.  Unfortunately, for the Postal Service, there

is no evidence whatsoever that Dr. Abramson used any of the information disclosed by Pitney

Bowes for the purposes of the mediation for the report that he has prepared for this case. Indeed, as I explained at the hearing, I presided over those discussions and I can assure the parties without breaching the confidentiality of those discussions that the analyses used in the mediation looked to the future while Dr. Abramson's looked to the past. It is inconceivable that any thing he did in the Pitney Bowes case could have influenced his work in this case.

### B. Policy Interests in Expert Disqualification

The Court must also consider the competing policy objectives in determining an expert's disqualification. See, e.g., English Feedlot, Inc. v. Norden Laboratories, Inc., 833 F.Supp. 1498, 1504-05 (D.Colo. 1993) (citing Paul v. Rawlings, 123 F.R.D. 271, 282 (S.D.Ohio 1988)). On the one hand, the policy objectives of preventing conflicts of interest and maintaining the integrity of the judicial process favor disqualification. Paul, 123 F.R.D. at 277-278. On the other hand, ensuring that experts who possess specialized knowledge can pursue their professional calling and that they are accessible to parties represents a strong policy objective against disqualification. English Feedlot, Inc., 833 F.Supp at 1505 (citing Palmer v. Ozbek, 144 F.R.D. 66, 67 (D.Md.1992)). Further, should disqualification of experts become too easy, courts express concern that unscrupulous attorneys and clients may create inexpensive confidential relationships with experts to prevent opposing counsel from hiring harmful experts. Id. (citing Paul, 123 F.R.D. at 281-82). In addition, unique to this case, is the policy interest in maintaining the integrity of confidential mediation proceedings.

In this case, Dr. Abramson served as an associate consultant for an expert witness hired by a third party not party to this current litigation. I have found, based on his testimony, that Dr. Abramson has not disclosed any confidential information gained from his employment on the

expert team for Pitney Bowes. As there has been no disclosure, Dr. Abramson's participation in this current litigation as an expert witness does not jeopardize the integrity of the judicial process, nor does it present a conflict of interest. Further, disqualification in this case would severely impede Dr. Abramson, and many other consultants, from pursuing their professional calling, if expert witnesses faced disqualification merely for serving as an assistant to an expert witness in a case 10 years prior which involved one party to the current litigation. Lastly, disqualification would further delay the progress of this decade-old case, a harsh sanction in no way proportional to the alleged misconduct of plaintiffs. See, e.g., Bonds v. District of Columbia, 93 F.3d 801, 811 (D.C. Cir. 1996).

### C. Conclusion

I will deny defendant's motion to strike; however, I do want to address some of defendant's concerns about Dr. Abramson's continued participation. Defendant is preoccupied with concerns that it will not be able to fully cross-examine the expert, because he will be bound to keep certain information confidential and will not be able to answer all questions about his knowledge and analysis. Reply to Plaintiffs' Opposition to Defendant's Motion to Strike Plaintiffs' Expert Designation, and to Enlarge Time for Defendant to Identify Its Expert [#117] ("Def. Reply") at 7. Defendant does not have any evidence that this will be true; it just assumes, based on Dr. Abramson's experience on the Pitney Bowes litigation ten years prior, that his knowledge and analysis will be based on confidential information disclosed in settlement negotiations related to that case. Dr. Abramson's testimony at the hearing negates that assumption. Defendant is further concerned that cross-examining Dr. Abramson about his participation in the Pitney Bowes litigation could be construed by plaintiffs as subject-matter

8

waiver, allowing plaintiffs to seek discovery of the confidential settlement discussions, or considered a violation by the Postal Service's counsel of Local Rule 84.9. Thus, I will order that, in the unlikely event that confidential or privileged information is inadvertently disclosed during the cross-examination of Dr. Abramson, such disclosure shall not constitute a waiver nor will it constitute a violation of Local Civil Rule 84.9.

Plaintiffs have requested costs, should defendant's motion be denied. I will not award costs, as defendant made a legitimate objection to plaintiffs' expert.

### V. Motion for Enlargement of Time

Defendant also seeks an enlargement of time to identify its expert until the Court rules on its motion to strike plaintiffs' expert. See Def. Mot. 1-2. Defendant argues that the Federal Rules of Civil Procedure do not require defendant to identify its rebuttal expert until after the plaintiff has identified its expert. Def. Mem. 3 (citing Fed. R. Civ. P. 26(a)(2)(C)(ii)). Plaintiffs argue that the motion was filed after the close of discovery and that defendant has been dilatory in making objections to plaintiffs' expert. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Strike Plaintiffs' Expert Designation, and to Enlarge Time for Defendant to Identify Its Expert [#147] ("Pls. Opp.") at 6-7. Federal Rule of Civil Procedure 6(b)(1) allows for such an enlargement for good cause, if the request is made before the original time or its extension expires. Fed. R. Civ. P. 6(b)(1)(A). Although the motion was filed after discovery had closed in the action, plaintiffs concede that they had granted defendant an extension through mid-August to identify an expert. Pls. Opp. 7. Defendant filed this current motion on August 13, 2009, before this extension had expired. I will grant defendant an enlargement of time to identify its expert. Defendant will have 10 days from the date of this order to identify its expert. This is not

9

an unreasonable amount of time, given that I have denied its order to strike plaintiffs' expert, and

thus, defendant is faced with the same expert.  Presumably, defendant has already conducted

much of the groundwork necessary to identify a rebuttal expert to Dr. Abramson.


 

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE