**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ASCOM HASLER MAILING SYSTEMS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 00-1401 (PLF/JMF)** |
| | ) | |
| **UNITED STATES POSTAL SERVICE,** | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| **NEOPOST, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 00-2089 (PLF/JMF)** |
| | ) | |
| **UNITED STATES POSTAL SERVICE,** | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION TO DEFENDANT'S MOTION TO**
**DISMISS AND MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Neopost, Inc. ("Neopost") and Hasler, Inc. f/k/a Ascom Hasler Mailing

Systems, Inc. ("Ascom") (collectively "Plaintiffs"), hereby oppose United States Postal Service's

("USPS" or "Defendant") Motion to Dismiss and Motion for Summary Judgment and state as

follows:

## I. INTRODUCTION

USPS begins its arguments by reducing them to a quip: Plaintiffs are allegedly asking

the Court to "find that, by merely complying with regulations that control a government-created

industry, a private party can create a binding contract in which the Government is bound never to change the regulations." *See* Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and Motion for Summary Judgment ("Defs Memo") at p.1.  USPS's quip is wrong – and unintentionally reveals USPS's lack of understanding of the facts and claims - at every step.

First, Plaintiffs have never argued that their compliance with regulations created a binding contract.  Indeed, nowhere does USPS cite to such a claim.  So it is a strawman. Plaintiffs instead rely on the statements and course of conduct of the Parties, which is set forth in great detail in Plaintiffs' Statement of Undisputed Material Facts ("SUMF") and Plaintiffs' Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Plfs Memo"), to establish each of its claims.  Importantly, it is undisputed that the *raison d'etre* for this case – the interest income from customers' trust accounts – was not subject to regulation until the 1995 Computerized Meter Resetting System ("CMRS") regulatory changes captured the interest income for USPS.  Thus, the case is clearly not about compliance with regulations, but instead the government's liability for changing regulations that breach contractual obligations. Defendant's quip cleverly ignores any reference to the myriad of evidence – from USPS's files, as well as from the testimony of current and former employees of all the Parties - establishing the contractual relationship between the Parties, the taking of property, and the disparate treatment suffered by Plaintiffs.

Second, Defendant helpfully agrees that CMRS is a "government-created" industry.  That admission is in sync with the testimonial and documentary evidence from the time period – USPS actively engaged in persuading meter manufacturers other than Pitney Bowes to enter the CMRS business.  And the means of that persuasion are quite clear from the record – an offer to

allow the Plaintiffs to operate their CMRSs on the same terms as Pitney Bowes. Indeed, correspondence from the Postal Service official in charge of the manufacturers' requests that the manufacturers "implement" "the 1978 Agreement." *See* Ex. 23 to SUMF. USPS "created" the incentives for Plaintiffs to enter the CMRS industry and those incentives undeniably included a right to retain the same interest income from customers' trust accounts that Pitney Bowes was receiving. This offer of USPS was critical to creation of the industry and had nothing to do with any regulations adopted regarding CMRS. USPS's motivations in creating the industry were quite clear – CMRSs provided more security than manual resetting, moved the postal meter technology forward by promoting more secure electronic meters, and saved USPS money and manpower by eliminating the need for postal employees to reset meters. Thus, the government-created industry flourished, and USPS benefited as a result of its offers and promises. Once the CMRSs were developed and operating, USPS chose to regulate in order to arrogate the interest income it had promised to Plaintiffs. These facts alone, essentially undisputed by USPS, are sufficient for Plaintiffs to prevail on each of their claims.

Finally, Plaintiffs have never claimed that USPS could not change its regulations. It is undisputed that the government is always free to change its regulations. But, as in *Winstar Corp v. United States*, 518 U.S. 839 (1996), the question remains as to whether such a change breaches existing agreements with private parties. If a regulation breaches an agreement, then the government entity may be liable for damages. *Id.* USPS simply ignores these questions. Similarly, Plaintiffs do not claim that the interest income would continue *ad infinitum*. *See* Defs Memo at p. 3. Instead, Plaintiffs simply claim that so long as USPS enjoys the benefit of its bargain through the development and operation of CMRS, then Plaintiffs have a right to continue to enjoy the benefit of their bargain – the right to retain the interest income. When USPS stops

using the CMRSs developed by the Plaintiffs, the right to further interest income will cease as well.

Notably, USPS largely abandons its quip when it gets down to its real arguments – that Plaintiffs' claims lack subject matter jurisdiction, that the evidence (or, more correctly, Defendant's less than complete review of it) fails to establish sufficient facts to support the claims, and that, in any event, Defendant's actions do not amount to a taking of property or disparate treatment of similarly situated persons in violation of the Constitution.  In fact, the Court has already rejected USPS's subject matter jurisdiction arguments.  USPS's arguments that the facts do not support the claims is woefully incomplete, misleading and Plaintiffs have set forth ample additional facts to support those claims; and, finally, the law mandates that USPS actions were a taking of property for which it must pay just compensation and amounted to disparate treatment of similarly situated persons.  Plaintiffs address each of USPS's arguments in full below.

