UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ASCOM HASLER MAILING ) | |
| SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 00-1401 (PLF) |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| NEOPOST, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 00-2089 (PLF) |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

OPINION

These consolidated cases are before the Court on the parties' objections to the

report and recommendation of Magistrate Judge John M. Facciola dated February 3, 2011.  In

that report and recommendation, Magistrate Judge Facciola recommended (1) that plaintiffs'

motion for summary judgment be granted on plaintiffs' contract claim and that defendant's

motion for summary judgment be denied on that claim; (2) that defendant's motion to dismiss

and the parties' cross-motions for summary judgment be denied as moot on plaintiffs' remaining

claims; and (3) that defendant's motion to strike certain affidavits submitted in support of

plaintiffs' motion for summary judgment be denied as moot.  See Ascom Hasler Mailing Sys.

Inc. v. USPS ("R&R"), Civil Action Nos. 00-1401 & 00-2089, 2011 WL 1044480, at *5 (D.D.C.

Feb. 3, 2011).

Rule 72(b) of the Federal Rules of Civil Procedure authorizes the referral of

dispositive motions to a magistrate judge for a report and recommendation.  When a party files

written objections to any part of the magistrate judge's recommendation, the Court considers

de novo those portions of the recommendation to which objections have been made, and "may

accept, reject, or modify the recommended decision; receive further evidence; or return the

matter to the magistrate judge."  FED. R. CIV. P. 72(b)(3).  The parties each have filed objections

to Magistrate Judge Facciola's report and recommendation, and briefing on those objections now

is complete.  Upon consideration of the parties' papers, the relevant legal authorities, and the

entire record in this case, the Court will reject Magistrate Judge Facciola's recommendations;

will deny in part, deny as moot in part, and grant in part defendant's motion to dismiss; will deny

defendant's motion to strike; and will deny the parties' cross-motions for summary judgment.[1]

---

[1]        The papers reviewed in connection with the pending objections and motions
include: defendant's motion to dismiss and for summary judgment ("DMSJ") [Dkt. Nos. 158,
162]; defendant's statement of material facts not in genuine dispute ("DSMF") [Dkt. No. 158-1];
plaintiffs' opposition to defendant's motion to dismiss and motion for summary judgment ("Opp.
to DMSJ") [Dkt. No. 165]; defendant's reply to plaintiffs' opposition to defendant's motion to
dismiss and motion for summary judgment ("DMSJ Reply") [Dkt. No. 171]; plaintiffs' motion
for summary judgment ("PMSJ") [Dkt. No. 159]; plaintiffs' statement of undisputed material
facts ("PSMF") [Dkt. No. 159-2]; defendant's opposition to plaintiffs' motion for summary
judgment ("Opp. to PMSJ") [Dkt. No. 166]; defendant's statement of genuine issues and
response to plaintiffs' statement of material facts not in dispute ("Response to PSMF") [Dkt.
No. 166-1]; plaintiffs' reply to defendant's opposition to plaintiffs' motion for summary
judgment ("PMSJ Reply") [Dkt. No. 172]; defendant's motion to strike plaintiffs' affidavits in
support of plaintiffs' motion for summary judgment ("Mot. to Strike") [Dkt. No. 164]; plaintiffs'
opposition to defendant's motion to strike plaintiffs' affidavits in support of plaintiffs' motion
for summary judgment ("Opp. to Mot. to Strike") [Dkt. No. 167]; defendant's reply to plaintiffs'
opposition to defendant's motion to strike plaintiffs' affidavits in support of plaintiffs' motion
for summary judgment ("Reply to Opp. to Mot. to Strike") [Dkt. No. 174]; defendant's

2

## I. BACKGROUND

Magistrate Judge Facciola previously has described the factual and procedural background on this case.  See, e.g., R&R, 2011 WL 1044480, at *1-2; see also Ascom Hasler Mailing Sys., Inc. v. USPS, Civil Action Nos. 00-1401 & 00-2089, 2010 WL 4116858, at *1 (D.D.C. Oct. 19, 2010); Ascom Hasler Mailing Sys., Inc. v. USPS, Civil Action Nos. 00-1401 & 00-2089, 2007 WL 724896, at *1-2 (D.D.C. 2007).  The Court therefore will limit its discussion accordingly and will draw largely from Magistrate Judge Facciola's prior decisions.

In the 1960s, Pitney Bowes invented and patented the Computerized Remote Meter Resetting System ("CMRS").  R&R, 2011 WL 1044480, at *1.  Marketed to the public under the trade name "Postage by Phone," this CMRS system "permits customers to use their phones to purchase more postage [for their postage meter] without having to take the meter to the nearest post office to have it reset."  Ascom Hasler Mailing Sys., Inc. v. USPS, 2007 WL 724896, at *1.

---

objections to Magistrate Judge Facciola's report and recommendation ("Def. Objections") [Dkt. No. 183]; plaintiffs' opposition to defendant's objections to Magistrate Judge Facciola's report and recommendation ("Opp. to Def. Objections") [Dkt. No. 185]; defendant's reply to plaintiffs' objections to Magistrate Judge Facciola's report and recommendation ("Reply to Opp. to Def. Objections") [Dkt. No. 187]; plaintiffs' objections to Magistrate Judge Facciola's report and recommendation ("Pls. Objections") [Dkt. No. 182]; defendant's reply to plaintiffs' objection to Magistrate Judge Facciola's report and recommendation ("Opp. to Pls. Objections") [Dkt. No. 184]; and plaintiffs' reply to defendant's opposition to plaintiffs' objection to Magistrate Judge Facciola's report and recommendation ("Reply to Opp. to Pls. Objections") [Dkt. No. 186].  The Court also reviewed the transcript of the November 5, 2010 motions hearing before Magistrate Judge Facciola ("Tr.") [Dkt. No. 180].

This Court consolidated Civil Action Nos. 00-1401 and 00-2089 on September 2, 2004. As in Magistrate Judge Facciola's report and recommendation, all docket references in this Opinion are to Civil Action No. 00-2089.

In 1978, defendant, the United States Postal Service ("USPS"), and Pitney Bowes entered into a Statement of Understanding ("SOU") that gave Pitney Bowes the right to operate the new CMRS system.  R&R, 2011 WL 1044480, at *1.  Later, USPS authorized plaintiffs Ascom Hasler Mailing Systems, Inc. ("Ascom") and Neopost, Inc., corporations that are competitors of Pitney Bowes, to operate their own version of this CMRS system as well.  Id.[2]

Under the CMRS system, "customers advanced payments for postage" to meter resetting companies like Pitney Bowes, Ascom, and Neopost.  Ascom Hasler Mailing Sys., Inc. v. USPS, 2007 WL 724896, at *1.  As a result, this CMRS system provided a significant financial advantage to these meter resetting companies.  See id.  As Magistrate Judge Facciola explained:

> [Customers'] money went first to the meter resetting companies' lockbox banks and from there to the companies' trustee banks. The funds remained with the trustee banks until the customer actually used the postage it had purchased for the postage meter. At that point, the funds went from the appropriate trustee bank to the Postal Service.  During the interval between receipt of the advance payment from the customer and the transmittal of those funds to the Postal Service, the funds in the meter resetting companies' trustee accounts earned interest, which the meter resetting companies kept.  It was hardly small change; the interest amounted to millions of dollars a year.

R&R, 2011 WL 1044480, at *1.

This process changed in 1995 when USPS promulgated new regulations governing the meter resetting system.  R&R, 2011 WL 1044480, at *1.  The 1995 regulations

---

[2]      At the time that Ascom and Neopost filed their complaints in this Court, the two companies were unaffiliated.  R&R, 2011 WL 1044480, at *1 n.3.  In 2011, however, Neopost purchased Ascom.  Id.  Since the time of that purchase, Neopost and Ascom have continued "to operate as separate companies, although under common ownership."  Id.

4

required that customers "send their advance payments directly to the Postal Service for ultimate transmittal to the United States Treasury.  As a result, the meter resetting companies could no longer collect the interest on their customers' advance deposits."  Id.  Compare 39 C.F.R. § 501.15(d) (Under the 1995 regulations, a CMRS customer must submit deposits "to the Postal Service's designated bank account."), with 44 FED. REG. 21,015, at 21,017 (Apr. 9, 1979) (Before the promulgation of the 1995 regulations, a CMRS customer would submit an advance deposit to a trustee bank that then would be wired to the Postal Service Federal Reserve Bank Account following a transaction.).

Two years after the new regulations went into effect, on December 19, 1997, Pitney Bowes sued USPS, alleging that USPS, "through the promulgation of [the 1995] regulations, breached an agreement with Pitney Bowes regarding interest income from funds deposited by postage meter companies." Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d 15, 17 (D.D.C. 1998).  Among other things, Pitney Bowes claimed that USPS "unjustly enriched itself at the expense of Pitney Bowes and its CMRS customers"; that USPS "through the promulgation of the CMRS regulations, breached the 1978 [SOU] and related agreements, upon which Pitney Bowes justifiably relied"; that USPS "wrongfully appropriated monies, payable to Pitney Bowes pursuant to contractual arrangements between Pitney Bowes and its CMRS customers"; and that USPS' "actions in promulgating the [1995] CMRS regulations and breaching the contractual arrangement constituted an unconstitutional taking under the Fifth Amendment." Id. at 19.

That case was assigned to Judge Urbina.  In 1998, Judge Urbina issued an opinion in which he denied cross-motions for summary judgment, concluding, among other things, that there were genuine issues of material fact. Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d at 25.

Regarding Pitney Bowes' contract claim and its Fifth Amendment takings claim, Judge Urbina concluded: "[T]he factual record requires further development for a determination of whether a contract existed and, if so, certain of its terms.  Further, [the] factual record requires further development for a determination of Pitney Bowes's reasonable, investment-backed expectations.  Thus, . . . summary judgment is not appropriate at this juncture."  Id.  Shortly thereafter, in 1999, that case settled.  See R&R, 2011 WL 1044480, at *2.