## II.  ARGUMENT

### A.  Defendant's Arguments That This Court Lacks Subject Matter Jurisdiction are Moot

#### 1.  The Court Previously Rejected USPS's Argument That the Tucker Act Bars Plaintiffs' Quasi-Contract Claims

In section I(A) of Defendant's Memo, USPS argues that Plaintiffs' Quasi-Contract claims should be dismissed because the United States has not waived sovereign immunity for those claims under the Tucker Act, which USPS claims is "the sole waiver of the [USPS] for claims sounding in contract."  Defs Memo at pp. 4-7.

USPS's argument conveniently ignores the Court's Order of September 27, 2007 wherein it was plainly stated:

> With respect to the defendants' argument about the Tucker Act, the Court concludes that "a claim against the Postal Service in its own name is not a claim against the United States and is thus not governed by the Tucker Act." (citing *Licata v. United States Postal Service*, 33 F.3d 259, 263 (3d. Cir. 1994); *Coconut Grove Entertainment Inc. v. United States*, 46 Fed. Cl. 249, 256 (2000)). It is clear that the Tucker Act does not apply to these cases.

*See* Memorandum Opinion and Order dated September 7, 2007 (DKT 128) (emphasis added).  Thus, USPS's arguments that this Court lacks subject matter jurisdiction over the Quasi-Contract claims based on the Tucker Act are moot.

## 2.        **Defendant's Claim That This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Equal Protection Claim is Also Moot**

USPS also argues that sovereign immunity has not been waived for Plaintiffs' equal protection claims. *See* Defs. Memo at p.8-9.  USPS then argues that even if sovereign immunity, has been waived, Plaintiffs equal protection claim for money damages is barred because there is no statute that provides for monetary damages. *Id*. at p. 9-10.

That USPS has waived sovereign immunity was addressed and rejected in Judge Facciola's March 3, 2007 Report and Recommendation, which was adopted in part by the Court in its Memorandum Opinion of September 7, 2007 (DKT 114).   Again, USPS refuses to recognize its capacious waiver of sovereign immunity in the Postal Reorganization Act of 1970. In denying USPS's motion to dismiss Plaintiffs' equal protection claims, the Court recognized that "[t]he clause in the Postal Reorganization Act indicating that Postal Service may 'sue or be sued in its official name' . . . is a capacious waiver of the sovereign immunity that the Postal Service could otherwise claim."  Report and Recommendation at 4-5 (March 6, 2007) (DKT 114).  "Thus, district courts may exercise jurisdiction over any type of claim for relief asserted against the Postal Service." *Id*. at 5 (emphasis added). *See also  Global Mail Limited v. USPS,* 142 F.3d 208 (4th Cir. 1998)(USPS waived its sovereign immunity and the "sue and be sued"

clause of the Postal Reorganization Act of 1970 creates a broad and presumptive waiver of sovereign immunity, including waiver of federally-created commercial torts such as actions under the Lanham Act); *FDIC v. Meyer*, 510 U.S. 471, 485 (1994) (finding waiver of sovereign immunity by FSLIC for constitutional tort because sue-and-be-sued provision is not limited to cases in which the FSLIC would be subjected to liability as a private person as provided by the FTCA).

The cases that USPS relies upon in its Motion are inapposite. First, USPS is not a party in any of those cases. Second, none of the cases address equal protection claims against a governmental agency that, like USPS, has generally waived sovereign immunity. *See, e.g.*, *U.S. v. Testan*, 424 U.S. 392, 400-402, 96 S. Ct. 948, 954-955 (1976) (finding that government attorneys did not have the right to back pay under the Classification Act or the Back Pay Act and also noting that sovereign immunity was not waived because, among other things, the claimants did "not rest their claims upon a contract" and were not "suing for money improperly exacted or retained."); *Keene Corp. v. U.S.*, 700 F.2d 836 (2nd Cir. 1983) (finding that plaintiffs did not meet jurisdictional requirements under The Suits in Admiralty Act, The Public Vessels Act, and The Federal Tort Claims Act); *FDIC v. Meyer*, 510 U.S. 471, 114 S.Ct. 996 (1994) (finding that employee's claim against the FSLIC for wrongful discharge in violation of his due process rights could not be brought against Agency); *Mac'Voy v. Smithsonian Institution*, 757 F.Supp. 60, 69 (D.D.C. 1991) ( dismissing plaintiff's claims against the Smithsonian for unconstitutional takings of artwork without due process); USPS's Memo at 8-10.

In regard to USPS second argument – that Plaintiffs are required to cite a statutory vehicle for the recovery of monetary damages – USPS fails to cite any legal authority that such a proposition applies to the equal protection clause of the Fifth Amendment, or that it applies to

such a claim against USPS. As this Court noted previously in this case, a claim against the USPS in its own name is not a claim against the United States. *See* Memorandum Opinion and Order dated September 7, 2007 (DKT 128). Thus the arguments related to the Administrative Procedures Act, the Tucker Act, and the Federal Tort Claims Act, Defs Memo at p. 9-10, are inapposite.