In 2000, Ascom and Neopost filed similar suits against USPS arising out of USPS' promulgation of the 1995 regulations.  See generally Ascom Compl.; Neopost Compl.  The complaints of Ascom and Neopost are substantively identical, making the same eight claims against USPS:

> (1) USPS' actions constitute a taking of plaintiffs' private property for public use without just compensation in violation of the Fifth Amendment to the United States Constitution.  Ascom Compl. ¶¶ 52-56; Neopost Compl. ¶¶ 49-53.
>
> (2) USPS unjustly enriched itself at plaintiffs' expense.  Ascom Compl. ¶¶ 57-59; Neopost Compl. ¶¶ 54-56.
>
> (3) USPS breached the terms of its express, implied, or quasi-contractual arrangements with plaintiffs.  Ascom Compl. ¶¶ 60-64; Neopost Compl. ¶¶ 57-60.
>
> (4) Plaintiffs were third-party beneficiaries of the 1978 SOU between Pitney Bowes and USPS.  Ascom Compl. ¶¶ 65-69; Neopost Compl. ¶¶ 61-65.
>
> (5) By compensating Pitney Bowes but not plaintiffs, USPS breached its constitutional obligation to treat similarly situated parties equally.  Ascom Compl. ¶¶ 70-72; Neopost Compl. ¶¶ 66-69.

(6) Plaintiffs relied to their detriment on USPS' promise that they would be permitted to keep interest, and they are now entitled to it. Ascom Compl. ¶¶ 73-76; Neopost Compl. ¶¶ 70-72.

(7) USPS violated a duty to treat regulated parties equally in compensating Pitney Bowes but not plaintiffs.  Ascom Compl. ¶¶ 77-79; Neopost Compl. ¶¶ 73-75.

(8) Plaintiffs are entitled to recovery in *quantum meruit*.  Ascom Compl. ¶¶ 80-82; Neopost Compl. ¶¶ 76-79.

Shortly after plaintiffs' filed their complaints, USPS moved to dismiss all eight claims on the ground that each failed to state a claim upon which relief could be granted; USPS also asserted that this Court lacked jurisdiction over this case.  See Ascom Hasler Mailing Sys., Inc. v. USPS, 2007 WL 724896, at *2.  On March 6, 2007, Magistrate Judge Facciola issued a memorandum opinion recommending that USPS' motion to dismiss be denied except as to plaintiffs' fourth claim, the third-party beneficiary claim, on which he recommended that USPS' motion be granted.  Id. at *7.  Both sides filed objections to that memorandum opinion.

On September 27, 2007, the Court issued a Memorandum Opinion and Order resolving the parties' objections.  See generally Memorandum Opinion and Order, Sept. 27, 2007 [Dkt. No. 95].  First, regarding USPS' jurisdictional arguments, the Court held: "Congress has waived sovereign immunity via the 'sue and be sued' clause of the Postal Reorganization Act, and neither the Contract Disputes Act nor the Tucker Act deprive this Court of jurisdiction."  Id. at 6.  The Court then dismissed plaintiffs' third-party beneficiary claim, but denied USPS' motion to dismiss regarding the other seven claims in plaintiffs' complaint.  Id. at 6-7.

On June 4, 2010, the parties filed cross-motions for summary judgment; USPS also filed a motion to dismiss certain claims for lack of subject matter jurisdiction or for failure to state a claim.  And in the course of briefing the cross-motions, on June 21, 2010, USPS filed a motion to strike certain affidavits that plaintiffs rely upon in their motion for summary judgment. Magistrate Judge Facciola held a motions hearing on November 5, 2010, and he issued his report and recommendation on those four motions on February 3, 2011.

## II.  FEBRUARY 3, 2011 REPORT AND RECOMMENDATION

In his report and recommendation, Magistrate Judge Facciola recommended that plaintiffs' motion for summary judgment be granted on the contract claim and that USPS' motion for summary judgment be denied on that claim.  R&R, 2011 WL 1044480, at *5.  He further recommended that USPS' motion to dismiss and the parties' cross-motions for summary judgment be denied as moot on the remaining claims.  Id.  Finally, he recommended that USPS' motion to strike be denied as moot because he avoided relying on any of the objected-to affidavits in arriving at the conclusions in his report and recommendation.  Id.

In his analysis, Magistrate Judge Facciola stated that "[t]he central dispute between the parties is whether there came into existence a contract from which would flow an obligation to continue to pay the plaintiffs the interest as long as they continued to permit USPS' customers to use their meter resetting systems."  R&R, 2011 WL 1044480, at *2.  Magistrate Judge Facciola then focused on what he considered to be four undisputed material facts in the record.  He stated:

Discounting the parties' characterizations, I do not see any dispute as to the following material facts:

1.  After the 1978 SOU, USPS desired to encourage competition between Pitney Bowes and its competitors in the meter resetting business in the interest of having a level playing field.

2.  The desire to foster competition in this manner led USPS employees to inquire when Neopost would develop its competing product.

3.  During conversations between Neopost officials and USPS officials, the latter referred to Neopost's capability to generate the same income stream as Pitney Bowes was generating and indicated that Neopost would be treated as Pitney Bowes was treated.

4.  Neopost expended substantial resources to bring its system on line.

R&R, 2011 WL 1044480, at *2-3.

In view of those four undisputed material facts, Magistrate Judge Facciola concluded that USPS entered into separate contracts with each plaintiff, that is, Ascom and Neopost.  R&R, 2011 WL 1044480, at *3-4.  He further concluded that there was no fair argument that the contracts were not definite in their duration and terms: the contracts' "duration and terms were simplicity itself — plaintiffs would be treated the same as Pitney Bowes with reference to Pitney Bowes' capture of the interest on customers' accounts for as long as Pitney Bowes captured that interest.  No more no less."  Id.  And finally, he concluded that there was "no genuine issue of material fact that the powers possessed by the [USPS] official with whom plaintiffs dealt when they made the agreement to develop the system, Fred Ganley, included authority over all regulations and compliance issues pertaining to meter resetting systems and new product development."  Id.  According to Magistrate Judge Facciola, the nature of Mr.

9

Ganley's duties required the conclusion that Mr. Ganley had implied actual authority to bind

USPS to contracts with plaintiffs.  Id.  Consequently, Magistrate Judge Facciola recommended

that plaintiffs' motion for summary judgment be granted on the contract claim.

Having found the existence of contracts with clear terms, Magistrate Judge

Facciola then recommended denying as moot USPS' motion to dismiss, which does not pertain

to the contract claim, and recommended denying the parties' cross-motions for summary

judgment on the remaining claims.  R&R, 2011 WL 1044480, at *5.  Furthermore, because he

did not rely on any of the plaintiffs' affidavits that were objected to by USPS in arriving at his

conclusion that the parties entered into contracts, he recommended denying as moot USPS'

motion to strike.  Id.

Both sides filed timely objections to Magistrate Judge Facciola's report and

recommendation.  Plaintiffs' objection is a limited one.  As they describe it, "[p]laintiffs do not

object to Judge Facciola's rulings on the pending motions, or his analysis of the claims, save for

one paragraph discussing the duration of the contract."  Pls. Objections at 1.  As discussed,

regarding the duration and terms of the contract, Magistrate Judge Facciola concluded: "Its

duration and terms were simplicity itself — plaintiffs would be treated the same as Pitney Bowes

with reference to Pitney Bowes' capture of the interest on customers' accounts *for as long as*

*Pitney Bowes captured that interest*.  No more no less."  R&R, 2011 WL 1044480, at *4

(emphasis added).  Plaintiffs believe that the italicized language is at odds with the substance of

Magistrate Judge Facciola's report and recommendation.  See Pls. Objections ¶¶ 1-3.  Plaintiffs

contend that if that italicized language is applied literally, then plaintiffs' right to collect interest

income would have terminated when the regulations changed in 1995 because Pitney Bowes was

no longer collecting interest at that time.  See id. ¶ 3.  According to plaintiffs, the more

appropriate conclusion on the duration of the contract, consistent with the substance of the report

and recommendation, is that the "contract . . . came into existence as a result of the parties'

actions [and] endures for as long as USPS customers continue to use [p]laintiffs' CMRS to pay

for postage."  Id. ¶ 7.

In contrast to plaintiffs' limited objection, USPS argues in its objections that

Magistrate Judge Facciola's report and recommendation should be rejected entirely, and that the

Court should dismiss certain claims and should grant summary judgment to USPS on all other

claims.  Def. Objections at 1-2.  USPS disputes Magistrate Judge Facciola's legal conclusion that

USPS entered into contracts with Ascom and Neopost.  See id.  USPS argues further that, to the

extent that there is any evidence of a contract between Neopost and USPS, there is no evidence

whatsoever in the record that USPS entered into a contract with Ascom.  See id. at 1-3.  Finally,

USPS argues that even if there were contracts with both Ascom and Neopost, there is no

evidence in the record of any breach of such contracts.  See id. at 12-13.

## III.  LEGAL STANDARD

### A.  Rule 72(b)

Both parties have served and filed specific written objections to the proposed

recommendations of Magistrate Judge Facciola regarding (1) USPS' motion to dismiss under

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure; (2) the parties'

cross-motions for summary judgment under Rule 56; and (3) USPS' motion to strike.  Where, as

here, a party files written objections to any part of a magistrate judge's recommendation, the

Court considers *de novo* those portions of the recommendation to which objections have been made, and "may accept, reject, or modify the recommended decision; receive further evidence; or return the matter to the magistrate judge." FED. R. CIV. P. 72(b)(3).

### B.  Rule 12(b)(1)

Federal courts are courts of limited jurisdiction, with the ability to hear only the cases entrusted to them by a grant of power contained in either the Constitution or in an act of Congress.  See, e.g., Beethoven.com LLC v. Librarian of Congress, 394 F.3d 939, 945 (D.C. Cir. 2005); Hunter v. District of Columbia, 384 F. Supp. 2d 257, 259 (D.D.C. 2005).  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the Court has jurisdiction.  See Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft, 339 F. Supp. 2d 68, 72 (D.D.C. 2004).  In determining whether to grant a motion to dismiss for lack of subject matter jurisdiction, the Court must construe the complaint in the plaintiff's favor and treat all well-pled allegations of fact as true.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).  The Court need not accept unsupported inferences or legal conclusions cast as factual allegations.  See Primax Recoveries, Inc. v. Lee, 260 F. Supp. 2d 43, 47 (D.D.C. 2003).  Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may dispose of the motion on the basis of the complaint alone, or it may consider materials beyond the pleadings "as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  Scolaro v. D.C. Board of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); see Lopez v. Council on American-Islamic Relations Action Network, Inc., 741 F. Supp. 2d 222, 231 (D.D.C. 2010).

12

*C.  Rule 12(b)(6)*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. at 555, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotations omitted).