In this case, monetary damages against USPS for its violation of the equal protection clause are appropriate under the Fifth Amendment to the United States Constitution and the "sue and be sued" clause of the PRA. *See also Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 396 (1971) ("It is well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."); *see also Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995) ("It has long been understood [that the equal protection clause] has been understood to provide a last-ditch protection against government action wholly impossible to relate to legitimate governmental objectives.").

**B.**     **The Undisputed Evidence Compels Judgment in Favor of Plaintiffs' Contractual Claims**

USPS's citations to the evidentiary record in support of its arguments to dismiss the contract claims are surprisingly sparse. That USPS is woefully out of touch with the wealth of facts that bear on the contract claims is readily revealed by review of Plaintiffs' Memo and the SUMF. In those two documents, Plaintiffs bring dozens of USPS letters, statements, and internal memoranda to bear on the contract claims; by contrast, USPS makes no comment or reference to any of these documents. Instead, USPS's entire argument is based on very brief citations to two depositions of former employees of Plaintiffs – Robert Hillegass, the former Vice President of Technical Operations for Neopost and Michael Alloca, the former President and Chief Executive

Officer of Ascom.  While these limited citations are informative, they are clearly not dispositive as both individuals have submitted affidavits detailing their Companies' work with USPS on the CMRSs, including both statements and conduct, that establish USPS had contractual agreements with each of the Companies to allow retention of the interest income.

While it is surprising that USPS completely ignores its own extensive documentary record, it is not surprising that USPS fails to offer any testimony from its current or former employees related to whether a contract for the development and operation of CMRSs was formed between USPS and the Plaintiffs.  As Plaintiffs noted in their Memorandum, in response to a Fed. R. Civ. P. 30(b)(6) deposition notice.  USPS failed to produce a witness to testify regarding the development of the CMRS system, USPS's communications with Plaintiffs regarding the development of CMRS, USPS's compensation of Plaintiffs for development of CMRS, USPS's decision not to develop CMRS itself, the benefits USPS derived from CMRS, and the 1978 Statement of Understanding with Pitney Bowes.  *See* Plfs Memo at p. 10; SUMF Exs. 69 and 70 thereto.  Thus, since USPS can provide no testimony from its current or former employees on the development of CMRSs by Plaintiffs, and it ignores the documentary evidence, the contract claims necessarily rise or fall solely on Plaintiffs' evidence.[1]

---

[1]     Defendant argues in a footnote that the contract is invalid because it fails to comply with the Statute of Frauds.  D.C. Code § 28-3502 (stating, in part, that "an action may not be brought . . . upon an agreement that is not to be performed within one year from the making thereof, unless the agreement . . . is in writing.")  This jurisdiction has interpreted the one-year provision narrowly, noting that "the statute applies only to those contracts whose performance could not possibly or conceivably be completed within one year." *Hodge v. Evans Financial Corp.*, 823 F.2d 559 561 (D.C. Cir. 1987) (citing 2 Corbin on Contracts § 445, at 542-43) ("It makes no difference how improbable it is that the condition will occur within a year; if there is any possibility that it may so happen, the statutory provision is not applicable.").  Here, it is not outside the realm of possibility that the contract at issue could be performed within a year.  For this reason alone, the Statute of Frauds does not apply.  *See Restatement (Second) of Contracts* § 130 (explaining that

1.     **Plaintiffs Have Presented Sufficient Evidence of an Express Contract Between Neopost and USPS**

The Court is respectfully referred to Plaintiffs' arguments in support of their express contract claims set forth in Plaintiffs' Memo.  *See* Plfs Memo at section IV(B)(2)(a).  USPS somehow did not foresee these straightforward arguments citing to the record evidence, as it has simply ignored them in its motion.   In summary, Fred Ganley, former Manager of Mail Classifications, and others, expressly offered Neopost a contract to develop a CMRS on the same terms and conditions under which Pitney Bowes was then operating its CMRS, and said terms are set forth in detail in the 1978 Statement of Understanding ("SOU").  *Id.*  Moreover, Mr. Ganley and others specifically offered the right to retain the interest from postage meter customers' trust accounts as consideration to Neopost for development and operation of CMRS. *Id.*   That Mr. Ganley had actual authority to enter into such contracts is confirmed by the testimony of Mr. Hillegass, the documentary evidence, *id.*, as well as the testimony of Wayne Wilkerson, who later assumed some of Mr. Ganley's duties.  *Id.* at pp. 13-14.

While USPS correctly notes that Plaintiffs claim the existence of two separate express contracts with Neopost, (Defs Memo at p. 13) USPS fails to understand the nature of the second express contract.   Plaintiffs do not contend that USPS entered into a contract to pay them compensation in consideration for the 1995 regulatory changes.   Instead, as set forth in section IV(B)(2)(b) of Plfs Memo, (*see* Plfs Memo at pp. 15-16) Wayne Wilkerson, USPS's lead Manager for postal meter manufacturer relations, approached Neil Mahlstedt, President of

---

even a lifetime employment contract is not within the Statute of Frauds because it could be fully performed within one year upon the employee's death within this period).