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint."  Erickson v. Pardus, 551 U.S. at 94; see also Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  The complaint "is construed liberally in the [plaintiff's] favor, and [the Court should] grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged."  Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions.  See id. at 1276; Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

*D.  Rule 56*

Summary judgment may be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*); Washington Post Co. v. U.S. Department of Health & Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-moving party is required to provide evidence that would permit a reasonable jury to find

14

in its favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the

non-movant's evidence is "merely colorable" or "not significantly probative," summary

judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v.

Harris, 550 U.S. at 380 ("[W]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  To defeat a motion for

summary judgment, a plaintiff must have more than "a scintilla of evidence to support [its]

claims."  Freedman v. MCI Telecomms. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).  On a motion

for summary judgment, the Court must "eschew making credibility determinations or weighing

the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## IV.  DISCUSSION

The Court concludes that there are genuine issues of material fact regarding

whether a contract existed between USPS and Neopost, and whether a contract existed between

USPS and Ascom.  Furthermore, assuming that such contracts did come into existence, there are

genuine issues of material fact regarding the terms of such contracts, which then relates to

whether there were in fact breaches of such contracts.  Consequently, the Court rejects Magistrate

Judge Facciola's recommendation that judgment be entered for plaintiffs on the contract claim.

Because judgment is inappropriate on the contract claim, Magistrate Judge

Facciola's conclusion that the other claims are moot necessarily cannot stand.  The Court

therefore rejects Magistrate Judge Facciola's recommendation that USPS' motion to dismiss be

denied as moot, and that the parties' cross-motions for summary judgment on plaintiffs' six other

claims be denied as moot.

Finally, the Court rejects Magistrate Judge Facciola's recommendation that USPS' motion to strike be denied as moot.  Having considered this motion on the merits, however, it will be denied.

In the discussion that follows, the Court first addresses USPS' motion to dismiss. The Court then addresses the motion to strike and the parties' cross-motions for summary judgment.

### A.  USPS' Motion to Dismiss

USPS requests that the Court dismiss plaintiffs' contract implied-in-law claims under Rule 12(b)(1), and that the Court dismiss plaintiffs' equal protection claims under Rule 12(b)(1) or 12(b)(6).  See DMSJ at 4-10.  According to plaintiffs, USPS' arguments are moot because they were addressed and rejected by Magistrate Judge Facciola's March 6, 2007 memorandum opinion, which was adopted in relevant part by this Court on September 27, 2007. See Opp. to DMSJ at 4-6.  The Court finds that plaintiffs' reliance on those two prior decisions is misplaced, as neither resolved the issues that USPS has raised.  Having considered USPS' motion on its merits, the Court concludes that the motion to dismiss must be denied as to plaintiffs' contract implied-in-law claims, but granted as to plaintiffs' equal protection claims.

1.  Contract Implied-in-Law Claims — Counts 2, 3 in part, 6, and 8

USPS acknowledges that "the sue-and-be-sued provisions of the Postal Reorganization Act of 1970 provide original . . . jurisdiction in the United States District Courts," and further acknowledges that these provisions allow USPS "to sue or be sued in its capacity as a federal agency[.]"  DMSJ at 4.  USPS argues, however, that this Court lacks

jurisdiction over claims for contracts implied-in-law — including, according to USPS, plaintiffs'
claims for unjust enrichment, quasi-contract, and promissory estoppel — because the government
has not waived sovereign immunity as to such claims.  See DMSJ at 6-7.  According to USPS,
the "*sole* waiver of sovereign immunity of [USPS] for claims sounding in contract is the Tucker
Act," id. at 5 (emphasis added), and the Tucker Act does not waive such immunity for contracts
implied-in-law.  Id. at 5-6.

> USPS is an independent establishment of the executive branch of the government
of the United States.  39 U.S.C. § 201; see USPS v. Flamingo Indus. (USA) Ltd, 540 U.S. 736,
741 (2004).  As such, USPS enjoys sovereign immunity absent a waiver.  USPS v. Flamingo
Indus. (USA) Ltd., 540 U.S. at 744; see MB Fin. Group, Inc. v. USPS, 545 F.3d 814, 816 (9th
Cir. 2008).  As the Supreme Court has made clear, to determine whether a claim against USPS
can proceed, the Court must follow a two-step analysis: it must determine "first whether there is
a wavier of sovereign immunity for actions against the Postal Service," and, if there is, the Court
then must resolve whether the particular claim at issue "appl[ies] to an independent
establishment of the Executive Branch of the United States."  USPS v. Flamingo Indus. (USA)
Ltd., 540 U.S. at 743.

> USPS is wrong that the Tucker Act provides the sole applicable waiver of
sovereign immunity in this case.  Indeed, as this Court previously determined, "[i]t is clear that
the Tucker Act does not apply."  Memorandum Opinion and Order at 6, Sept. 27, 2007.  Rather,
the applicable waiver of sovereign immunity is the Postal Reorganization Act itself, which
waives the immunity of USPS by giving it the power "to sue and be used in its official name."
39 U.S.C. § 401(1); see USPS v. Flamingo Indus. (USA) Ltd., 540 U.S. at 744 ("The

sue-and-be-sued clause waives immunity, and makes the Postal Service amenable to suit, as well as to the incidents of judicial process.") (citing 39 U.S.C. § 401); Anselma Crossing, L.P. v. USPS, 637 F.3d 238, 240 (3d Cir. 2011) ("The government has waived the immunity of the USPS through the PRA, which gives the USPS the power to 'sue and be sued in its official name.'") (quoting 39 U.S.C. § 401(1)); id. at 242 n.6 ("[T]here is no question that the 'sue and be sued' clause of § 401(1) waives sovereign immunity."); cf. A & S Council Oil Co., Inc. v. Lader, 56 F.3d 234, 241 (D.C. Cir. 1995) (a sue-and-be-sued clause waives sovereign immunity) (citing FDIC v. Meyer, 510 U.S. 471, 475 (1994)).  This much was resolved by the Court's September 27, 2007 Memorandum Opinion and Order.  See Memorandum Opinion and Order at 2, Sept. 27, 2007 ("[T]he 'sue and be sued' clause in the Postal Reorganization Act is a capacious waiver of sovereign immunity.").

That, however, is only the first step in the analysis.  The Court must proceed to the second step, "look[ing] to the substantive claim" — in this case, a contract implied-in-law claim — "to see whether Congress intended it to apply to the government agency."  Anselma Crossing, L.P. v. USPS, 637 F.3d at 242 n.6.  That issue is distinct from the question whether sovereign immunity has been waived: "An absence of immunity does not result in liability if the substantive law in question is not intended to reach the federal entity."  USPS v. Flamingo Indus. (USA) Ltd., 540 U.S. at 744.  In other words, immunity is different from liability.  See id.; see also Licata v. USPS, 33 F.3d 259, 262 (3d Cir. 1994) (noting distinction between (1) subject matter jurisdiction, (2) sovereign immunity, and (3) whether a plaintiff has stated a valid cause of action).  Although consideration of this issue perhaps was implicit in Magistrate Judge Facciola's March 6, 2007 memorandum opinion, it was not specifically addressed.

A contract implied-in-law is one "'in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice.'" Lumbermens Mut. Cas. Co. v. United States, Nos. 2010-5086 & 2010-5087, 2011 WL 3319722, at *9 n.9 (Fed. Cir. Aug. 3, 2011) (quoting Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007)). Such an implied-in-law claim may include: unjust enrichment; quasi-contract; promissory estoppel; and *quantum meruit*.  See id.; Carter v. United States, 98 Fed. Cl. 632, 638-39 (Fed. Cl. 2011); Marcatante v. City of Chicago, Illinois, Nos. 10-2114, 10-2243, 10-2814 & 10-2921, 2011 WL 3690041, at *8 (7th Cir. Aug. 24, 2011).

The case law suggests doubt whether a contract implied-in-law claim can be made against the United States itself.  See, e.g., McCauley v. Thygerson, 732 F.2d 978, 980 (D.C. Cir. 1984) (noting that "[p]rinciples of promissory estoppel apply less broadly against the federal government than they might in situations involving only private actors," and that "'courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel'") (quoting Kizas v. Webster, 707 F.2d 524, 535 (D.C. Cir. 1983)); Sutton v. United States, 256 U.S. 575, 581 (1921) (expressly noting that it was not deciding the question "whether the doctrine [of unjust enrichment] *is ever applicable* to transactions with the government") (emphasis added). But USPS has not provided this Court with any persuasive authority for the proposition that such doubt should also exist for a claim against USPS — by statute a federal agency that has been given "a high degree of independence from other offices of the [g]overnment," USPS v. Flamingo Indus. (USA) Ltd., 540 U.S. at 746, including the express authority "to enter into and perform contracts" in its own name, as well as the authority to "execute instruments, and

19

determine the character of, and necessity for, its expenditures." 39 U.S.C. § 401(3). The Court

therefore concludes that a contract implied-in-law claim is intended to reach USPS. See, e.g.,

Beckman v. USPS, 79 F. Supp. 2d 394, 406 n.15 (S.D.N.Y. 2000) ("[T]here is nothing to prevent

this Court from hearing a claim of promissory estoppel *against the USPS*, provided there is some

basis for jurisdiction and the claim is properly pleaded.") (emphasis added); cf. Donovan v.

USPS, 530 F. Supp. 872, 892-94 (D.D.C. 1981) (resolving promissory estoppel claim against

USPS on its merits). Consequently, the Court will deny USPS' motion to dismiss plaintiffs'

contract implied-in-law claims.

2. Equal Protection Claims — Counts 5 and 7

USPS argues that plaintiffs' equal protection claims should be dismissed for lack

of subject matter jurisdiction or for failure to state a claim. See DMSJ at 8-10. Plaintiffs

respond that this argument previously was addressed and rejected, see Opp. to DMSJ at 5-6, but

also present substantive arguments that this Court has jurisdiction over plaintiffs' equal

protection claims, and that plaintiffs have a valid cause of action. See id. at 6-7.