Neopost, in the mid-1990s, and requested that Neopost be the first meter manufacturer to implement the 1995 regulation changes.  Mr. Mahlstedt agreed on behalf of Neopost on the condition that USPS would treat Neopost and Pitney Bowes equally in regard to the loss of interest income.  *Id.* at pp. 15-16.  Mr. Wilkerson agreed on behalf of USPS and Neopost in fact implemented the 1995 regulation changes prior to all the other meter manufacturers.  *Id.*  USPS breached that express agreement when it compensated Pitney Bowes and refused to compensate Neopost.  Notably, USPS has not disputed any of these facts.

**2.      Alternatively, Neopost Has Presented Undisputed Evidence of an Implied-in-Fact Contract between Neopost and USPS**

USPS argues that because CMRS was regulated, and Plaintiffs admit that they followed those regulations, there can be no implied contract from performance.  Defs Memo at pp. 14-15.  Further, USPS claims that Plaintiffs cannot demonstrate any promise from USPS to show the required "mutual assent to contract" for implied-in-fact contracts, or that any person with authority to contract assented.  *Id.* at pp. 15-17.  Again, USPS ignores the abundance of evidence at the Parties' fingertips that support these claims.  As set forth in Plaintiffs' Memo, USPS does not deny that it encouraged and requested Plaintiffs to develop CMRSs, and that Mr. Fred Ganley referenced the SOU with Pitney Bowes in persuading Plaintiffs to enter the CMRS market, and that he specifically offered the right to retain the interest income as consideration for said agreement.  *Id.*  And USPS does not deny that Pitney Bowes' operation of the first CMRS was the model for the other meter manufacturers to follow, thereby supplying definite terms for the contract.  Indeed, the Acting Director of Mail Classification, Scott Hamels, wrote Neopost in 1988 and urged it to "implement" the SOU.  *See* Ex. 23 to SUMF.  And it is undisputed that USPS and Plaintiffs worked closely together to develop Plaintiffs' CMRSs.  Thus, the evidence in fact demonstrates mutual assent to contract and that Mr. Ganley, the USPS executive whose

conduct is relied upon to form the contract, possessed the authority, actual or implied, to contract with Plaintiffs.  *See* SUMF at ¶¶ 12-40.  The contract terms were definite, as supplied by the SOU and Pitney Bowes' prior conduct.  There can be no dispute that USPS thereafter accepted the services and that the circumstances were such that USPS was notified that Plaintiffs expected to retain the interest income in exchange for their efforts.

### 3. Plaintiffs Have Presented Undisputed Evidence of an Implied-in-Fact Contract Between Ascom and USPS

The facts that support the finding of an implied-in-fact contract between USPS and Ascom are set forth in detail at paragraphs 31-40 in the SUMF.  Again, USPS has chosen to simply ignore these facts in its brief.  As set forth in Plaintiffs' Memo, in the mid-1980s, Ascom developed a CMRS system in reliance on USPS's offer to allow meter companies to retain the interest income from the required trust accounts and that Ascom would be treated equally with Pitney Bowes in the CMRS market.  *See* Edmond Goggin Affidavit (hereinafter "Goggin Aff.") at ¶¶ 5-8, Ex. 31 to SUMF.

Ascom understood that Pitney Bowes had been operating its CMRS system since the late 1970s, that USPS desired a competitive and level playing field in the postage meter market, and that USPS desired other companies entering the CMRS market.  *Id.*  In order to develop Ascom's CMRS, Ascom hired NYNEX, a computer software firm, to develop the software necessary to run the TMS system.  NYNEX worked closely with USPS personnel, including Mr. Ganley, and Mr. Gardner, who worked for Mr. Ganley.  NYNEX worked with these and other USPS personnel for 9-12 months developing the CMRS, and sought and obtained approval from USPS for all hardware and software related to operation of the CMRS, including the hardware and software related to the customers' required advance deposits.  Goggin Aff. at ¶ 6, Ex. 31.

In 1988, USPS approved Ascom's TMS for distribution to customers.  Ascom understood from that approval that it was entitled to retain the interest income from customer advance deposits, and Ascom relied upon its ability to retain the interest income, among other things, in making the determination to go forward with the development and operation of its TMS.  Letter from R. Arvonio to T. Pistelli (Nov. 18, 1988), Ex. 33 to SUMF; Goggin Aff. at ¶ 7, Ex. 31 to SUMF.

USPS had always stated that it desired competition in the postage meter market and it attempted not to prefer one meter manufacturer over another in its policies.  In developing the CMRS, Ascom shared its plans, including the retention of the interest income with USPS, and USPS approved.  Goggin Aff. at ¶ 8, Ex. 31 to SUMF.