In their argument on the merits, plaintiffs appear to provide two bases for their

equal protection claims. First, citing Bivens v. Six Unknown Named Agents of Federal Bureau

of Narcotics, 403 U.S. 388 (1971), plaintiffs argue that "monetary damages against USPS for its

violation of the equal protection clause are appropriate under the Fifth Amendment to the United

States Constitution and the 'sue and be sued' clause of the [Postal Reorganization Act]." Opp.

to DMSJ at 7. Second, plaintiffs argue that this Court "should draw upon its inherent

constitutional and remedial powers to infer a damage remedy against USPS" under the equal

protection clause.  PSMJ Reply at 22.  The Court concludes that the Supreme Court's decision in

FDIC v. Meyer, 510 U.S. 471 (1994), controls and requires that plaintiffs' equal protection

claims be dismissed.[3]

      As discussed, the Postal Reorganization Act waives the immunity of USPS by

giving it the power "to sue and be sued in its official name," 39 U.S.C. § 401(1), and under

Meyer that sue-and-be-sued clause waives USPS' sovereign immunity for constitutional claims

for money damages.  FDIC v. Meyer, 510 U.S. at 480-83.  Again, however, that does not end the

analysis.  Even though plaintiffs' constitutional claims fall within the sue-and-be-sued waiver,

the Court must determine "whether the source of substantive law upon which the claimant relies

provides an avenue for relief."  FDIC v. Meyer, 410 U.S. at 484; see USPS v. Flamingo Indus.

(USA) Ltd., 540 U.S. at 744; Anselma Crossing, L.P. v. USPS, 637 F.3d at 242 n.6.

      Plaintiffs cite Bivens, as well as this Court's inherent power, as the basis for

USPS' substantive liability for money damages under the equal protection clause.  But the

Supreme Court rejected that argument in Meyer itself.  Under Meyer, it is established that Bivens

— even in combination with a sue-and-be-sued clause — does not provide a cause of action for

money damages against federal agencies that allegedly violate the Constitution.  FDIC v. Meyer,

510 U.S. at 484-86.  Yet plaintiffs' claims are exactly that: requests for money damages against

USPS, a federal agency, for an alleged violation of the equal protection clause.[4]  And plaintiffs

---

    [3]     Contrary to what plaintiffs contend, this issue was not resolved by the Court's
September 27, 2007 Memorandum Opinion and Order.

    [4]     As a federal agency, USPS has a high degree of independence from other
government offices.  See USPS v. Flamingo Indus. (USA) Ltd., 540 U.S. at 746.  It nevertheless
"remains part of the [g]overnment," as an independent establishment of the executive branch.
Id.; see also id. at 743 ("While Congress waived the immunity of the Postal Service, Congress
did not strip it of its governmental status.").

have provided the Court with no persuasive reason to extend <u>Bivens</u> to their claims against

USPS.  Indeed, other courts have rejected such requests.  <u>See</u> <u>Tapia-Tapia v. Potter</u>, 322 F.3d

742, 746 (1st Cir. 2003) ("[T]he Supreme Court has refused to recognize a <u>Bivens</u> remedy

against federal agencies (even those for which sovereign immunity has been broadly waived). . . .

Hence, the appellant cannot rewardingly direct his constitutional claims *against the Postal*

*Service*.") (emphasis added); <u>Perereira v. USPS</u>, 964 F.2d 873, 877 (9th Cir. 1992) (holding that

"Postal Service cannot be sued for constitutional torts," a decision "consistent with decisions of

other circuits").  The Court concludes that extending <u>Bivens</u> in this case is unwarranted.  Such an

expansion of government liability is better left to Congress.  <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S.

at 486.

        USPS' motion to dismiss plaintiffs' equal protection claims is brought under

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  As discussed, the Court has

jurisdiction over plaintiffs' complaints, and USPS has waived sovereign immunity.

Consequently, dismissal under Rule 12(b)(1) is inappropriate.  Instead, the Court will dismiss

plaintiffs' equal protection claims under Rule 12(b)(6) for failure to state a claim.  <u>See</u> <u>FDIC v.

Meyer</u>, 510 U.S. at 486; <u>see</u>, <u>e.g.</u>, <u>McManamon v. Department of Veterans Affairs</u>, Civil Action

No. 11-2820, 2011 WL 3423346, at *2 (E.D.N.Y. Aug. 4, 2011) (dismissing under Rule 12(b)(6)

suit for damages for an alleged constitutional violation against a federal agency); <u>Jackson v.

Federal Bureau of Prisons</u>, 657 F. Supp. 2d 176, 179 (D.D.C. 2009) (same).[5]

---

[5]    Plaintiffs appear to make two claims under the equal protection clause.  <u>See</u>
Ascom ¶ ¶ 70-72 (Count 5); <u>id</u>. ¶¶ 77-79 (Count 7); Neopost Compl. ¶¶ 66-69 (Count 5); <u>id</u>.
¶¶ 73-75 (Count 7).  The language used in these claims suggests that they are different: whereas
Count 5 refers to "equal treatment under the law," Ascom Compl. ¶ 71; Neopost Compl. ¶ 68,
Count 7 refers to USPS' alleged "duty" to treat regulated parties equally.  Ascom Compl. ¶ 78;

### B.  Cross-Motions for Summary Judgment and USPS' Motion to Strike

In their summary judgment papers, plaintiffs contend that there are no genuine issues as to any material fact, and that they are entitled to judgment as a matter of law on all their claims.  In support of their motion, plaintiffs submit, among other things, affidavits from various former corporate officers of Ascom and Neopost in which these officers describe the nature of their interactions with USPS regarding the development of the CMRS system.

USPS has filed a motion for summary judgment of its own, but in support of its motion it relies primarily on plaintiffs' evidence.  USPS also has filed a motion to strike certain affidavits upon which plaintiffs rely in support of their motion for summary judgment.  In the motion to strike, USPS points to purported inconsistencies, if not direct contradictions, between prior deposition testimony of former Ascom and Neopost officers and the subsequent affidavits submitted by those officials in support of plaintiffs' motion for summary judgment.  In the view of USPS, such inconsistencies or contradictions are so significant that this Court should strike portions of certain affidavits.

---

Neopost Compl. at 21.  The parties' papers, however, treat the claims as the same, both arising under the equal protection clause.  See PMSJ at 27-29; DMSJ at 23-25; see also Opp. to DMSJ at 18 (referring to both counts as plaintiffs' "equal protection claims").  To the extent that these claims are the same, both are dismissed under Rule 12(b)(6).  To the extent that plaintiffs make a claim that USPS had a duty to treat regulated parties equally that is separate and apart from their claim under the equal protection clause, the parties do not address it; so neither will this Court.

USPS argues that all claims premised on the settlement agreement between USPS and Pitney Bowes should be dismissed for failure to state a claim because Rule 408 of the Federal Rules of Civil Procedure precludes the use of a settlement agreement to demonstrate liability.  See DMSJ at 11-12.  The settlement agreement between USPS and Pitney Bowes relates only to plaintiffs' equal protection claims.  Because the Court will dismiss these claims for the reasons just discussed, the Court need not address USPS' argument regarding the settlement agreement.  USPS' motion to dismiss on that ground will be denied as moot.

23

1.  USPS' Motion to Strike

In support of their motion for summary judgment, plaintiffs submitted affidavits from the following corporate officers of Ascom and Neopost: Michael Allocca, a former president and chief executive officer of Ascom; Edmond B. Goggin, a former vice president of Ascom; Neil Mahlstedt, a former president of Neopost; and Robert L. Hillegass, a former vice president of Neopost.  USPS requests that the Court strike portions of the affidavits of these four individuals because they contradict prior deposition testimony, see, e.g., Mot. to Strike at 5, 10, and because, in violation of Rule 56 of the Federal Rules of Civil Procedure, "the allegations contained in the affidavits are not based upon personal knowledge, do not set out facts that would be admissible in evidence, or [do not] show that the affiant is competent to testify on the matters set forth therein."  Id. at 1.  Plaintiffs respond that USPS has mischaracterized the record, and they argue that there is no basis for striking any affidavits.  See Opp. to Mot. to Strike at 2.

"The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion."  Canady v. Erbe Elektromedizin GmbH, 384 F. Supp. 2d 176, 180 (D.D.C. 2005).  The moving party "bears a heavy burden as courts generally disfavor motions to strike."  Id.  Under Rule 56, when affidavits or declarations are used to support or to oppose a motion for summary judgment, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  A court may strike all improper portions of an affidavit used to support or to oppose a motion for summary judgment, but in resolving a motion to strike a "court uses 'a scalpel, not a butcher knife.'"  Canady v. Erbe Elektromedizin GmbH, 384 F. Supp. 2d at 180 (quoting Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001)).  Exercising its discretion, the Court will deny USPS' motion to strike.

The Court agrees with USPS that the objectives of summary judgment would be seriously impaired if a party could create or resurrect factual disputes by filing self-serving affidavits that contradict prior sworn testimony.  See Pyramid Secs. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991); Thompson v. Islam, Civil Action No. 01-0585, 2005 WL 3262926, at *3 (D.D.C. July 29, 2005); Reetz v. Jackson, 176 F.R.D. 412, 414 (D.D.C. 1997). Thus, on summary judgment, a district court may strike or disregard a party's or its agent's affidavit if it contradicts his or her own prior sworn deposition testimony.  Mack v. United States, 814 F.2d 120, 124-25 (2d Cir. 1987); Thompson v. Islam, 2005 WL 3262926, at *3.

In this case, the Court does find inconsistencies between certain affidavits submitted by plaintiffs and prior deposition testimony, but these inconsistencies are not directly contradictory with respect to material facts in the case; rather, they go to the credibility and weight of plaintiffs' evidence.  They therefore do not warrant striking the affidavits at issue. Compare Flynn v. Veazey Constr. Corp., 474 F. Supp. 2d 24, 36 (D.D.C. 2006) (holding that inconsistency between deposition testimony and affidavit was insufficient to warrant striking the affidavit, but did "create[] an issue of credibility to be resolved by the fact finder") (internal quotations omitted), with Thompson v. Islam, 2005 WL 3262926, at *3 ("[A] party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment.") (internal quotations omitted) (alteration in original).

## 2.  Contract Claim — Count 3

In their complaints, Ascom and Neopost each allege the existence of either an express or an implied-in-fact contract with USPS.  An implied-in-fact contract has the same legal

effect as an express one.  <u>Novak v. Seiko Corp.</u>, 37 Fed. App'x 239, 243 (9th Cir. 2002).  The

only difference between the two "is the means by which the parties manifest their agreement."

<u>Id</u>. (internal quotations).  "In an express contract, the parties manifest their agreement by their

words, whether written or spoken," whereas "[i]n an implied-in-fact contract, the parties'

agreement is inferred, in whole or in part, from their conduct."  <u>Id</u>. (internal quotations omitted);

<u>see</u> <u>Brunner v. United States</u>, 70 Fed. Cl. 623, 626-27 (Fed. Cl. 2006) ("The difference between

an express and an implied-in-fact contract is that the lack of ambiguity in offer and acceptance,

. . . or meeting of the minds . . . is inferred as a fact, from conduct of the parties showing, in light

of the surrounding circumstances, their tacit understanding.") (internal quotations and citation

omitted).[6]

       The elements of an express and an implied-in-fact contract are the same.