In reliance upon USPS's assurances that it would receive the interest on advance deposits, Ascom entered into a trust agreement pursuant to which, among other things, the Bank agreed to act as Trustee of CMRS customers' advance deposits and pursuant to which it was obligated to pay Ascom interest earned on the deposited funds.  Amended and Restated TMS Trust Agreement at ¶ 4 ("Interest on such investments shall inure to the benefit of Hasler.  The customer shall not be entitled to such interest."), Ex. 34 to SUMF.

Once Ascom began marketing TMS to its customers, it entered into agreements with its customers giving Ascom the right to retain the interest on the customer advance deposits.  Because every CMRS customer was required by Postal Regulations to make advance deposits for the purchase of postage, and said advance deposits were held in a trust account, Ascom entered into agreements giving it the right to retain the interest income with every one of its CMRS customers.  Goggin Aff. at ¶ 9, Ex. 31 to SUMF; TMS Postage Meter Rental Agreement

("Interest on such investments shall inure to the benefit of Hasler.  The customer shall not be entitled to such interest."), Ex. 35 to SUMF.[2]

These facts clearly establish the required material assent, unambiguous terms, and that USPS was on notice that Ascom expected to retain the interest income for its efforts.

### 4.    Plaintiffs Have Presented Undisputed Evidence That Establishes Their Quasi-Contract Claims

USPS claims that the quasi-contract claims (or implied-in-law contract claims) should be dismissed because Plaintiffs have not shown that USPS "enticed or otherwise caused" Plaintiffs to enter the CMRS market.  *See* Defs Memo at 25-26.  In perfunctory fashion, USPS cites excerpts from Mr. Hillegass' Affidavit, ignores the mountain of documentary evidence from its own files and the testimony of Plaintiffs' witnesses that it was engaged in efforts to entice Plaintiffs to enter the CMRS, and concludes that no quasi-contract need be imposed by the Court.  *Id.*

Plaintiffs contend that if this Court does not find that express or implied-in-fact contracts exist between the Parties, then the evidence supports the imposition of a quasi-contract.  The doctrine is equitable in nature and equity demands that USPS not be allowed to arrogate interest income that they knew the manufacturers were relying on as compensation for developing and operating CMRS.  *BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 56 F. Supp. 2d 14, 64 (D.D.C. 1999), *rev'd on other grounds,* 214 F.3d 168 (D.C. Cir.).

It is undisputed that USPS encouraged Plaintiffs to enter the market, that USPS referenced Pitney Bowes CMRS operation, and that USPS personnel specifically mentioned the

---

[2]    Just like Ascom, Neopost also entered into trust agreements and CMRS meter rental agreements, giving it the right to the interest on advance deposits, in reliance upon USPS's assurances.  Plfs Memo at 6; SUMF at ¶¶ 29-30, 37-38, Exs. 28-30, 34-35.

right to retain interest income to persuade Plaintiffs to develop a CMRS.  *See* SUMF at ¶¶ 12-37.

USPS has received, and continues to receive, all the benefits of CMRS – reduced manpower requirements, and more secure meters – without spending any money to develop the system. That it then arrogates the one source of steady income without justification is unfair and inequitable and justice requires this Court to redress that wrong through imposition of a quasi-contract.

### C.      Plaintiffs Have Presented Undisputed Evidence of Disparate Treatment

The evidentiary record supports Plaintiffs' claims for USPS's Unlawful Disparate Treatment (Count V of Ascom's Complaint) and Violation of its Duty to Treat Regulated Parties Equally (Count VII of Neopost's Complaint).  Plaintiffs should have been treated in the same manner as their similarly situated competitor Pitney Bowes — as USPS repeatedly promised Plaintiffs it would do — and be compensated for the losses arising from the promulgation of the 1995 Regulations.

USPS argues that because there was no SOU between Plaintiffs and USPS,  Plaintiffs and Pitney Bowes were not similarly situated for purposes of recovery under equal protection principles.  Defs Memo at 24-25.  That Plaintiffs and Pitney Bowes were similarly situated, however, is indisputable. All three meter companies spent substantial time, effort and capital developing and implementing their CMRS meters, worked closely with USPS to comply with all requirements and regulations, obtained approval for their meters from USPS, had agreements with USPS for the interest income, had those agreements breached, had their right to the interest income confiscated, and had their property taken without just compensation.  *See* Plfs Memo at 28-29.  That Plaintiffs did not execute a written SOU with USPS is immaterial.  As set forth in detail in Plaintiffs' Motion for Summary Judgment, USPS repeatedly referenced the SOU, and Pitney Bowes' performance, in its efforts to persuade Plaintiffs to develop CMRSs.  Thus, the

terms of the SOU, by those references, and the Parties' conduct, became the terms of the Agreements between USPS and Plaintiffs.[3]   *See* Plfs Memo at 11-12.   That USPS held USPS to the terms of the SOU is indisputable.   At his deposition, Stephen Kearney, the Treasurer of USPS at the time the new CMRS regulations were promulgated, reviewed the terms of the SOU during his deposition and agreed that Plaintiffs operated under the terms set forth in the SOU, just as Pitney Bowes did.   S. Kearney Depo. 73-88 (testifying that all of the meter manufacturers adhered to the terms set forth in the SOU); S. Kearney Depo. 55:7-9 ("My understanding is that they did operate under the set of rules and regulations [in regards to manufacturers' use of CMRS systems]);" S. Kearney Depo. 76:1-4 ("I knew they – all operated under the same authorization and regulations issued by the Postal Service, and I also knew they used the same type of cash management system."), Ex. 53 to SUMF.