<u>Goldings v. United States</u>, 98 Fed. Cl. 470, 479 (Fed. Cl. 2011) ("The elements of a binding

contract with the United States are identical for express and implied-in-fact contracts.").  Where,

as here, a party alleges the existence of a contract with USPS, a federal agency, that party must

establish the following elements: "a mutual intent to contract including offer, acceptance, and

consideration; and authority on the part of the government representative who entered or ratified

the agreement to bind [USPS] in contract."  <u>Hoag v. United States</u>, No. 11-4C, 2011 WL

2675963, at *7 (Fed. Cl. July 6, 2011) (internal quotations omitted); <u>see</u> <u>BioFunction, LLC v.</u>

<u>United States</u>, 92 Fed. Cl. 167, 172-73 (Fed. Cl. 2010).

---

[6]    As for the express contract claim, it is undisputed that the parties did not sign any
written agreement.

Magistrate Judge Facciola concluded that four undisputed facts establish that USPS entered into separate contracts with each plaintiff, Ascom and Neopost, because those facts show a mutual intent to contract.  See R&R, 2011 WL 1044480, at *2-3.  He further concluded that the USPS official with whom the plaintiffs' dealt, Fred Ganley, had the authority to bind USPS, thereby establishing all the required elements for a contract.  See id. at *3-4.

The problem with Magistrate Judge Facciola's conclusion is that it relied entirely on undisputed facts that pertained only to Neopost, not Ascom.  The record makes clear that Ascom's interactions with USPS were not the same as those of Neopost.  Compare PSMF ¶¶ 12-30 (describing Neopost and USPS interactions), and DSMF ¶¶ 6-25 (same), with PSMF ¶¶ 31-40 (describing Ascom and USPS interactions), and DSMF ¶¶ 26-32 (same).  Whereas Neopost alleges the existence of an express contract, an implied-in-fact contract, or both, Ascom acknowledges that there was no express contract and alleges the existence of an implied-in-fact contract only.  See Tr. at 32-33 ("[W]e do make an express contract claim in regards to Neopost . . . there is not, on behalf of Ascom . . . . [T]he express contract really goes to Neopost only."); see also Opp. to DMSJ at 9-13 (alleging existence of an express contract, an implied-in-fact contract, or both with Neopost, but alleging only an implied-in-fact contract with Ascom).  The Court therefore must analyze separately whether Neopost had a contract with USPS and whether Ascom had a contract with USPS.  Having done so, the Court concludes that summary judgment is inappropriate as to both plaintiffs.  While the facts alleged are different as to each plaintiff, there are genuine issues of material fact as to the contract with USPS that each maintains existed.

*a. Neopost.*  As discussed, Magistrate Judge Facciola did not see any dispute as to four material facts.  See R&R, 2011 WL 1044480, at *2-3.  From these four facts, he concluded

sk

that USPS and Neopost entered into a contract.  Id.  He further concluded that there was no

genuine issue of material fact that the authority of USPS official Fred Ganley extended to "all

regulations and compliance issues pertaining to meter resetting systems and new product

development."  Id. at *4.  And because binding the government contractually was an integral part

of Mr. Ganley's duties, Magistrate Judge Facciola concluded that Mr. Ganley had implied actual

authority to bind USPS to a contract with Neopost.  Id.

        In their objections, USPS disputes one of the four material facts upon which

Magistrate Judge Facciola relied to find the existence of a contract, and further disputes that Mr.

Ganley had the authority to bind the government.  See Def. Objections at 4-7.  Specifically,

Magistrate Judge Facciola found no dispute that "[d]uring conversations between Neopost

officials and USPS officials, the latter referred to Neopost's capability to generate the same

income stream as Pitney Bowes was generating and indicated that Neopost would be treated as

Pitney Bowes was treated."  R&R, 2011 WL 1044480, at *3.  In doing so, he relied on the

affidavit of Robert L. Hillegass, a former vice president of Neopost, where Mr. Hillegass stated:

> USPS management responsible for postage meter programs,
> Messrs. Ganley and [Gene] Gardner, were well aware of the cash
> management component of CMRS that gave [Pitney Bowes] the
> right to earn interest on the funds in its CMRS escrow accounts.
> Both Messrs. Ganley and Gardner used the revenue [Pitney Bowes]
> was earning from interest income as a selling point when they
> requested that Neopost develop a CMRS.
>
> I had many conversations with Messrs. Ganley and Gardner over
> the course of several years in which they would ask when Neopost
> was going to develop its own CMRS system.  Initially, I
> consistently replied that there were significant development costs
> and obstacles that needed to be addressed and overcome.  Disputes
> with [Pitney Bowes] related to patent licensing issues and the high
> costs associated with system development deterred Neopost from

> building its own CMRS meter for a number of years. *Both Mr.*
> *Ganley and Mr. Gardner continued to encourage development and*
> *again offered that Neopost would have the right to earn interest on*
> *customer accounts to recoup costs and earn a profit. Messrs.*
> *Ganley and Gardner also repeatedly stated that if Neopost*
> *developed a CMRS, Neopost would be treated the same as [Pitney*
> *Bowes] in regard to the CMRS market, and that USPS would not*
> *prefer one system over the other.*

PSMJ, Ex. 16, Affidavit of Robert L. Hillegass ("Hillegass Aff.") ¶¶ 9-10, June 2, 2010

(emphasis added); see R&R, 2011 WL 1044480, at *3 (citing Hillegass Aff. ¶¶ 9, 10).

Although USPS does not dispute that Mr. Ganley, Mr. Gardner, and Mr. Hillegas

had conversations about the development of a CMRS system, see Response to PSMF at 5-6;

PSMF ¶ 15; DSMF ¶¶ 7-8, USPS does dispute Mr. Hillegas' characterization of the nature of

those conversations as expressed in his affidavit. See Response to PSMF at 5-6. Specifically,

USPS argues that Mr. Hillegass' characterization in his affidavit of what was said by USPS

officials differs materially from what Mr. Hillegass stated in his deposition, where he described

USPS' statements as referring simply to an opportunity to earn profits from interest income that

was already permitted by the pre-1995 regulations. Id.; see DMSJ, Attachment 3, Deposition of

Robert Hillegass ("Hillegass Dep") at 89-93 (July 28, 2009).[7]

---

[7]     USPS references the following discussion in Mr. Hillegass' deposition:

> *A*: Gene Gardner worked for Fred Ganley, and Fred Ganley
> was the manager of rates and classifications, and the postage meter
> operation reported to him. . . . [I]t was mentioned [by Mr. Gardner
> and Mr. Ganley], in more than one occasion, there was money to
> be earned on the escrow account. . . . What [Mr. Gardner and Mr.
> Ganley] said was, Look at that [money to be earned on the escrow
> account] as an opportunity to earn money on your development to
> recapture your costs. . . .
>
> *Q*: Did the people at Neopost ever — were they already
> aware of the regulations that allowed for them to use trust accounts
> for customer funds?

USPS also asserts that even Mr. Hillegass' affidavit does not state that USPS said

Neopost "would be treated as Pitney Bowes was treated" regarding interest income.  R&R,

2011 WL 1044480, at *3.  Rather, he states that "Neopost would be treated the same as [Pitney

Bowes] *in regard to the CMRS market*, and that USPS would not prefer one system over the

other."  Hillegass Aff. ¶ 10 (emphasis added).  The Court agrees.  Furthermore, during his

deposition, Mr. Hillegas specifically was asked whether Mr. Gardner and Mr. Ganley said that

Neopost would be treated the same as Pitney Bowes, or whether they said that Neopost "could go

in the same program and earn revenue just like they[, that is, Pitney Bowes,] were?"  Hillegass

Dep. at 95.  There, Mr. Hillegas stated that Mr. Ganley and Mr. Gardner said: "Look at the

revenue [Pitney Bowes is] earning.  You have the same opportunity."  Id.

The Court concludes that what USPS officials said to Neopost officials and how

they said it are material facts in dispute relating to whether USPS in fact made an offer to

---

*A*: I'm sure they were. . . .

*Q*: [D]id [Mr. Gardner and Mr. Ganley] make any promises
to you or to Neopost — . . . .

*A*: I mean, the only thing they said is "Those revenues
[from the escrow account] will help offset some of your expenses."
. . . . [I]t was no surprise. . . .

*Q*: Okay.  So did they make any promise that they would
change anything from Neopost to make it easier for Neopost to
enter into the [CMRS] market?

*A*: No.  They referred to the same programs as Pitney
Bowes, same revenue.  "Pitney's earning a lot of revenue.  You
should look at yours."

Hillegass Dep. at 89-93.

Neopost and the terms of any such offer, as well as whether there was consideration and whether

there was a breach.  See Pitney Bowes v. USPS, 27 F. Supp. 2d at 24 (concluding that genuine

issues of material fact existed regarding whether Pitney Bowes and USPS entered into a contract

and finding that the parties "left important questions unanswered concerning the context of . . .

discussions and communications, the parties' intent and understanding, and the parties' course of

conduct regarding the CMRS"); see also Fifth Third Bank of W. Ohio v. United States, 52 Fed.

Cl. 264, 270 (Fed. Cl. 2002) ("A promise may be express or implied, but it is to be distinguished

from mere statements of intention, opinion, or prediction.") (quoting Cutler-Hammer, Inc. v.

United States, 441 F.2d 1179, 1182 (Ct. Cl. 1971) ("In general, the obligation of the

Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere

prediction or statement of opinion or intention."); RESTATEMENT (SECOND) OF CONTRACTS

§ 2 cmt. f (1981) ("A promise must be distinguished from a statement of opinion or a mere

prediction of future events.").  The Court therefore is unable to conclude that there are no

genuine issues of material fact regarding the essential elements of Neopost's contract claim.