In fact, USPS contemplated that the SOU would be the basis for its Agreements with other meter manufacturers while the SOU was being negotiated and then later when Plaintiffs were developing their CMRSs.   Letter from S. Hamel to M. Rapoport (Nov. 18, 1988) (noting that USPS has "repeatedly encouraged postage meter vendors to reach licensing agreements implementing the 1978 agreement" and asking about "the progress [Neopost] has made toward implementing the agreement."), Ex. 23 to SUMF.   *See also* ¶¶ 9-10, 19 of SUMF.   Accordingly, Plaintiffs and Pitney Bowes were "similarly situated" for purposes of Plaintiffs' equal protection claims and USPS has provided no rational basis for compensating Pitney Bowes and not

---

[3]       Notably, USPS now conveniently changes its position with respect to the SOU and argues that it is the SOU that differentiated Pitney Bowes from Plaintiffs, thereby entitling Pitney Bowes to compensation as opposed to Plaintiffs.   Nonetheless, in the Pitney Bowes litigation, USPS argued that the SOU was not a binding contract, and that USPS had no rights under it.   *See, e.g.,* USPS's Opposition to Pitney Bowes' Motion for Summary Judgment at 18-19.   That this was USPS's  argument demonstrates how disingenuous it is now being by now arguing that it is the SOU that precluded Plaintiffs and Pitney Bowes from being similarly situated.

Plaintiffs.  *See also, e.g.*, *Barrington Cove Limited Partnership v. Rhode Island Housing and Mortgage Company*, 246 F.3d 1, 8 (2001) (recognizing that the test for whether parties are similarly situated is "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent. . . .  [T]he relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands a like result.  Exact correlation is neither likely nor necessary, but the cases should be fair congeners.  In other words, apples should be compared to apples") (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004); *Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999) (stating that reasonableness is the touchstone as to whether parties are similarly situated and that "the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances)".

Accordingly, the inability of USPS to articulate any rational basis for distinguishing Pitney Bowes from Plaintiffs should compel the Court to declare that USPS acted unconstitutionally.  Three meter companies were similarly situated, followed the same set of guidelines, rules and regulations, experienced the same set of circumstances, but were treated absolutely differently.

Finally, USPS argues that Plaintiffs are not allowed to rely upon the July 30, 1999 Settlement between USPS and Pitney Bowes to support its disparate treatment claims because Fed. R. Evid. 408(a) prohibits the use of settlements to demonstrate liability.  *See* Defs Memo at 11-12.  Contrary to USPS's assertions, however, Fed. R. Evid. 408(a) does not preclude

Plaintiffs from relying upon the 1999 Settlement in this case. [4]  Plaintiffs are not relying upon the 1999 Settlement to argue that USPS's settlement with Pitney Bowes in and of itself proves fault and liability on the part of USPS.  Plaintiffs recognize that this would violate Fed. R. Evid. 408(a).  Instead, Plaintiffs' position is that by compensating Pitney Bowes with $51,750,000 for its losses associated with the promulgation of the 1995 Regulations, but refusing to pay Plaintiffs, USPS acted arbitrarily and discriminatorily, thereby breaching its constitutional obligation to treat parties equally.

Because Plaintiffs are not using the Settlement to establish USPS's liability in this case for the same claims at issue in the Pitney Bowes case, Fed. R. Evid. 408(a) is not implicated. *SEC v. Pentagon Capital Management*, No. 08 Civ. 3324 2010 WL 985205 (S.D.N.Y. March 17, 2010) (allowing settlements into evidence because they were not being used to establish liability of that same party in another lawsuit for the same claim).  In fact, the distinctions between the Pitney Bowes case and this one were noted in Judge Facciola's March 6, 2007 Report and Recommendation where he said "[o]bviously, Judge Urbina did not have to deal with whether the Postal Service settlement of the <u>Pitney Bowes</u> case violated the due process clause because the Postal Service did not settle with these Plaintiffs simultaneously."   Report and Recommendation at 11 (March 6, 2007) (DKT 114).  In situations like these, where information related to a settlement is offered for a purpose "other than the proof of liability for or invalidity

---

[4]      Fed. R. Evid. 408 states that "evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.  Evidence of conduct or statements made in compromise negotiations is likewise not admissible. However, this rule does not require the exclusion of any evidence otherwise admissible merely because it is presented in the course of compromise negotiations.  This rule does not require exclusion when the evidence is offered for a purpose other than the proof of liability for or invalidity of the claim or its amount, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

of the claim or its amount," USPS's arguments fail. *See, e.g., C&E Services, Inc. v. Ashland, Inc.*, 539 F.Supp.2d 316 (D.D.C. 2008) (admitting evidence of settlement agreement to prove element of claims); *B&B Investment Club v. Kleinert's Inc.*, 473 F.Supp. 787, 791 (E.D. Pa. 1979) ("[Rule 408] excludes evidence of a compromise only on the issue of the amount or validity of the claim which is the subject of the compromise. If the compromise negotiations are used for another purpose, they are not inadmissible."); *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F.Supp.2d 435, 440 (D.Del. 2007) (stating that restrictions of Rule 408 do not apply when compromise evidence is offered for a purpose other than to prove specific details of a negotiated claim).