As for the question of Mr. Ganley's authority, Magistrate Judge Facciola

concluded that Mr. Ganley's authority extended to "all regulations and compliance issues

pertaining to meter resetting systems and new product development."  R&R, 2011 WL 1044480,

at *4.  In reaching that conclusion, Magistrate Judge Facciola relied on Mr. Hillegass' affidavit in

which Mr. Hillegass stated:

> Mr. Ganley was in charge of USPS's relationship with all meter
> manufacturers, and all proposals, agreements, new product ideas,
> and deviations from Domestic Mail Manual . . . regulations had to
> be authorized and/or approved by him.  Mr. Ganley always held
> himself out to Neopost and the other meter manufacturers as the

> person with the authority to bind USPS in any agreement with the
> meter manufacturers and he regularly did so.  For example, Mr.
> Ganley was the USPS representative to whom Neopost submitted
> its CMRS meters for USPS authorization and approval and Mr.
> Ganley approved all CMRS meters for use. . . . Mr. Ganley also
> approved the relocation of Neopost's meter repair facility from
> Hayward, California to Tijuana, Mexico. . . . As Neopost expanded
> its meter population, Mr. Ganley was the USPS official who
> authorized increased numbers of CMRS meters.

Hillegass Aff. ¶ 4; see R&R, 2011 WL 1044480, at *4.

As an initial matter, USPS disputes the statement that Mr. Ganley "always held

himself out . . . as the person with the authority to bind USPS in any agreement with the meter

manufacturers[.]"  Response to PSMF at 4.  Whether Mr. Ganley did in fact hold himself out as

an official with such actual authority, however, is irrelevant: it goes to the issue of apparent

authority, and it is established that "apparent authority will not suffice to hold the [g]overnment

bound by the acts of its agents[.]"  Doe v. United States, 95 Fed. Cl. 546, 583 (Fed. Cl. 2010)

(internal quotations omitted); see also Jumah v. United States, 90 Fed. Cl. 603, 612 (Fed. Cl.

2009) ("[A]nyone entering into an arrangement with the [g]overnment takes the risk of having

accurately ascertained that he who purports to act for the government stays within the bounds of

his authority.") (internal quotations omitted); District of Columbia v. United States, 67 Fed. Cl.

292, 338 (Fed. Cl. 2005) ("[A] party contracting with the government is on constructive notice of

the limits of the [government agent's] authority, and cannot reasonably rely on representations to

the contrary.") (alteration in original).  Only actual authority, express or implied, can bind the

government.  Jumah v. United States, 90 Fed. Cl. at 612; see Doe v. United States, 95 Fed. Cl.

at 583.

The question therefore is whether Mr. Ganley had the implied actual authority to bind USPS to the alleged contract with Neopost, as Magistrate Judge Facciola concluded.  See R&R, 2011 WL 1044480, at *4-5.  "[I]mplied actual authority may exist only where contracting authority is an integral part of the duties assigned to the government employee."  BioFunction, LLC v. United States, 92 Fed. Cl. at 172; see Monument Realty LLC. v. Washington Metro. Area Transit Auth., 535 F. Supp. 2d 60, 71 (D.D.C. 2008).  "Contracting authority is 'integral' when an employee cannot perform [his or her] duties without it, and the authority is an essential or necessary part of the employee's occupation."  BioFunction, LLC v. United States, 92 Fed. Cl. at 172.  Thus, in order for a court to decide as a matter of law that an official had implied actual authority to bind the government, there necessarily can be no genuine issue of material fact as to what that official's job duties actually were.  See id.

Curiously, as plaintiffs point out, USPS puts forward no affirmative evidence regarding the nature of Mr. Ganley's job duties at USPS — neither reciting Mr. Ganley's job duties in an affidavit or declaration, nor presenting the testimony of USPS executives at deposition.  See PMSJ Reply at 15; see also Opp. to Def. Objections at 9 n.4.  Instead, USPS argues that plaintiffs have failed to put forward any evidence that Mr. Ganley did have contracting authority.  See Opp. to PMSJ at 18; DMSJ at 17-18; DMSJ Reply at 13-15.  But see Tr. at 46 (USPS' counsel suggesting during oral argument that "[t]he only person who had actual authority to bind the Postal Service for a money transaction was the Postmaster himself," and that "Mr. Ganley's function was purely to make sure that new postage meters comply with the regs," but providing no evidence in the record to this effect).[8]

---

[8]     If, as USPS contends, Mr. Ganley clearly lacked the actual authority to bind USPS to a contract with Neopost, USPS likely could have resolved this issue decisively by submitting an affidavit or declaration.  See, e.g., Pure Power!, Inc. v. United States, 70 Fed. Cl. 739, 743 (Fed. Cl. 2006) (in addressing an alleged contract claim, USPS established through declarations of agency officials that employee lacked actual authority to bind the agency).

By contrast, plaintiffs plainly have put forward evidence that *could* lead a finder of fact to conclude that Mr. Ganley had authority to bind USPS to a contract with Neopost.  But the Court finds that the facts leading to that conclusion are neither fully developed nor undisputed.  They therefore must be determined at trial.

Mr. Ganley was the general manager of the Business Systems Divisions of the Rates and Classification Department at USPS.  See PMSJ at 13; see also DMSJ, Ex. 3 at 28, Letter from J. Hughes to F. Ganley at 1, Oct. 22, 1990).  It is undisputed that Mr. Ganley "was in charge of USPS's relationship with all meter manufacturers, and all proposals, agreements, new product ideas, and deviations from the Domestic Mail Manual regulations had to be authorized and/or approved by him."  PSMF ¶ 14; Response to PSMF at 4; see also PMSJ Reply, Ex. 3, Hillegass Dep. at 89 (Mr. Ganley "was the manager of rates and classifications, and the postage meter operation reported to him.").[9]  But those facts alone do not compel the conclusion that Mr. Ganley had the implied actual authority to enter into the alleged contract with Neopost.

For the Court to conclude that Mr. Ganley had such contractual authority, the Court would have to find that the undisputed facts show that Mr. Ganley would not have been able to perform his job duties without the authority to contract — that is, that such authority was "integral" to his duties.  BioFunction, LLC v. United States, 92 Fed. Cl. at 173.  The undisputed facts discussed above make clear that Mr. Ganley had broad regulatory and compliance duties

_____

[9]    USPS states in its response to plaintiffs' statement of material facts that it moved to strike the quoted language in paragraph 14 of plaintiffs' statement of material facts.  See Response to PSMF at 4.  USPS is wrong.  The language in paragraph 14 comes directly from paragraph four of Mr. Hillegas' affidavit; although USPS moved to strike certain paragraphs from Mr. Hillegass' affidavit, paragraph four was not one of them.  See Mot. to Strike at 2 (challenging Hillegass Aff. ¶¶ 11, 22, 23, 24, 25).

34

relating to postage meter operation.  But those supervisory duties, including the ability to authorize and approve new products, do not necessarily require contractual authority.  Cf. Arakaki v. United States, 71 Fed. Cl. 509, 516 (Fed. Cl. 2006) ("An employee's duties in supervising or managing specific contractor activities or government functions may not carry the corresponding authority to enter into or modify existing contracts in the name of the government."); Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 63 (Fed. Cl. 2000) (Contractual authority "in no way can be considered an integral part of the duty of reviewing contractor compliance.") (internal quotations omitted).  Furthermore, the fact that Mr. Ganley "was in charge of USPS's relationship with all meter manufacturers," PSMF ¶ 14, also does not necessarily require contractual authority.  Cf. H. Landau & Co. v. United States, 20 Cl. Ct. 400, 402-05, 407 (Cl. Ct. 1990) (distinguishing responsibility of business development from contractual authority).

Plaintiffs contend, however, that Mr. Ganley's job duties extend further to certain responsibilities on the finance side of things — that is, financial approval and compensation relating to postage meter operation.  See PMSJ Reply at 15-16.  Such responsibilities certainly are relevant in determining whether Mr. Ganley could bind USPS to the alleged contract with Neopost.  See H. Landau & Co. v. United States, 20 Cl. Ct. at 407 (employee's business development job duties did not permit a finding of implied actual authority to bind agency to contract because, among other things, "[t]he only duty [the employee] had in connection with contract administration was to monitor special joint accounts and to *recommend* whether payments should be authorized to the credit of a contractor") (emphasis in original).  But the extent of Mr. Ganley's financial responsibilities is not clear on the present record.  Compare

PMSJ Reply at 16 (Mr. Ganley "had authority over financial aspects of CMRS with respect to communications and dealings with the meter manufacturers."), and id. (providing examples of "Rates and Classification Department's authority to bind USPS on financial aspects of CMRS"), with PSMJ, Ex. 65, Deposition of Wayne A. Wilkerson ("Wilkerson Dep.") at 78 (Aug. 6, 2008) (Wayne Wilkerson, Mr. Ganley's successor, describing Mr. Ganley's job duties as "[t]o interface with the meter manufacturers as far as the regulations and . . . to approve new products"), and id. at 78-79 (discussing approval of CMRS system as opposed to compensation for development of CMRS system), and Opp. to PMSJ at 18-19.  The nature and extent of Mr. Ganley's financial responsibilities for USPS, if any, bear on the question whether Mr. Ganley would have been able to perform his job without having contracting authority, but the relevant facts are both in dispute and not adequately developed.  At this stage, therefore, the Court cannot determine as a matter of law that Mr. Ganley had implied actual authority to bind USPS to the alleged contract with Neopost.

    b. *Ascom.*  In its objections to Magistrate Judge Facciola's report and recommendation, USPS argues that it was error for Magistrate Judge Facciola to rely on facts that pertained only to Neopost in concluding that there existed a contract between USPS and both Ascom and Neopost.  See Def. Objections at 2-3.  As USPS describes it:

> To support his finding of a contract, the only material facts that the Magistrate Judge relies upon are ambiguous conversations between Postal Service Employee Fred Ganley and Neopost employee Robert Hillegass. . . . There is no evidence of any similar conversations, or of any conversations at all, between any Postal Service employee and any **Ascom** employee.  Nor were they any allegations of such conversations.

Id. at 2 (emphasis in original).  Plaintiffs disagree, asserting that the facts relied upon by

Magistrate Judge Facciola apply equally to Ascom as they do to Neopost.  Opp. to Def.

Objections at 2-5.