The cases USPS relies upon do not support its argument that the USPS/Pitney Bowes Settlement can not be used as a basis of Plaintiffs' equal protection claims. *See Johnson v. Roberts*, C.A. No. 92-0052 (JHG), 92-0066 (JHG) 1996 WL 61774 (D.D.C. Feb. 5, 1996) (holding that no testimony concerning settlement would be admitted because it was highly prejudicial and the jury could infer liability from the fact of settlement); *C&E Services, Inc. v. Ashland, Inc.*, 539 F. Supp. 2d 316 (D.D.C. 2008) (evidence of settlement agreement between government and subcontractor was admissible to prove the subcontractor made misrepresentation upon which contractor relied); *SEC v. Pentagon Capital Management*, 2010 WL 985205 (S.D.N.Y. 2010) (allowing settlements into evidence because they were not being used to establish liability of that same party in another lawsuit for the same claim). *See In Re Subpoena Issued to Commodity Futures Trading Commission*, 370 F. Supp. 2d 201 (D.D.C. 2005) (ordering Commodity Futures Trading Commission to produce settlement documents in response to a subpoena).

**D.**     **Plaintiffs' Claim for an Unconstitutional Taking in Violation of the Fifth Amendment to The Constitution is Well Supported by the Evidence**

USPS begins its argument that no taking occurred in violation of the Fifth Amendment of the Constitution with the dubious contentions that Plaintiffs lost a "contingent right" to "future income" for "services not yet rendered to their customers." Defs Memo at pp. 19-20. USPS ignores the undisputed fact that the right to the interest generated on the customers' trust account was not contingent on any action or condition. As Plaintiffs have demonstrated, they had a contractual right to collect the interest income by way of their agreements with their customers. *See* Exs. 28, 30, 34, and 35 to SUMF. As for claims of "future income" for "services not yet rendered to their customers," USPS misunderstands Plaintiffs' contractual rights. These trust agreements between Plaintiffs and their customers were not contingent on any services rendered. *See* Postage on Call Deposit Trust Agreement at ¶ 6 ("The Renter shall not be entitled to any interest or other income earned by investment of the Deposits."), Ex. 28 to SUMF; Letter from A. Zeisler to K. Jacobs (Dec. 1, 1989) ("accumulated interest will be paid by the Trustee to [Neopost] on a monthly basis."), Ex. 29 to SUMF; Amended and Restated TMS Trust Agreement at ¶ 4 ("Interest on such investments shall inure to the benefit of Hasler. The customer shall not be entitled to such interest."), Ex. 34 to SUMF.

Notably, USPS simply ignores that the Supreme Court has repeatedly recognized that interest income is "private property" for purposes of the Takings Clause. *See Phillips v. Washington Legal Found.*, 524 U.S. 156 (1998); *see also Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162-164 (1980) (stating that "earnings of a fund are incidents of ownership of the fund itself and are property just as the fund is property itself"); *Washington Legal Found., v. Texas Equal Access to Justice Found.*, 94 F.3d 996, 1004 (5th Cir. 1996) (noting that "interest earned on a deposit of principal belongs to the owner of the principal").

Second, Defendant engages in a lengthy discussion of a taking under the regulatory, or "ad hoc" rubric when the Supreme Court has held that the taking of interest income is akin to a *per se* taking of private property and, therefore, automatically entitled to "just compensation." *Brown v. Legal Found of Washington*, 538 U.S. 216 (2003) (rejecting argument that the taking of interest income is more akin to an ad hoc regulatory taking requiring a determination whether the taking interfered with investment backed expectation). Defendant simply fails to address the per se taking that occurred.

However, even if an examination of the taking pursuant to the "ad hoc" taking line of cases was appropriate, the Defendant's argument still fails. The Defendant contends that a taking did not occur because the Plaintiffs continue to derive an economic benefit from their property because they still profit from their CMRS systems. In addition, according to Defendant, Plaintiffs could not have a reasonable investment backed expectation of future profits given the pervasiveness of government regulation of the postal industry. In support of its arguments, Defendant relies on cases involving licensing agreements with the United States Government and where the party alleging a taking retained some viable economic use for the property at issue. *Andrus v. Allard*, 444 U.S. 51 (1979); *American Pelagic Fishing Company v. United States*, 379 F.3d 1363 (Fed. Cir. 2004); *Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001). These cases are easily distinguishable from the instant matter.