It appears from the record that plaintiffs' allegation of a contract between Ascom

and USPS relies entirely on the affidavit of one of Ascom's former corporate officers,

Edmond B. Goggin.  See PMSJ Reply at 19-20; id., Ex. 31, Affidavit of Edmond B. Goggin

("Goggin Aff.") ¶¶ 5-8 (June 2, 2010).  In their summary judgment papers, plaintiffs state that

Mr. Goggin's affidavit "is sufficient to establish that an implied-in-fact contract for development

and operation of Ascom's CMRS was formed with USPS."  PMSJ Reply at 19-20.  Regarding

this purported implied-in-fact contract, Mr. Goggin states:

> Ascom understood that USPS desired and would approve of . . .
> postage meter companies entering the [Remote Resetting Meter
> System ("RRMS")] market.  Ascom understood that RMRS meter
> companies were able to recoup their capital investments, defray
> operating expenses, and make a profit through retention of the
> interest earned on customer trust funds, resetting fees and cash
> advances to customers for postage purchases as well as sale of
> postage meter bases.
>
> In order to develop Ascom's TMS[, the brand name of Ascom's
> RRMS], Ascom hired NYNEX, a computer software firm, to
> develop the software necessary to run the TMS system.  NYNEX
> worked closely with USPS personnel, including [Mr.] Ganley . . .
> and [Mr.] Gardner, who worked for Mr. Ganley.  NYNEX worked
> with USPS for all hardware and software related to operation of
> TMS, including the hardware and software related to the
> customer's required advance deposits.  NYNEX and Ascom
> personnel also worked with USPS personnel to ensure that the
> TMS system operated similarly to [Pitney Bowes'] RMRS, but did
> not infringe or violate any of [Pitney Bowes'] patents for RMRS.
> Ascom spent several million dollars developing and operating the
> TMS.

> In 1988, USPS approved Ascom's TMS for distribution to customers. Ascom understood from that approval that it was entitled to retain the interest income from customer advance deposits, and Ascom relied upon its ability to retain the interest income, among other things, in making the determination to go forward with the development and operation of its TMS.
>
> USPS had always stated that it desired competition in the postage meter market and it attempted not to prefer one meter company over another in its policies. In developing the TMS, Ascom shared its plans, including the retention of the interest income with USPS, and USPS approved of Ascom's TMS plan.

Goggin Aff. ¶¶ 5-8; see PSMF ¶¶ 31-36.

USPS moved to strike these statements, arguing that they are not made on any personal knowledge, and "do not even allege that they are made on information and belief." Mot. to Strike at 4. USPS did not, however, offer any evidence to the contrary with their motion for summary judgment. See Response to PSMF at 8. Consequently, plaintiffs argue that "if USPS's objections to the admissibility of Mr. Goggin's testimony are overruled, the testimony is left undisputed and [p]laintiffs' submit that it is sufficient to establish that an implied-in-fact contract for development and operation of Ascom's CMRS was formed with USPS." PSMJ Reply at 19-20.

The Court concludes that neither plaintiffs nor USPS have met their burden of establishing that they are entitled to judgment as a matter of law on Ascom's contract claim. As plaintiffs themselves acknowledge, Ascom's contract claim is limited to one that is implied-in-fact. See PMSJ Reply at 19. As discussed, "[i]n an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct." Novak v. Seiko Corp., 37 Fed. App'x at 243 (internal quotations omitted). Such conduct must show, "in light of the

surrounding circumstances," the parties' "tacit understanding." Brunner v. United States, 70 Fed. Cl. at 627. In other words, for an implied-in-fact contract, the nature of the parties' conduct is key. See id. Mr. Goggin's affidavit, however, omits almost all relevant information concerning conduct that would be necessary to determine whether an implied-in-fact contract came into existence.

Mr. Goggin asserts that Ascom "understood" from USPS' approval of its TMS system that "it was entitled to retain the interest income from customer advance deposits," Goggin Aff. ¶ 7, but provides no underlying basis for this purported understanding. He asserts that "Ascom shared its [TMS] plans, including the retention of the interest income with USPS, and USPS approved of Ascom's TMS plans," id. ¶ 8, without providing any specifics as to the nature of the parties' discussions and the approval process. Mr. Goggin's affidavit therefore is insufficient factually to support plaintiffs' position that Ascom is entitled to judgment as a matter of law on its contract claim. While the Court will not strike Mr. Goggin's affidavit and has considered it for what it is worth on summary judgment, it is not worth much on the crucial factual issue of what conduct of the parties led to a tacit understanding.

USPS also, however, is not entitled to judgment as a matter of law. Ascom and USPS both "have left important questions unanswered concerning the context of . . . discussions and communications, the parties' intent and understanding, and the parties' course of conduct regarding the CMRS." Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d at 24. Ultimately, Mr. Goggin says that Ascom and USPS came to an "understand[ing]," and USPS says that there is no evidence of such an understanding, much less the terms of any such understanding. This genuine dispute will be resolved at trial by considering the trial testimony of persons with personal

knowledge of relevant facts, as will the issue regarding the authority of Mr. Ganley, a matter that relates to both Ascom and Neopost.

As in Pitney Bowes, Inc. v. USPS, the Court concludes that there are genuine issues of material fact regarding whether Neopost entered into a contract with USPS, whether Ascom entered into a contract with USPS, and, if so, whether there were breaches of such contracts. See Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d at 24. Summary judgment therefore is inappropriate on plaintiffs' contract claim. Because judgment is inappropriate on the contract claim, the parties' cross-motions for summary judgment regarding the remaining claims cannot be moot. Accordingly, the Court addresses the parties' arguments regarding the plaintiffs' remaining claims.

### 3. Contract Implied-in-Law Claims — Counts 2, 3 in part, 6, and 8

As discussed earlier, see supra at 19, a contract implied-in-law is one "in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." Lumbermens Mut. Cas. Co. v. United States, 2011 WL 3319722, at *9 n.9 (internal quotations omitted). Such an implied-in-law claim includes plaintiffs' claims for unjust enrichment and *quantum meruit* under a quasi-contract theory, as well as plaintiffs' claims for promissory estoppel.[10]

---

[10]    These claims are all types of contracts implied-in-law. The elements for an unjust enrichment claim and a *quantum meruit* claim appear to be the same. See Lumbermens Mut. Cas. Co. v. United States, 2011 WL 3319722, at *9 n.9. But see Perles v. Kagy, 362 F. Supp. 2d 195, 201-02 (D.D.C. 2005) (describing "confusion" in the law "surrounding the term '*quantum meruit*,'" and noting that it has been used to describe a contract implied-in-fact), vacated and remanded on other grounds by Perles v. Kagy, 473 F.3d 1244, 1254-55 (D.C. Cir. 2007). Those two claims proceed under a quasi-contract theory, see Oceanic Exploration Co. v. ConocoPhillips, Inc., Civil Action No. 04-0332, 2006 WL 2711527, at *20 (D.D.C. Sept. 21,

40

The parties have moved for summary judgment on plaintiffs' contract implied-in-law claims.  The Court concludes that genuine issues of material fact regarding plaintiffs' contract claims apply equally to plaintiffs' contract implied-in-law claims.  Consequently, for the reasons set forth above, summary judgment on these claims is inappropriate.

### 4.  Fifth Amendment Takings Claim — Count 1

Plaintiffs allege that USPS' actions constitute a taking of plaintiffs' private property for public use without just compensation in violation of the Fifth Amendment to the United States Constitution.  Plaintiffs assert that they had a cognizable property interest in interest income.  See PMSJ at 5.  Relying on Brown v. Legal Foundation of Washington, 538 U.S. 216 (2003), plaintiffs contend that they are entitled to summary judgment on this claim because the taking of interest income constitutes a *per se* taking (as opposed to an *ad hoc* taking) under the Fifth Amendment, entitling plaintiffs to just compensation that they have yet to receive.  See PMSJ at 7.  Plaintiffs state: "USPS's arrogation of the interest earned on the advance deposits has no contractual or constitutional footing and USPS must either remit the interest income or provide the 'just compensation' demanded by the Fifth Amendment."  Id.

_____

2006), requiring proof that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retain[ed] the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  National R.R. Passenger Corp. v. Veolia Transp. Servs., Inc., Civil Action No. 07-1263, 2011 WL 1872199, at *28 n.30 (D.D.C. May 9, 2011) (internal quotations omitted).  A claim for promissory estoppel has different elements, requiring proof of "(1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his [or her] detriment."  Parnigoni v. St. Columba's Nursery Sch., 681 F. Supp. 2d 1, 25 (D.D.C. 2010) (internal quotations omitted).

USPS argues that plaintiffs have failed to establish that its actions constituted either a *per se* taking or an *ad hoc* taking.  <u>See</u> Opp. to PMSJ at 2.  As USPS describes it, plaintiffs "fail to raise a cognizable *per se* takings claim because they were not the owners of the alleged property taken, nor can they bring a takings claim for alleged loss of future income."  <u>Id</u>. at 2.  Furthermore, USPS argues that plaintiffs "fail to raise a takings claim under the less stringent *ad hoc* analysis as they did not have an investment backed expectation, cannot dispute the importance of the government's action, and fail to offer any evidence of economic impact."  <u>Id</u>.  USPS therefore requests that the Court enter judgment on this claim in USPS' favor.  <u>See</u> DMSJ at 19-23.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  This clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  <u>First English Evangelical Lutheran Church of Glendale v. County of Los Angeles</u>, 482 U.S. 304, 315-16 (1987) (emphasis in original).  In effect, this clause bars the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  <u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960).

In order to prevail on a takings claim, a plaintiff "must first establish that it had a protectable property interest cognizable under the Fifth Amendment."  <u>Foggy Bottom Ass'n v. D.C. Office of Planning</u>, 441 F. Supp. 2d 84, 89 (D.D.C. 2006); <u>see</u> <u>National Leased Hous. Ass'n v. U.S. Department of Hous. & Urban Dev.</u>, Civil Action No. 03-1509, 2007 WL 148829, at *11 (D.D.C. Jan. 16, 2007) ("The threshold inquiry in a takings analysis is to determine if the

claimant has a property interest protected by the Fifth Amendment.").  Such property interests

"'are created and their dimensions are defined by existing rules or understandings' arising from

non-Constitutional sources."  National Leased Hous. Ass'n v. U.S. Department of Hous.

& Urban Dev., 2011 WL 148829, at *11 (quoting Board of Regents v. Roth, 408 U.S. 564, 577

(1972)).

   If a plaintiff satisfies this threshold inquiry, that plaintiff then must establish that a

government taking occurred.  See Foggy Bottom Ass'n v. D.C. Office of Planning, 441 F. Supp.

2d at 88-89.  "The Supreme Court has articulated four theories of takings claims," two of which

are at issue in this case: a *per se* regulatory taking and an *ad hoc* regulatory taking.  Id. at 89.

   Plaintiffs allege that a *per se* regulatory taking occurred.  That type of taking

"occurs either if governmental regulations result in 'permanent physical occupation of property,'

or alternatively leads to a loss of '*all* economically beneficial or productive use of property.'"