In *Ardus v. Allard*, a collector and seller of bird artifacts argued that a constitutional taking occurred when a statute designed to protect endangered birds prohibited him from selling his collection. 444 U.S. at 55. In determining that a taking did not occur, the Supreme Court noted that while the plaintiff suffered a "significant reduction" in his business, the plaintiff could still derive an economic benefit from the artifacts by, for example, exhibiting them for an

admissions charge.  *Id.* at 65-66.  Moreover, *Ardus* is inapposite because it involved future profits, not interest income.  444 U.S. at 66.

Similarly, in *American Pelagic*, the plaintiff alleged a taking when the government revoked its license to fish in any U.S. fishery within the Exclusive Economic Zone in the Atlantic Ocean.  379 F.3d at 1369.  In deciding that a taking did not occur, the court noted that the government-issued license expressly provided that it could be revoked at any time, *Id.* at 1374, and that the plaintiff still possessed some economically viable options for the property's use.  *Id.* at 1369; *see also Rith Energy Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001) (deciding that a taking did not occur because the government-issued mining license was subject to environmental standards and could be cancelled at anytime and the plaintiff was actually able to profit from the mining license despite the revocation).

Unlike plaintiffs in the above cases, Plaintiffs in the instant matter are no longer able to derive any economic use from the property at issue – the interest income.  And the interest income is the property to be measured for "economic use," not the CMRS.  While it is true that "mere diminution in the value of property . . . is insufficient to demonstrate a taking," *Concrete Pipe Prods., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 645 (1993), Plaintiffs' right to the interest income was not merely diminished in value, it was completely extinguished by the 1995 CMRS regulations.  In addition, unlike in American Pelagic and Rith Energy, the instant matter does not involve contracts with the government, in the form of licenses or permits, but rather private contracts between private parties.  For these reasons, the cases relied upon by Defendant are not persuasive.

The instant matter is more analogous to *Huntleigh USA Corp. v. United States*, 63 Fed.Cl. 440 (Fed. Cl. 2005).  In *Huntleigh*, a private security company, which had private contracts with

airlines to provide passenger screening services, alleged that the government effected a taking when it federalized airport security. 63 Fed. Cl. at 441. As in this case, the government in *Huntleigh*, citing *American Pelagic*, argued that the plaintiff lacked a property interest under the Fifth Amendment because of the "pervasive regulatory dominance" over the airline industry. *Id.* at 446. The government also argued that the plaintiff continued to have some economic use for its business because plaintiff was free to engage in screening activities where permitted by law. *Id.* at 447. The court disagreed, noting that while *American Pelagic* involved government issued licenses, *Huntleigh*, as in the instant matter, involved private contracts. *Id.* Furthermore, the court agreed that mere participation in a heavily regulated industry does not preclude a plaintiff from ever prevailing on a takings claim and noted that the plaintiff's property interest was "now completely in the hands of the federal government." *Id.* at 447-449.

As in *Huntleigh*, the Defendant's arguments that the Plaintiffs have failed to establish a violation of the Takings Clause should be rejected. The Defendant's 1995 regulatory changes effectively rendered thousands of private contractual arrangements between Plaintiffs and their customers worthless. The value in those contracts – the interest income – was appropriated by the Defendant for its own use. Plaintiffs' participation in a regulated industry does not allow the USPS to take actions in violation of the Takings Clause. Because the Supreme Court has held that interest income is private property, a taking of this property is entitled to a "just compensation" which Plaintiffs have yet to receive. (The matter of "just compensation" is not the subject of the pending motions. The parties are addressing only liability for the claims at this stage and have left the issue of damages for subsequent proceedings.)

Date:   June 25, 2010                    Respectfully submitted,


                                         /s/ Benjamin S. Boyd
                                         Benjamin S. Boyd (Bar # 413698)
                                         Michelle Schaefer (Bar # 478773)

                                         DLA PIPER LLP (US)
                                         500 8th Street, N.W.
                                         Washington, D.C.  20004
                                         Telephone:  202-799-4000
                                         Facsimile:   202-799-5000
                                         benjamin.boyd@dlapiper.com
                                         michelle.schaefer@dlapiper.com

                                         *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June, 2010, I caused a copy of Plaintiffs'
Opposition to Defendants Motion to Dismiss and Motion for Summary Judgment to be served by
ECF Filing to:

> Darrell Valdez
> United States Attorney's Office
> 501 3rd Street, NW
> Washington, DC 20001

> /s/ Benjamin S. Boyd
> Benjamin S. Boyd (Bar # 413698 )
> Michelle Schaefer (Bar # 478773  )
> DLA PIPER LLP (US)
> 500 8th Street, N.W.
> Washington, D.C.  20004
> Telephone:  202-799-4000
> Facsimile:   202-799-5000
> benjamin.boyd@dlapiper.com
> michelle.schaefer@dlapiper.com
> syma.mirza@dlapiper.com

> *Attorneys for Plaintiffs*