George Washington Univ. v. District of Columbia, 391 F. Supp. 2d 109, 112 (D.D.C. 2005)

(quoting District Intown Props. Ltd. P'Ship v. District of Columbia, 183 F.3d 874, 879 (D.C. Cir.

1999) (emphasis in original).  USPS argues that plaintiffs have failed to state any cognizable

takings claim, but to the extent that plaintiffs have asserted such a claim, it should be analyzed

under the three-part balancing test applicable to *ad hoc* regulatory takings.  That type of taking,

as set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978), is

governed by consideration of the following factors: (1) "the economic impact of the regulation on

the claimant"; (2) "the extent to which the regulation has interfered with distinct

investment-backed expectations"; and (3) "the character of the governmental action."  Penn Cent.

Transp. Co. v. City of New York, 438 U.S. at 124; see also Lingle v. Chevron U.S.A. Inc.,

544 U.S. 528, 538-40 (2005) (discussing *per se* regulatory takings in comparison with *ad hoc* Penn Central regulatory takings).

In Pitney Bowes, Inc. v. USPS, Judge Urbina examined an identical claim to the one alleged by plaintiffs here.  As Judge Urbina explained: Pitney Bowes alleged that it had a property interest in "advance deposits [that] derived from thousands of existing contractual arrangements between it and its customers."  Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d at 25 (internal quotations omitted).  Citing Penn Central, Judge Urbina concluded:

> To establish a taking . . . Pitney Bowes must . . . show that it had a reasonable, investment-backed expectation in the property taken.  That is, Pitney Bowes must demonstrate that it could expect the advance deposit process to continue and the interest generated thereby would attach to it.  In other words, Pitney Bowes must first establish contractual rights.

Id.  Judge Urbina concluded that there were genuine issues of material fact regarding the existence of Pitney Bowes' contractual relationship, and further concluded that those genuine issues related to Pitney Bowes' takings claim.  Id.  Consequently, he found that summary judgment was inappropriate.  Id.

The threshold question here is whether the plaintiffs have established that they "had a protectable property interest cognizable under the Fifth Amendment."  Foggy Bottom Ass'n v. D.C. Office of Planning, 441 F. Supp. 2d at 89.  As plaintiffs describe it, "[t]he Postal Service's 1995 regulatory changes effectively rendered thousands of contractual agreements between [p]laintiffs and their customers worthless.  The value in those contracts — the interest income — was appropriated by the USPS for its own use."  PSMJ at 5.  Thus, the purported

44

property interests at issue are plaintiffs' contractual agreements with its CMRS customers, as well as the interest income that flowed from those contracts.  See id.

"[T]here is . . . ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment."  Cienega Gardens v. United States, 331 F.3d 1319, 1330 (Fed. Cir. 2003) (quoting Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.  Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States.")).  There also is precedent acknowledging a property interest in "interest income."  Phillips v. Washington Legal Found., 524 U.S. 156, 172 (1998); see Brown v. Legal Found. of Wash., 538 U.S. 216, 232-35 (2003).  As the Supreme Court described it in Phillips, interest flows from principal and therefore is "the 'private property' of the owner of the principal."  Phillips v. Washington Legal Found., 524 U.S. at 172.

According to plaintiffs, every one of the contracts entered into between CMRS customers — that is, the owners of the principal — and Neopost gave "Neopost the right to collect interest income from the [customers'] advanced deposits."  Hillegass Aff. ¶ 19; see PSMF ¶ 30.  Similarly, every one of the contracts entered into between CMRS customers and Ascom gave Ascom "the right to retain the interest income with every one of its CMRS customers."  Goggin Aff. ¶ 9.  Plaintiffs therefore contend that these contracts, and the rights to interest income included within them, were taken without compensation by USPS when it promulgated its 1995 regulations requiring that a customer submit advance-postage-meter funds directly to USPS.  Compare 39 C.F.R. § 501.15(d) (Under the 1995 regulations, a CMRS customer must remit deposits "to the Postal Service's designated bank account."), with 44 FED. REG. at 21,017

45

(Under the pre-1995 regulations, a CMRS customer would remit an advance deposit to a trustee bank that then would be wired to the Postal Service Federal Reserve Bank Account following a transaction). See also R&R, 2011 WL 1044480, at *1.

Having identified property interests, plaintiffs then cite Brown v. Legal Foundation of Washington for the proposition that a taking of interest income amounts to a per se taking mandating just compensation. See PMSJ at 7 & n.1. In Brown, the Supreme Court addressed whether a state's use of interest from interest-on-lawyers'-trust accounts ("IOLTA") constituted a taking under the Fifth Amendment. Brown v. Legal Found. of Wash., 538 U.S. at 220-21. Regarding the appropriate framework of analysis, the Supreme Court stated: "We agree that a per se approach is more consistent with the reasoning in our Phillips opinion than Penn Central's ad hoc analysis. As was made clear in Phillips, the interest earned in the IOLTA accounts is the private property of the owner of the principal." Brown v. Legal Found. of Wash., 538 U.S. at 235. Plaintiffs therefore are correct that interest income generally is considered the private property of the owner of the principal, and that the government's taking of that interest is subject to the per se approach. Id. at 234-35.

It is undisputed that the principal in this case — the advance deposits — belonged at all times to the CMRS customers until transferred for payment of postage. Before the 1995 regulations, CMRS customers submitted advance deposits to Ascom's or Neopost's trustee banks. As plaintiffs' acknowledge, "funds deposited into the advance deposit accounts by [p]laintiffs' customers remain[ed] the property of the customers until they elect[ed] to apply those funds to payment of postage for a meter reset." PSMJ at 7. After the promulgation of the 1995 regulations, CRMS customers submitted those deposits directly to USPS. In the past, then,

46

plaintiffs' right to earn any interest income was entirely dependent on an advance deposit of

principal in the trustee bank accounts.  The 1995 regulations merely said that CMRS customers

must now submit their advance deposits — the principal — to USPS.  See 39 C.F.R. § 501.15

(CMRS customer deposits "must be remitted to the Postal Service's designated bank account.");

see also Reply to Opp. to Def. Objections at 6.  Thus, the 1995 regulations reduced the amount of

principal in the trustee bank accounts to zero, but they did not effect a direct confiscation by

USPS of any of plaintiffs' interest income.  Consequently, the per se takings approach set forth in

Brown does not apply.[11]

---

[11]     In Brown, the Supreme Court analyzed the takings claim under Loretto v. Teleprompter Manhattan CATV Corp., 438 U.S. 419 (1982), ultimately equating the taking of interest income to the permanent occupation of a small amount of rooftop space, no matter the economic effect.  Brown v. Legal Found. of Washington, 538 U.S. at 235.  Plaintiffs rely primarily on Brown and, by extension, Loretto, for the proposition that a taking of their property occurred, no matter the economic effect.  See PMSJ at 6-7.  As discussed above, that argument fails.

     Although plaintiffs focus on Brown, plaintiffs also assert that the 1995 regulations "effectively rendered thousands of contractual arrangements between [p]laintiffs and their customers worthless."  PMSJ at 5.  That type of claim is different from the one addressed in Brown.  It applies only in the "extraordinary circumstance" where "no productive or economically beneficial use . . . is permitted."  Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1017 (1992) (emphasis in original).  A property owner alleging such a regulatory taking "must suffer a literal total loss in value to trigger liability on the part of the government for a categorical taking."  Lost Tree Village Corp. v. United States, No. 08-117L, 2011 WL 3773340, at *14 (Fed. Cl. Aug. 26, 2011).  The Court is not convinced that the Lucas line of analysis applies.  As USPS points out, and as plaintiffs have acknowledged, although the 1995 regulations rendered worthless the value of their contracts between plaintiffs and their CMRS customers, plaintiffs still derive value from the CMRS system as a whole.  See Opp. to PMSJ at 9-10 ("Plaintiffs continue to own their CMRS systems and receive monies for the lease of those meters, as well as resetting fees each time postage is added on to a meter."); Tr. at 30 (plaintiffs' counsel acknowledging that plaintiffs have other ways of making money and "charge a fee for the meters").  Consequently, the Court cannot conclude that the promulgation of the 1995 regulations resulted in the "extraordinary circumstance" where "no productive or economically beneficial use . . . is permitted."  Lucas v. South Carolina Coastal Council, 505 U.S. at 1017 (emphasis in original).

That, however, does not mean that there was no taking in this case.  Indeed, as the Supreme Court acknowledged in Brown, a transfer-of-principal claim, like the plaintiffs' claim here, "[c]onceivably . . . could be viewed as the first step in a 'regulatory taking' which should be analyzed under the factors set forth . . . in Penn Central."  Brown v. Legal Found. of Wash., 538 U.S. at 234.  The Supreme Court in Brown concluded that the petitioners' transfer-of-principal claim would fail under Penn Central as "it [was] clear that there would be no taking because the transaction had no adverse economic impact on petitioners and did not interfere with any investment-backed expectation."  Id.  In this case, by contrast, the Court cannot draw the same conclusion at this stage in view of the many material facts in dispute regarding plaintiffs' investment-backed expectations.  See Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 124.  As in Pitney Bowes, there are genuine issues of material fact in dispute regarding plaintiffs' contractual claims, see supra at 30-40; and to succeed on their takings claim, plaintiffs "must demonstrate that [they] could expect the advance deposit process to continue and the interest generated thereby would attach to it," which ultimately is a matter dependent on plaintiffs' contractual rights, if any.  Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d at 25.  Summary judgment on the Fifth Amendment takings claim therefore is inappropriate.  The Court will deny the parties' cross-motions for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, the Court will reject the recommendations in Magistrate Judge Facciola's report and recommendation dated February 3, 2011 [Dkt. No. 181]; will deny in part, deny as moot in part, and grant in part defendant's motion to dismiss [Dkt.

No. 162]; will deny defendant's motion to strike [Dkt. No. 164]; will deny defendant's motion

for summary judgment [Dkt. No. 158]; and will deny plaintiffs' motion for summary judgment

[Dkt. No. 159].

   The Court will order the parties to meet and confer and file a joint report with the

Court regarding how they wish to proceed in this case by October 28, 2011. The parties are

encouraged to return to the magistrate judge for further settlement discussions or to engage a

private mediator.

   An Order consistent with this Opinion shall issue this same day.

   SO ORDERED.


         /s/ _____

         PAUL L. FRIEDMAN

DATE:  September 30, 2011    United States District Judge