UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ASCOM HASLER MAILING ) | |
| SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 00-1401 (PLF) |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |
| NEOPOST, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 00-2089 (PLF) |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

Section     Page

| | | | | |
|---|---|---|---|---|
| I. | INTRODUCTION | | | 1 |
| II. | BACKGROUND | | | 1 |
| III. | FINDINGS OF FACT | | | 7 |
| | A. | General Witness Background | | 7 |
| | | 1. | Plaintiffs' Witnesses | 7 |
| | | 2. | USPS' Witnesses | 11 |
| | B. | Pitney Bowes, CMRS, and USPS | | 12 |
| | C. | The 1979 CMRS Regulations | | 16 |
| | D. | Neopost, CMRS, and USPS | | 17 |
| | E. | Ascom, CMRS, and USPS | | 21 |
| | F. | The Job Duties of Frederick W. Ganley, Jr. and Francis Eugene Gardner | | 24 |
| | G. | The 1995 CMRS Regulations | | 27 |
| | | 1. | Promulgation and Effect | 27 |
| | | 2. | Motivation for the Changes | 28 |
| | | | a. Cash Management | 29 |
| | | | b. Customer Service and Security | 31 |
| | H. | Implementation of the 1995 CMRS Regulations | | 33 |
| | | 1. | Neopost Goes First | 33 |
| | | 2. | Ascom Follows Neopost | 37 |
| | | 3. | Pitney Bowes Goes Last | 38 |
| | I. | Lawsuit and Settlement Between Pitney Bowes and USPS | | 39 |
| | J. | Damages | | 39 |

| | | |
|---|---|---|
| IV. | CONCLUSIONS OF LAW | 40 |
| A. | Standard of Proof | 40 |
| B. | Contract Claims (Count III) | 41 |
| | 1. Alleged Oral or Implied-in-Fact Contract Between Neopost and USPS Regarding Interest Income | 43 |
| | 2. Alleged Implied-in-Fact Contract Between Ascom and USPS Regarding Interest Income | 49 |
| | 3. Alleged Oral Contract Between Neopost and USPS for Implementing the 1995 CMRS Regulatory Changes | 50 |
| C. | Contract Implied-in-Law Claims (Counts II, III in Part, VI, and VIII) | 53 |
| | 1. Unjust Enrichment and *Quantum Meruit* Under a Quasi-Contract Theory (Counts II, III in Part, and VIII) | 53 |
| | a. Development of CMRS — Neopost and Ascom | 54 |
| | b. Implementation of the 1995 CMRS Regulations — Neopost Only | 56 |
| | 2. Promissory Estoppel (Count VI) | 57 |
| | a. Development of CMRS — Neopost and Ascom | 59 |
| | b. Implementation of the 1995 CMRS Regulations — Neopost Only | 61 |
| D. | Takings Claims (Count I) | 62 |
| V. | CONCLUSION | 73 |

I.  INTRODUCTION

These consolidated cases came before the Court for a five-day bench trial on plaintiffs' contractual, equitable, and constitutional claims against defendant, the United States Postal Service ("USPS"), arising out of USPS' alleged arrogation of certain interest income that plaintiffs contend rightfully belonged to them.  Upon consideration of the evidence presented at trial, the parties' proposed findings of fact and conclusions of law, and the relevant legal authorities, the Court now issues its Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.  BACKGROUND

The Court previously has described the background of these consolidated cases. See Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d 148, 151-55 (D.D.C. 2011); see also Memorandum Op. & Order at 1-3, Dec. 2, 2011 [Dkt. No. 199].[1]  It therefore will limit its discussion accordingly.

In the 1970s, Pitney Bowes, Inc. invented and patented a Computerized Remote Meter Resetting System ("CMRS") that it marketed under the name "Postage by Phone."  Joint Stipulation of Facts ¶ 1, Mar. 5, 2012 [Dkt. No. 215-1].  CMRS permits postal service customers to use their phones to purchase more postage without having to take their postage meter to the post office to have it reset.  Id. ¶ 2.  In 1978, USPS and Pitney Bowes entered into a Statement of Understanding that gave Pitney Bowes the right to operate its new CMRS.  Ascom Hasler

---

[1]     The Court consolidated Civil Action Nos. 00-1401 and 00-2089 on September 4, 2004.  All docket references in this Opinion, Findings of Fact, and Conclusions of Law are to Civil Action No. 00-2089.

1

Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 151.  And on April 9, 1979, by publication in the

Federal Register, USPS promulgated regulations governing the operation of CMRS for all meter

manufacturers.  See Joint Stipulation of Facts ¶ 8.

In the 1980s, plaintiffs, Ascom Hasler Mailing Systems, Inc. ("Ascom") and

Neopost, Inc., corporations that are competitors of Pitney Bowes, began development of their

own CMRSs.  See Joint Stipulation of Facts ¶¶ 10-18.  USPS ultimately authorized Ascom to

operate its CMRS in 1988 and authorized Neopost to operate its system in 1990.  See id.

With CMRS in operation, postal service customers advance payments for postage

to meter resetting companies like Pitney Bowes, Ascom, and Neopost.  Ascom Hasler Mailing

Sys., Inc. v. USPS, 815 F. Supp. 2d at 152.  Consequently, as the Court previously has noted,

CMRS provided meter manufacturers with a financial opportunity:

> [Customers'] money went first to the meter resetting companies'
> lockbox banks and from there to the companies' trustee banks.
> The funds remained with the trustee banks until the customer
> actually used the postage it had purchased for the postage meter.
> At that point, the funds went from the appropriate trustee bank to
> the Postal Service.  During the interval between receipt of the
> advance payment from the customer and the transmittal of those
> funds to the Postal Service, the funds in the meter resetting
> companies' trustee accounts earned interest, which the meter
> resetting companies kept.

Id. (quotations omitted) (alteration in original).

But this process involving trustee bank accounts changed in 1995 when USPS

promulgated new regulations governing CMRS.  See Joint Stipulation of Facts ¶ 19; Ascom

Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 152.  The 1995 CMRS regulations

eliminated the commercial trustee bank accounts, and required that postal service customers'

2

advance-meter-resetting deposits go directly into USPS' account.  Joint Stipulation of Facts ¶ 19.

As a result of that change, all the meter resetting companies operating CMRS could no longer

collect interest on the customers' advance deposits.  See id.

On December 19, 1997, two years after the new regulations went into effect,

Pitney Bowes sued USPS, alleging contractual, equitable, and constitutional claims arising out of

USPS' promulgation of the 1995 CMRS regulations and USPS' alleged arrogation of interest

income.  See Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 152; see also Pitney

Bowes, Inc. v. USPS, 27 F. Supp. 2d 15, 17 (D.D.C. 1998).  That case was assigned to Judge

Ricardo M. Urbina.  Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 152.  In 1998,

Judge Urbina denied the parties' cross-motions for summary judgment, and shortly thereafter, in

1999, that case settled.  Id. at 152-53.

On June 13, 2000, Ascom filed a complaint against USPS, similar to the one filed

by Pitney Bowes, "for damages suffered as a result of [USPS'] unlawful misappropriation of the

revenue stream earned or which would have been earned by Ascom from its" CMRS.  Ascom

Compl. ¶ 1.  Two months later, on August 30, 2000, Neopost filed a substantively identical

complaint against USPS.  See generally Neopost Compl.[2]

In their complaints against USPS, Ascom and Neopost make the exact same

claims:

---

[2]     At the time that Ascom and Neopost filed their complaints in this Court, the two companies were unaffiliated.  Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 152 n.2.  In 2011, however, Neopost purchased Ascom.  Id.  Since the time of purchase, Neopost and Ascom have continued to operate as separate companies, although under common ownership.  Id.

- *Count I.*  USPS' actions constitute a taking of plaintiffs' private property for public use without just compensation in violation of the Fifth Amendment to the United States Constitution.  Ascom Compl. ¶¶ 52-56; Neopost Compl. ¶¶ 49-53.

- *Count II.*  USPS unjustly enriched itself at plaintiffs' expense.  Ascom Compl. ¶¶ 57-59; Neopost Compl. ¶¶ 54-56.

- *Count III.*  USPS breached the terms of its express, implied, or quasi-contractual arrangements with plaintiffs.  Ascom Compl. ¶¶ 60-64; Neopost Compl. ¶¶ 57-60.

- *Count IV.*  Plaintiffs were third-party beneficiaries of the 1978 Statement of Understanding between Pitney Bowes and USPS.  Ascom Compl. ¶¶ 65-69; Neopost Compl. ¶¶ 61-65.

- *Count V.*  By compensating Pitney Bowes but not plaintiffs, USPS breached its constitutional obligation to treat similarly situated parties equally.  Ascom Compl. ¶¶ 70-72; Neopost Compl. ¶¶ 66-69.

- *Count VI.*  Plaintiffs relied to their detriment on USPS' promise that they would be permitted to keep interest, and they are now entitled to it.  Ascom Compl. ¶¶ 73-76; Neopost Compl. ¶¶ 70-72.

- *Count VII.*  USPS violated a duty to treat regulated parties equally in compensating Pitney Bowes but not plaintiffs.  Ascom Compl. ¶¶ 77-79; Neopost Compl. ¶¶ 73-75.

- *Count VIII.*  Plaintiffs are entitled to recovery in *quantum meruit*.  Ascom Compl. ¶¶ 80-82; Neopost Compl. ¶¶ 76-79.

USPS moved to dismiss all eight of plaintiffs' claims on the ground that each

failed to state a claim upon which relief could be granted; USPS also asserted that this Court

lacked jurisdiction.  <u>Ascom Hasler Mailing Sys., Inc. v. USPS</u>, 815 F. Supp. 2d at 153.  On

4

September 27, 2007, the Court issued a Memorandum Opinion and Order in which it concluded

that it had jurisdiction; dismissed plaintiffs' third-party beneficiary claim (Count IV); and denied

USPS' motion to dismiss regarding the other seven claims in plaintiffs' complaints.  See

Memorandum Op. & Order at 6-7, Sept. 27, 2007 [Dkt. No. 95].

The parties then filed cross-motions for summary judgment on June 4, 2010;

USPS also filed a motion to dismiss certain claims for lack of subject matter jurisdiction or for

failure to state a claim.  Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 153-54.

And in the course of briefing the cross-motions, USPS filed a motion to strike certain affidavits

that plaintiffs relied upon in their motion for summary judgment.  Id.

On September 30, 2011, the Court issued an Opinion and Order that, among other

things, granted USPS' motion to dismiss plaintiffs' equal protection claims (Counts V and VII),

but denied the parties' cross-motions for summary judgment on all other claims.  See Ascom

Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 176; Order at 1-2, Sept. 30, 2011 [Dkt.

No. 192].  That decision ultimately left four remaining claims in these consolidated cases.  See

Joint Pretrial Statement at 2 (listing plaintiffs' remaining claims as (1) breach of contract,

(2) Fifth Amendment takings, (3) unjust enrichment, and (4) promissory estoppel).  USPS then

moved for partial reconsideration of the Court's September 30, 2011 decision.  The Court denied

that motion on December 2, 2011, see Memorandum Op. & Order at 6, Dec. 2, 2011, and these

consolidated cases proceeded to trial before the Court on both liability and damages.[3]

---

[3]        Shortly before trial, USPS asserted that these consolidated cases had been
bifurcated on liability and damages by Magistrate Judge John M. Facciola.  Plaintiffs disagreed,
arguing that these cases had never been bifurcated, and that trial should be on both liability and
damages.  The Court heard oral argument on this bifurcation issue and considered the parties'
written submissions setting forth their respective positions.  See Dkt. Nos. 204 & 205.  On

The bench trial of these consolidated cases began on March 19, 2012, and concluded on March 27, 2012.  The following eight witnesses were called by plaintiffs to testify: Frederick W. Ganley, Jr.; Robert Hillegass; Neil Mahlstedt; Edmond B. Goggin; Steven M. Kearney; Wayne Wilkerson;  Robert J. Pedersen; and Bruce Abramson, Ph.D.[4]  The following two witnesses were called by USPS to testify: Patricia M. Gibert; and G. William Kennedy, Ph.D.

After the conclusion of the bench trial, the parties filed a joint proposal regarding trial exhibits to be admitted in evidence and objections thereto.  See Joint Proposal at 1, Apr. 18, 2012 [Dkt. No. 226].  Plaintiffs moved to admit 100 exhibits in evidence, see id. at 2-7, and USPS objected to the admission of many of those exhibits on various grounds.  Id. at 7-9.  USPS moved to admit 115 exhibits in evidence, see id. at 9-16, and plaintiffs objected only to one — DX 36, DemandOne Invoice to USPS — on the ground of relevance.  See id. at 16.  USPS eventually withdrew its proposal to introduce DX 36 in evidence.  See Dkt. No. 228.

The parties since have filed proposed findings of fact and conclusions of law.  See generally Def. Post Trial Brief with Findings of Fact and Conclusions of Law ("USPS Findings & Conclusions"), June 14, 2012 [Dkt. No. 235]; Pls. Proposed Findings of Fact and Conclusions of Law ("Pls. Findings & Conclusions"), June 14, 2012 [Dkt. No. 236].  These consolidated matters therefore now are ripe for judgment.

---

January 19, 2012, the Court held a status conference and announced its conclusion that these consolidated cases had not been bifurcated, and that trial would proceed on both liability and damages.

[4]     Mr. Ganley provided testimony through a *de bene esse* deposition that took place on March 9, 2012, shortly before trial began.  See generally PX 202, Deposition of Frederick W. Ganley, Jr. ("Ganley Dep."), Mar. 9, 2012.  On the parties' joint request, the Court presided over Mr. Ganley's deposition.  See Minute Order, Feb. 23, 2012.

The Court has considered the testimony of all the witnesses at trial and the documentary evidence admitted by the Court, and has made credibility findings as necessary and appropriate to resolve any material discrepancies in the testimony. The Court admits into the record all the exhibits requested by the parties in their joint proposal — with the exception of DX 36, which USPS subsequently withdrew. The Court need not resolve USPS' objections to plaintiffs' proposed exhibits, because, as discussed below, even with the admission of the objected-to exhibits, all of plaintiffs' claims fail.

In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law. See FED. R. CIV. P. 52(a) ("In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

## III. FINDINGS OF FACT

### A. General Witness Background

#### 1. Plaintiffs' Witnesses

*a. Frederick W. Ganley, Jr.* Mr. Ganley is a retired USPS employee. See Ganley Dep. at 11. He was first employed by USPS in 1971 and retired in 1992. Id. at 11-12. From the early 1970s until shortly before his retirement, Mr. Ganley's position at USPS was as General Manager of the Special Services Division, later changed to the Business Systems Division, of the Office of Mail Classification Rates and Classification Department. Id. at 26. That division was

part of the Finance Department, but Mr. Ganley's financial responsibilities were negligible.  Id.

at 110-11.  Mr. Ganley was the primary liaison between USPS and the meter manufacturers.  Id.

at 27.  His subordinate, Francis Eugene Gardner, assisted Mr. Ganley in his role as the primary

liaison between USPS and the meter manufacturers during the time period relevant to this

litigation.  Id. at 97-99.

       Plaintiffs acknowledge that their claims turn in large part on Mr. Ganley's

testimony.  See Trial Tr. (3/27/12) at 156-57 (plaintiffs' counsel acknowledging that "the case

really . . . turns to a large extent on Mr. Ganley's testimony").  Of all the witnesses, the Court

found Mr. Ganley's testimony during his *de bene esse* deposition to be the most credible and

persuasive and the least biased.

       Although Mr. Ganley is a central figure in this litigation, he was not contacted

about these consolidated cases until February 2012; before that time, the parties presumed that

Mr. Ganley had passed away.  See Ganley Dep. at 14-15.  In preparing for trial, counsel for

plaintiffs discovered that Mr. Ganley had not in fact passed away and has been living in Virginia

since retiring from USPS in 1992.  See id. at 11.  Counsel for plaintiffs subsequently met with

Mr. Ganley in person to discuss this litigation, and counsel for plaintiffs drafted an affidavit that

Mr. Ganley signed, after requesting certain changes, on February 10, 2012.  See PX 187,

Affidavit of Frederick W. Ganley, Jr. ("Ganley Aff."), Feb. 10, 2012; Ganley Dep. at 16-17.  Mr.

Ganley then met with counsel for USPS and discussed this litigation and his recently signed

affidavit with them.  See Ganley Dep. at 18.  Thus, before testifying at his *de bene esse*

deposition, Mr. Ganley made himself available to both sides for discussion and questioning.  See

id. at 23, 25.

The Court finds Mr. Ganley's testimony during his deposition much more probative than the affidavit he signed on February 10, 2012. Although the affidavit referenced statements made by Ascom and Neopost employees, see, e.g., Ganley Aff. ¶ 13, Mr. Ganley was not provided with those specific statements before he signed the affidavit. See Ganley Dep. at 100-01. And during his deposition, Mr. Ganley credibly clarified the statements made in his affidavit and testified about his responsibilities at USPS, his interactions with the meter manufacturers, and ultimately his role in litigation.

b. *Robert Hillegass*. Mr. Hillegass was an employee of Neopost or one of its predecessors for over 40 years before retiring from the company in 1999. He started working at Neopost's predecessor in 1958 when he was 20 years old. Trial Tr. (3/19/12 a.m.) at 39. He worked his way up in the company, and, in 1974, he took the position of National Service Manager. Id. at 41. Around 1988, he was promoted to Director of National Service, and, in 1990, he was promoted to Vice President of Technical Operations, a position he held until he retired in 1999. Id. at 42. Mr. Hillegass was the primary liaison between Neopost and USPS for most of his career and was the lead Neopost employee involved in discussions with USPS related to the development of Neopost's CMRS. See id. at 43, 53-55, 59-60; Trial Tr. (3/19/12 p.m.) at 62-64, 79-80.

c. *Neil Mahlstedt*. Mr. Mahlstedt is a former President of Neopost. Trial Tr. (3/19/12 p.m.) at 88. Mr. Mahlstedt began working for Neopost's predecessor in the late 1960s; he was initially hired to start its financial company. Id. at 87. In 1991, he became Neopost's President. Id. at 88. In that role, Mr. Mahlstedt "ran the administration arm of the company, day-to-day activities," and performed oversight of Neopost's CMRS. Id. at 88-89. He was

personally involved in discussions with USPS regarding the proposed CMRS regulatory changes

that ultimately took effect in 1995.  See, e.g., PX 145, Letter from N. Mahlstedt to P. Gibert

at 1-2, Aug. 15, 1994.  He retired around 2002.  Trial Tr. (3/19/12 p.m.) at 84.

   *d.  Edmond B. Goggin*.  Mr. Goggin was an employee of Ascom or its predecessor

for over 15 years.  He joined Ascom's predecessor in 1975 and served in various capacities,

including as Ascom's Vice President of Operations, from 1981 to 1991.  See Trial Tr. (3/20/12

a.m.) at 27.  Mr. Goggin was in charge of Ascom's development of its CMRS.  See id. at 27-29.

During trial, USPS orally moved to strike part of Mr. Goggin's testimony.  The parties then filed

briefs addressing that oral motion after trial.  See Dkt. Nos. 223 & 225.  The Court concludes that

it need not resolve this oral motion and will deny it as moot.

   *e.  Steven Michael Kearney*.  Mr. Kearney is a current USPS employee.  Trial Tr.

(3/20/12 p.m.) at 3.  He began working for USPS around 1980 and spent the first 10 years as an

Investment Officer and as an Investment Manager.  See id. at 3.  In 1990, Mr. Kearney became

the Treasurer of USPS and remained in that position for approximately 10 years.  Id. at 4, 8.  Mr.

Kearney was involved in formulating and executing the 1995 CMRS regulatory changes.  See id.

at 30-32.

   *f.  Wayne A. Wilkerson*.  Mr. Wilkerson is a former USPS employee and is

currently a self-employed consultant and expert witness.  Trial Tr. (3/21/12) at 104.  He was first

employed by USPS in 1979 as a Postal Inspector.  Id. at 53.  He then held various jobs for USPS

in various cities.  See id. at 54.  In 1992, he was hired at the USPS headquarters in Washington,

D.C., as a Manager of Mailing Systems Development.  Id.  It was in that position that Mr.

Wilkerson assumed responsibility for postage meters.  Id.  Mr. Wilkerson served as a successor to Mr. Ganley.  Id. at 55.

        *g.  Robert John Pedersen*.  Mr. Pedersen currently is employed by USPS in the position of Manager, Technical Analysis, Accounting and Finance.  Trial Tr. (3/21/12) at 135.  He began working for USPS in 1983 and, from 1983 to 1987, he served as an Investment Officer.  Id.  Mr. Pedersen then left USPS for five years to work in the Army Banking and Investment Fund, managing investments as the Army's Chief Investment Officer.  Id. at 136.  He returned to USPS in 1992 as a Debt Portfolio Manager.  Id.  When USPS was restructured later that year, he became a Chief Investment Officer, id. at 137, and, in 1994, he was promoted to Assistant Treasurer, Cash Management, a position that he remained in until March of 2002.  Id. at 138.  Mr. Pedersen participated in several internal and external discussions between USPS and the meter manufacturers relating to the 1995 CMRS regulatory changes.  See id. at 141-42.

        *h.  Bruce Abramson, Ph.D.*  Dr. Abramson testified as plaintiffs' retained expert witness on damages.  He holds a bachelor's degree in computer science and mathematics, a master's degree in computer science, and a Ph.D. in computer science, all of which are from Columbia University.  See Trial Tr. (3/26/12 a.m.) at 6.  Dr. Abramson also holds a J.D. from the Georgetown University Law Center.  Id.

## 2.  USPS' Witnesses

        *a.  Patricia M. Gibert*.  Ms. Gibert was a USPS employee from 1968 until her retirement in 2002.  Trial Tr. (3/21/12) at 104.  She began her USPS career as a management intern and subsequently held various positions throughout the organization.  See id. at 104-06.  In

1992, Ms. Gibert became the Vice President of Customer Service Support.  See id. at 106-08.  In

that role, she assumed responsibility for a large group, about one-eighth of which involved

postage meters.  Id. at 107-09.  As for postage meters, Ms. Gibert's responsibilities included

dealing with meter operations and policy issues concerning the meter manufacturers' ability to do

business with USPS.  Id. at 107.  Meters remained under her purview until approximately 2002

when she retired.  Id. at 108.  Ms. Gibert played no role in the development of CMRS, and,

before 1992, she did not work with postage meters or CMRS.  Id. at 109.

       *b. G. William Kennedy, Ph.D.*  Dr. Kennedy testified as USPS' retained expert

witness on damages.  He holds a bachelor's degree and a master's degree in accounting, both

from the University of Illinois, and a Ph.D. in finance from St. Louis University.  Trial Tr.

(3/27/12) at 5-6.  Dr. Kennedy is also a licensed certified public account.  Id. at 6.

### B.  Pitney Bowes, CMRS, and USPS

       In the 1970s, Pitney Bowes invented and patented CMRS, which it marketed

under the name "Postage by Phone."  Joint Stipulation of Facts ¶ 1.  This system permits postal

service customers to use their phones to purchase more postage without having to take their

postage meter to the post office to have it reset.  Id. ¶ 2.

       Pitney Bowes' invention of CMRS was a significant technological advancement

in the postal industry.  Joint Stipulation of Facts ¶ 3.  USPS itself considered developing its own

CMRS, but concluded that it probably was not cost effective to do so.  See, e.g., PX 6,

Handwritten Notes from USPS Meeting Held on Mar. 24, 1972 at ASC 001031.  CMRS

increased convenience for postal service costumers; reduced USPS' workload at retail window

operations; led USPS customers to use more postage because of convenience; and reduced meter fraud.  Joint Stipulation of Facts ¶¶ 4-8.

Pitney Bowes and USPS negotiated over the course of several years to reach an understanding regarding how CMRS would be developed and operated.  Ganley Dep. at 31.  In September 1978, Pitney Bowes and USPS entered into a Statement of Understanding ("SOU") that detailed the conditions under which Pitney Bowes' CMRS was authorized.  PX 50, Statement of Understanding Between the United States Postal Service and Pitney Bowes, Inc. at 1, Sept. 28, 1978.  The SOU was signed by Fred T. Allen, the then-Chairman of the Board and President of Pitney Bowes, and William F. Bolger, the Postmaster General.  Id. at 10.

The SOU provides that a trust account will be established for advance deposits, PX 50 at 4, but does not address the ownership of that account or the interest generated from that account.  Under the terms of the SOU, Pitney Bowes provided postage meters to its customers; provided its customers with the information needed to reset the meter; verified the status of the customers' advanced deposits at a trustee bank to ensure the customers had sufficient funds to pay for postage; was responsible for transferring funds to USPS; interfaced with the customer; provided USPS with statements documenting customer transactions; and provided USPS with transaction reports describing the meter resetting activity.  See id. at 2-10.

The SOU does not explicitly or implicitly address whether Pitney Bowes has the right to earn interest income from CMRS customers' trust accounts.  But the question whether USPS would agree that Pitney Bowes would collect interest income from advanced customer deposits in the trust accounts specifically was discussed and negotiated by USPS.  Ganley Dep. at 36-38.  Pitney Bowes stated to USPS that in order to develop and operate CMRS at the

13

appropriate cost to postage users and to allow Pitney Bowes an acceptable profit, USPS must agree that Pitney Bowes "had the right to collect the interest to defray development and operational costs." Id. at 37.  USPS "ultimately agreed to allow [Pitney Bowes] to collect the interest income from the trust accounts." Id. at 37.  That agreement regarding interest income, however, was not memorialized in the SOU, see id. at 59, and a material term of that agreement — the duration of Pitney Bowes' right to collect interest income — is unclear and was not established by plaintiffs by a preponderance of the evidence at trial.

Mr. Ganley testified in his *de bene esse* deposition that Pitney Bowes stated to USPS that it "must agree that [Pitney Bowes] had the right to collect the interest to defray development and operational costs," and that USPS "ultimately agreed to allow [Pitney Bowes] to collect the interest income from the trust accounts." Ganley Dep. at 37.  But Mr. Ganley did not testify as to the duration of Pitney Bowes' right to collect interest income.  Thus, it is unclear from Mr. Ganley's testimony whether Pitney Bowes' right to collect interest income continued as long as Pitney Bowes operated its CMRS, as plaintiffs' contend, see, e.g., Trial Tr. (3/19/12 p.m.) at 79; or whether that right continued only to the extent necessary to defray certain development and operational costs; or whether that right continued for some other period of time. See, e.g., PX 40, Memorandum from R. Fairbaugh to F. Allen at 1, June 8, 1978 (Pitney Bowes, describing its proposal to USPS that "generated earnings be used to defray some of the [CMRS] systems costs").  Mr. Ganley testified only that USPS agreed to allow Pitney Bowes "to collect the interest income from the trust accounts." Ganley Dep. at 37.

Mr. Hillegass, on behalf of Neopost, testified at trial that it was his understanding from discussions with Mr. Ganley that Pitney Bowes negotiated and obtained the right to collect

the interest income "as long as [it] operated the system."  Trial Tr. (3/19/12 p.m.) at 79.

Furthermore, Mr. Hillegass testified that Mr. Ganley told him that Neopost would be treated

equally to Pitney Bowes and therefore would be "entitled to the interest from the escrow account

as long as [Neopost] operated the system."  Id. at 16.  But Mr. Hillegass previously said during

his deposition that the "only thing" that Mr. Ganley (or his subordinate, Mr. Gardner) said was

that revenues from interest income "will help offset some of [Neopost's] expenses."  Deposition

of Robert Hillegass ("Hillegass Dep.") at 92, July 28, 2009 (quotations omitted).  And Mr.

Hillegass' statement at his deposition is consistent with some evidence in the record suggesting

that Pitney Bowes' right to collect interest would be used "to defray some of the [CMRS]

systems costs," PX 40 at 1, but did not necessarily continue in perpetuity as long as Pitney

Bowers operated its CMRS.

   Mr. Goggin, on behalf of Ascom, testified at trial that it was his understanding

from his own discussions from Mr. Ganley and Mr. Gardner that Ascom "would get the same

rights and benefits that Pitney Bowes received with their CMRS system."  Trial Tr. (3/20/12

a.m.) at 30.  As for the duration of Ascom's alleged right to collect interest income, Mr. Goggin

testified that it was his understanding that "as long as [Ascom] had [its CMRS] system in

operation, [Ascom] would be entitled to all . . . revenues" — including interest income —

"associated with it."  Id. at 31.  But as Mr. Goggin admitted at trial, he never mentioned in his

affidavit any such discussions with Mr. Ganley and Mr. Gardner.  Id. at 79-80; see also PX 184,

Affidavit of Edmond B. Goggin ("Goggin Aff.") ¶ 5, June 2, 2010.  Furthermore, in his affidavit,

Mr. Goggin made no claim that Ascom would be entitled to interest income as long as it operated

its CMRS; he stated only that he understood that Ascom would be "entitled to retain the interest income from customer advance deposits[.]"  Goggin Aff. ¶ 7; see also id. ¶ 5.

The Court finds that neither Mr. Hillegass' testimony nor Mr. Goggin's testimony nor any other evidence admitted at trial shows that Pitney Bowes' right to collect interest income continued as long as Pitney Bowes operated its CMRS.  Consequently, although the Court finds that Pitney Bowes and USPS did in fact agree that Pitney Bowes would be entitled to retain interest income from CMRS, the Court cannot find from the evidence admitted at trial that that agreement included the right of Pitney Bowes to obtain interest income *for as long as Pitney Bowes operated its CMRS*.  The duration of Pitney Bowes' negotiated right regarding interest income is unclear and was not established by a preponderance of the evidence at trial.

### C.  The 1979 CMRS Regulations

On April 9, 1979, by publication in the Federal Register, USPS promulgated regulations governing CMRS.  Joint Stipulation of Facts ¶ 8.  The CMRS regulations were published in the Domestic Mail Manual ("DMM"), which contains the regulations governing postage meters, as well as in Title 39 of the Code of Federal Regulations.  Id. ¶ 9.

The 1979 CMRS regulations set forth requirements related to advancing to USPS an amount equal to one average day's meter resetting revenue; the creation of a trust account; postage meter specifications and maintenance; customer deposits; resetting activity; transfer of funds to USPS; transaction reporting; and accounting and auditing.  See DX 1 § 144.97.  Under the 1979 CMRS regulations, customers were required to have an advance deposit of funds at least equal to the desired postage increments in their account at the trustee bank before resetting.

16

See id. § 144.975.  The regulations, however, made no mention of interest income or who had the right to the interest income accruing on customer advanced deposits maintained by the meter manufacturers in trust accounts.  See id.; see also Trial Tr. (3/20/12 p.m.) at 35-36.  Those CMRS regulations remained in effect for the next 15 years with no significant changes.

### D.  Neopost, CMRS, and USPS

According to Mr. Hillegass, Neopost first learned about the concept of CMRS in the fall of 1978 from conversations between Mr. Hillegass and Mr. Ganley.  See Trial Tr. (3/19/12 a.m.) at 53-54.  At the time of Mr. Hillegass' first conversation with Mr. Ganley regarding CMRS, Neopost had the world's first electronic meter in testing at the post office.  Id.  Mr. Ganley told Mr. Hillegass that an electronic meter "would be a prime candidate for a CMRS system[.]"  Id. at 54.  Although Mr. Ganley could not recall any specific conversations with Mr. Hillegass, Mr. Ganley said that he would have informed the meter manufacturers, including Neopost, that in his judgement CMRS "was a very attractive concept and that it had the potential to being very attractive to customers and that it would be, it might be in their best interests to consider developing such a system if they wanted to remain competitive in the marketplace."  Ganley Dep. at 121-22.

Neopost alleges that statements made orally by Mr. Ganley and his subordinate, Mr. Gardner, created a binding contract between Neopost and USPS that allowed Neopost the right to earn interest income on customer funds held in trust accounts for as long as Neopost operated its CMRS.  Mr. Hillegass testified that Mr. Ganley told him that Neopost would be treated equally to Pitney Bowes and therefore would be "entitled to the interest from the escrow

account as long as [Neopost] operated the system." Trial Tr. (3/19/12 p.m.) at 16. But Mr.

Hillegass previously said during his deposition that the "only thing" that Mr. Ganley and Mr.

Gardner said was that revenues from interest income "will help offset some of [Neopost's]

expenses." Hillegass Dep. at 92 (quotations omitted).

During Mr. Ganley's tenure at USPS, Neopost put all of its meter authorization

requests to USPS in writing, and USPS, in turn, responded to all of those requests in writing.

See Ganley Dep. at 79-81. As for anything of substance requiring Mr. Ganley's agreement or

approval regarding meter manufacturers, Mr. Ganley testified that it would have been evidenced

by a writing. See id. at 126-27; see also id. at 130. There is no writing that memorializes the

alleged contract between Neopost and USPS regarding interest income.

Mr. Ganley testified that, to the best of his recollection, in his discussions with the

meter manufacturers, which would have included Neopost, he never offered or promised

anything regarding "how long they could receive interest income[.]" Ganley Dep. at 114-15.

And Mr. Ganley testified that he did not provide the meter manufacturers with "any incentives

. . . outside of the regulatory framework of the" then-existing 1979 "CMRS regulations as an

incentive for entering into the CMRS system[.]" Id. at 115. Rather, Mr. Ganley told the meter

manufacturers that they would have the same opportunities "under the regulations . . . that Pitney

Bowes does." Id. at 124; see id. at 146-47, 165-66; see also Trial Tr. (3/19/12 a.m.) at 63 (Mr.

Hillegass, testifying that Mr. Ganley informed him "regarding the CMRS system and the fact that

the revenues were there, that we have the opportunity to earn revenue on the escrow account and

on the setting fees").

As Mr. Ganley recalled his discussions with meter manufacturers regarding interest income, he "communicated with them probably through a number of conversations with each one of the companies," including Neopost, that CMRS "appeared to be an attractive system that they should be certainly looking at."  Ganley Dep. at 167.  But Mr. Ganley made clear that "that's as far as [he] could do it, is to suggest to them that [CMRS] looked attractive to get into as a corporate business decision."  Id.  As stated above, the Court finds Mr. Ganley's testimony credible and finds that Mr. Ganley never said or even suggested, by words or deeds, that Neopost would be entitled to interest income as long as Neopost operated its CMRS.

Neopost eventually began developing its CMRS in the late 1980s.  Trial Tr. (3/19/12 a.m.) at 63.  Before Neopost's (and Ascom's) development of its CMRS, USPS was concerned about Pitney Bowes' dominance in the postage meter market; Neopost's entrance into the market addressed that concern because it increased the number of meter manufacturers operating CMRSs and thereby increased competition.  See Ganley Dep. at 49.

According to Mr. Hillegass, Neopost's belief that it would be entitled to recover interest income from operation of CMRS was relied upon in "figuring out the cost justification for building the system."  Trial Tr. (3/19/12 a.m.) at 64.  At the same time, however, in deciding to develop its own CMRS, Neopost realized that Pitney Bowes' CMRS presented a "significant threat to [Neopost's] viability."  DX 41, Letter from R. Goldman to F. Allen at 2, Sept. 2, 1980 (Neopost's then-President informing Neopost's then-Chairman of the Board that Pitney Bowes' CMRS "presents a high-barrier to entry for any newcomers in our business and a significant threat to our viability"); see Trial Tr. (3/19/12 p.m.) at 67-68.  Thus, Neopost considered the development of CMRS as a way to reduce its losses.  Trial Tr. (3/19/12 p.m.) at 67-68.  In

19

developing its CMRS, Neopost had a team of engineers that addressed issues such as putting security and encryption in the meter, and coordinating it with the resetting system to ensure revenue protection and testing.  See Trial Tr. (3/19/12 a.m.) at 66.

 Neopost expressly has disclaimed in this litigation any request for recovery of investment and development costs related to CMRS.  Trial Tr. (3/20/12 a.m.) at 59-60 (plaintiffs' counsel, stating that plaintiffs are "not seeking as damages any reimbursement of those costs" — that is, money spent "in developing and operating the [CMRS] system" — "as a measure of [their] damages."); see also Dkt. No. 213 at 11 ("Plaintiffs do not seek to recover those [costs that plaintiffs incurred in developing the CMRS] and such costs [are] not the subject matter of the contract at issue.").

 USPS authorized Neopost to provide CMRS service on April 10, 1990, and Neopost began offering CMRS to its customers around May 1990.  Joint Stipulation of Facts ¶ 10.  Neopost entered into an agreement with Bank of America under which, among other things, the bank agreed to act as trustee of CMRS customers' advance deposits.  Id. ¶ 13.  Each iteration of its trustee agreement, which was revised once and then replaced when Neopost changed banks, provided that Neopost, and not the CMRS customer, would earn interest on the advance deposits placed in the escrow account.  See PX 89, Postage on Call Deposit Trust Agreement at 3, Jan. 3, 1990; Trial Tr. (3/19/12 a.m.) at 70-71.  Neopost also put contracts in place with all of its customers that informed them that their money would be placed into an escrow account.  Trial Tr. (3/19/12 a.m.) at 67-68.  Set forth in Neopost's standard postage meter rental agreement is the Postage-on-Call Deposit Trust Agreement.  See PX 189, Alcatel Frieden Rental Agreement, Mar. 1990.  That agreement provides the rights and duties between the trustee

bank, Neopost, and the licensee of the postage meter in managing advanced deposits.   One of the

terms of that rental agreement was that "[t]he renter shall not be entitled to any interest or other

income earned by investment of the Deposits."   Id.   That agreement applied to all of Neopost's

CMRS customers and had to be executed by them.   Trial Tr. (3/19/12 a.m.) at 74-76.

   With its CMRS in operation, Neopost earned four sources of revenue from 1990

until the 1995 CMRS regulatory changes went into effect: (1) interest income; (2) meter resetting

fees; (3) fees on cash advances; and (4) monthly meter rental fees.   See Trial Tr. (3/19/12 a.m.)

at 67-68, Trial Tr. (3/19/12 p.m.) at 106.   After the 1995 CMRS regulatory changes went into

effect, Neopost no longer earned interest income revenue, but continues to earn meter resetting

fees, fees on cash advances, and monthly rental fees.   See Trial Tr. (3/19/12 p.m.) at 107-08.

### E.  Ascom, CMRS, and USPS

   From 1981 to 1991, Mr. Goggin served as Ascom's Vice President of Operations.

See Trial Tr. (3/20/12 a.m.) at 26-27.   Mr. Goggin believes that he first heard of CMRS in the

early 1980s when Ascom learned of Pitney Bowes' CMRS.   Id. at 28.   Mr. Goggin testified at

trial that, around 1986, he personally discussed with Mr. Ganley and Mr. Gardner the

development of Ascom's own CMRS.   Id. at 29-30.   He stated: "[I]n discussions that [we] had

and I had with Mr. Gardner and Mr. Ganley, they made us quite aware that we would get the

same rights and benefits that Pitney Bowes received with their CMRS system."   Id. at 30.   Mr.

Goggin testified that Mr. Ganley and Mr. Gardner mentioned as rights and benefits the "meter

rental, . . . reset fees, and . . . the interest on the customers' accounts."   Id.   Mr. Goggin further

testified that, as a result of his discussions with Mr. Ganley and Mr. Gardner, it was his

21

"understanding that as long as [Ascom] had [its CMRS] system in operation, [Ascom] would be entitled to all those revenues associated with it," including interest income.  Id. at 31.

Mr. Goggin, however, did not mention any such personal conversations with Mr. Ganley and Mr. Gardner in his affidavit prepared for this litigation.  See Trial Tr. (3/19/12 a.m.) at 79-80; see also Goggin Aff. ¶¶ 5-8.  And Mr. Goggin's testimony contradicts that of Mr. Ganley, which the Court finds more credible.  As the Court has found, in his discussions with meter manufacturers regarding CMRS, Mr. Ganley never told the companies anything regarding "how long they could receive interest income[.]"  Ganley Dep. at 114-15.  Mr. Ganley did not provide the meter manufacturers with "any incentives . . . outside of the regulatory framework of the" then-existing 1979 "CMRS regulations as an incentive for entering into the CMRS system[.]"  Id. at 115.  Rather, Mr. Ganley told the meter manufacturers that they would have the same opportunities "under the regulations . . . that Pitney Bowes does."  Id. at 124; see id. at 146-47, 165-66.

As Mr. Ganley recalled his discussions with meter manufacturers regarding interest income, he "communicated with them probably through a number of conversations with each one of the companies," including Ascom, that CMRS "appeared to be an attractive system that they should be certainly looking at."  Ganley Dep. at 167.  But Mr. Ganley made clear that "that's as far as [he] could do it, is to suggest to them that [CMRS] looked attractive to get into as a corporate business decision."  Id.

According to Mr. Goggin, Ascom ultimately decided to develop and operate its own CMRS.  Trial Tr. (3/20/12 a.m.) at 35.  In making the decision to go forward with development of its CMRS, Ascom looked "at the revenue stream from the meter revenue,"

including "reset fees" and "interest income," and also "look[ed] at how much investment was going to be and what would it do to [Ascom] as [a] competitor[] in the market." Id. at 34. Development of Ascom's CMRS entailed two separate projects. Id. at 35. First, Ascom had to undertake the software development, and it hired NYNEX Corporation to accomplish this. Id. In carrying out its work, NYNEX spend a substantial amount of time at USPS, during which they interfaced with Mr. Ganley and Mr. Gardner. Id. at 36-37. Second, Ascom had to purchase the hardware to get the system operational, including computers and the power supply. Id. at 35.

Ascom, like Neopost, expressly has disclaimed in this litigation any request for recovery of investment and development costs related to CMRS. Trial Tr. (3/20/12 a.m.) at 59-60 (plaintiffs' counsel, stating that plaintiffs are "not seeking as damages any reimbursement of those costs" — that is, money spent "in developing and operating the [CMRS] system" — "as a measure of [their] damages."); see also Dkt. No. 213 at 11 ("Plaintiffs do not seek to recover those [costs that plaintiffs incurred in developing the CMRS] and such costs [are] not the subject matter of the contract at issue.")

In 1988, USPS approved Ascom's CMRS for distribution to its customers within the USPS regulatory framework. Joint Stipulation ¶ 15. In operating its CMRS, Ascom set up a trust account to handle CMRS advance deposits. Trial Tr. (3/20/12 a.m.) at 42. Under the trust agreement that governed that account, Ascom was entitled to the interest on all mailers' advanced deposits received by the bank. Id. at 42. Ascom's right to that interest was also memorialized in its rental agreement with each of its customers. The terms of the trust agreement, including Ascom's right to receive interest income and the fact that the customer "shall not be entitled to such interest," PX 114, Amended and Restated TMS Trust Agreement

23

at 2, Aug. 30, 1991, were set forth in the rental agreement and the customer explicitly agreed "to be bound by all the terms and conditions of the Trust Agreement . . . as if [he or she] were an actual signatory to the Trust Agreement."  PX 190, TMS Postage Meter Rental Agreement at 1, Nov. 1990.  Each of Ascom's customers was required to sign this agreement.  Trial Tr. (3/19/12 a.m.) at 46.

With its CMRS in operation, Ascom earned five sources of revenue from 1988 until the 1995 CMRS regulatory changes went into effect: (1) interest income; (2) meter resetting fees; (3) fees on cash advances; (4) monthly meter rental fees; and (5) revenue from the sale of CMRS bases.  See Trial Tr. (3/20/12 a.m.) at 64.  After the 1995 CMRS regulatory changes went into effect, Ascom no longer earned interest income on advance deposits, but continues to earn meter resetting fees, fees on cash advances, monthly rental fees, and revenues from the sale of CMRS bases.  See id. at 64-66.

### F.  The Job Duties of Frederick W. Ganley, Jr. and Francis Eugene Gardner

From the early 1970s until shortly before his retirement in 1992, Mr. Ganley's position at USPS was as General Manager of the Business Systems Division of the Office of Mail Classification Rates and Classification Department.  Ganley Dep. at 26.  Although the Rates and Classification Department, and thus Mr. Ganley's position, was within the Finance Department, Mr. Ganley made clear that he was not a "finance person" within USPS.  Id. at 111.  His responsibilities on issues of finance, such as the trust accounts and the interests earned on them, were "[n]egligible."  Id. at 110.  Even Mr. Ganley's supervisor, Ted Troy, was not within the chain of command that had supervision over the trust accounts and the interest earned on

those trust accounts.  Id.  Rather, the Finance Department was responsible for overseeing

compliance regarding trust accounts.  Id. at 85.

    In his general manager position, Mr. Ganley was responsible for USPS'

relationship with the meter manufacturers.  Ganley Dep. at 26-27.  Consequently, Mr. Ganley

was the primary contact with representatives of meter manufacturers, and he regularly interacted

with meter manufacturers regarding meters generally and CMRS specifically.  Id.; see also id.

at 152.  As Mr. Ganley described his duties,

> I had the same duties with regard to CMRS meters that I had with
> any other meter, the individual meter, the piece of hardware that
> was going into customer's hands would have come through me and
> gone out to out laboratory for evaluation to make sure it was a
> secure piece of equipment.
>
>     And I would have coordinated with other offices in the
> building to make sure that the other attributes of the CMRS system
> were being controlled within the constraints of the regulations, that
> the trust account system was working correctly and not just the
> trust account, but the transfer of funds from that trust account to
> the Postal Service.
>
>     Now that was outside of my department, but . . . I would
> have made sure that that was happening before anything, any meter
> were approved or any system was approved.

Id. at 84-85.

    In his general manager position, Mr. Ganley did not enter into or sign contracts on

behalf of USPS.  Ganley Dep. at 86.  As Mr. Ganley understood his position, he had no authority

to enter into contracts or to bind USPS regarding the issue of CMRS finances.  Id. at 86.  More

generally, as Mr. Ganley understood his position, he had no authority to sign any contracts on

behalf of USPS.  Id. at 86, 163.[5]  Nor did Mr. Ganley have a warrant, a term that he understood to

mean that he did not have authorization to commit USPS funds.  Id. at 85.  It was Mr. Ganley's

understanding, from his ongoing relationship with the meter manufacturers, that they knew that

he "did not have contractual authority beyond the regulations."  Id. at 117; cf. Trial Tr. (3/19/12

p.m.) at 110 (Mr. Mahlstedt, testifying that he assumed that Mr. Wilkerson, Mr. Ganley's

successor, did not have contracting authority to bind USPS "because he wasn't part of the

Treasury Department").

Mr. Ganley authorized or approved meter manufacturer products and actions to

ensure regulatory compliance.  See Ganley Dep. at 78-81, 106-110.  As an example, Mr. Ganley

approved Neopost's operation of a meter repair facility in Tijuana, Mexico.  See PX 112, Letter

from F. Ganley to R. Hillegass at 1, Aug. 23, 1991; see Ganley Dep. at 83-84, 103.  And Mr.

Ganley made "commitments" to the meter manufacturers, which he defined as "on a day-to-day

basis, meter manufacturers would ask me questions and I would answer them."  Id. at 90.

The majority of Mr. Ganley's job responsibilities at USPS did not involve postage

meters: Mr. Ganley testified that 10 to 15 percent of his time was spent with issues of postage

meters, and 85 to 90 percent of his time was spent on "other things" involving "the systems that

customers paid fees for, registered, insured, certified, et cetera, money order system, packaging

regulations, mailability regulations, the Postal money order system, developing some alternative

---

[5]      Mr. Ganley's testimony is consistent with that of Mr. Wilkerson, Mr. Ganley's
successor at USPS.  Mr. Wilkerson testified that he never entered into any contracts on behalf of
USPS, and that he did not have any authority to enter into such contracts.  Trial Tr. (3/21/12)
at 99; see also id. at 100-01 (Mr. Wilkerson, explaining that he would submit requests for
contracts to a contracting officer).  Instead, Mr. Wilkerson signed "approvals," in which he
would approve products and systems in accordance with USPS' regulations.  Id. at 68.

postage payment systems." Ganley Dep. at 170; see id. at 171. Beginning around 1981, after the development of CMRS and the promulgation of the 1979 CMRS regulations, Mr. Ganley testified that he spent about 15 percent of his time working on postage meters, and about half of that 15 percent involved CMRS. See id. at 170-71.

Mr. Gardner was a USPS employee on Mr. Ganley's staff and was directly supervised by Mr. Ganley. Ganley Dep. at 98. Mr. Ganley testified that he was familiar with Mr. Gardner's authority as a USPS employee and testified that Mr. Gardner had neither warrant authority nor contracting authority. Id. at 98-99. Mr. Gardner worked for Mr. Ganley for nearly 20 years, see id. at 98, and in all that time Mr. Gardner never entered into any contracts on behalf of USPS. Id. at 99.

### G.  The 1995 CMRS Regulations

#### 1.  Promulgation and Effect

On June 9, 1995, USPS promulgated new regulations governing CMRS. See Joint Stipulation of Facts ¶ 19; PX 159, 60 FED. REG. 30,714 (June 9, 1995). The 1995 CMRS regulations changed CMRS financial arrangements by, among other things, eliminating the commercial trustee bank account and requiring that customers' advance meter resetting deposits go directly into USPS' account. Joint Stipulation of Facts ¶ 19.

Under the 1995 CMRS regulations, all the meter manufacturers continued to perform the following tasks, which they previously performed under the 1979 CMRS regulations:

- The meter manufacturers had to verify that customers had sufficient funds on deposit with USPS;

- The meter manufacturers had to track all customer deposits and activity;

- The meter manufacturers were allowed to establish and charge fees to customers' accounts for the postage reset following each resetting;

- The meter manufacturers had to provide customers with statements documenting their transactions and balances;

- The meter manufacturers had to respond to customer inquiries concerning the status of their payments;

- The meter manufacturers had to publish payment options to customers;

- The meter manufacturers had to provide USPS with daily activity reports, revenue allocation reports, postage fund reports, and funds advanced reports.

Joint Stipulation of Facts ¶ 20 (citations omitted).

Although the 1995 CMRS regulations eliminated the commercial trustee bank accounts and required that customers' advance meter resetting deposits go directly into USPS' account, the meter manufacturers continued to earn the following revenues from the operation of CMRS: meter resetting fees; fees on cash advances; monthly meter rental fees; and revenue from the sale of CMRS bases. See Trial Tr. (3/19/12 p.m.) at 107-08; Trial Tr. (3/20/12 a.m.) at 64-66.

2.  Motivation for the Changes

USPS ultimately decided to eliminate the commercial trustee bank accounts by means of the 1995 CMRS regulations in order to improve USPS' cash management and to

28

improve customer service and security.  See, e.g., Trial Tr. (3/20/12 p.m.) at 4, 17 (Mr. Kearney,

testifying that the CMRS changes to the trust accounts "was an improvement to our cas[h]

management system" and "improv[ed] customer service" by "improving the safety and security

of our incoming funds to the Postal Service, and possibly making the Postal Service more

competitive in the marketplace").

### a.  Cash Management

As for the cash management motivation, Mr. Kearney, USPS' Treasurer, testified

that "one of the main measurements of improvements in cash management is improvement in the

availability of funds as measured by interest value of those funds."  Trial Tr. (3/20/12 p.m.) at

23-24.  As Mr. Kearney described Pitney Bowes' CMRS trust accounts before the 1995

regulatory changes, a large amount of money,

> almost $300 million, was sitting in a private company's bank
> account and being delayed on the process of being moved to the
> Postal Service fund, we thought unnecessarily.  So there was an
> opportunity to speed up the flow of cash into the Postal Service
> fund, which was one of the basic goals of all cash management
> systems.

Id. at 12-13.

James Grant, a member of Mr. Kearney's staff, drafted a memorandum, dated

January 7, 1994, that was sent to Michael Riley, USPS' then-Chief Financial Officer, and Mr.

Kearney analyzing the CMRS cash management procedures.  PX 133, Memorandum from

J. Grant to M. Riley et al. at 1 (Jan. 7, 1994).  Mr. Grant analyzed the proposed regulatory

changes in purely financial terms; he concluded in that memorandum:

The proposed cash management changes would provide the USPS with an investable balance of $294,400,000.  This balance managed within the Postal Service Fund, during FY 1993, would have realized $19,165,440 in interest income.  The newly acquired lockbox bank account would become an explicit expense of $1,454,000.  The result would have been net income generation of $17,711,440.

Since possession of the trust fund represents a permanent increase in cash or a reduction in debt, the income generation is not a one time event.  Therefore, giving consideration to future CMRS program growth and historical interest rates the estimated new present value of this change, discounted at 6%, over the next 20 year period could exceed $300 million.

Id.; see Trial Tr.(3/20/12 p.m.) at 22.

USPS attempted to minimize the importance of that $300 million figure by putting it into perspective through the testimony of Mr. Pedersen.  Mr. Pedersen testified that "300 million . . . was certainly less than one-and-a-half days of *revenue* at the time" — that is, the early 1990s.  Trial Tr. (3/21/12) at 141 (emphasis added).  Mr. Pedersen further testified: "[O]ne day of revenue, I'm approximating at about 200 million.  During our best days when revenue was higher and around 75 billion, it worked out to over or close to $270 million . . . . per day."  Id.  That testimony, however, is unhelpful because Mr. Grant's $300 million estimate regarding interest income was in reference to USPS *profit*, not revenue.  See PX 131 at 1 (calculating "net income generation" after subtracting expenses).  And Mr. Pedersen did not explain at trial how USPS' daily revenue of $200 to $270 million related to its net income.  Consequently, without any evidence to the contrary, the Court finds that the possibility of a net income generation of $300 million over 20 years was a significant factor leading to the promulgation of the 1995 CMRS regulations.

b. Customer Service and Security

USPS had another motivation for the 1995 CMRS regulations: it was concerned about the safety of CMRS customers' money, "which was sent by [its] customers ultimately to be used as postage on mail."  Trial Tr. (3/20/12 p.m.) at 13 (testimony of Mr. Kearney).  First, USPS was concerned with postage meter fraud generally.  That concern traced back to early 1993 when the Postal Inspection Service notified Ms. Gibert's organization that they could no longer rely on the physical inspection of meters to determine if they had been tampered with, because they had identified a case of meter tampering that was not discernable by the naked eye. See Trial Tr. (3/21/12) at 110.  Ms. Gibert testified that this discovery "sent shock-waves through our whole organization" since meters were a very big source of revenue for USPS.  Id. Consequently, Ms. Gibert then spent a significant portion of her time learning about the issue of meter fraud and making plans to rectify it.  Id. at 111.  In describing the scope of the scrutiny given to the meter-fraud issue, Ms. Gibert noted that the General Accounting Office "did a study and Congress held hearings, . . .  and so we were getting a lot of attention."  Id.

As for CMRS specifically, each witness asked at trial about any known security breaches related to the cash management component of CMRS stated that they were unaware of any.  See, e.g., Trial Tr. (3/21/12) at 83-84 (Mr. Wilkerson, testifying that he was not aware of any monetary losses suffered by USPS as a result of the CMRS operations before the 1995 regulatory change); Trial Tr. (3/19/12 a.m.) at 80-81 (Mr. Hillegass, testifying that he knew of no revenue loss relating to the use of the trust fund in connection with the CMRS); Trial Tr. (3/21/12) at 125 (Ms. Gibert, testifying that she was not aware of any issues of fraud in the cash management of CMRS).  Nevertheless, as part of its comprehensive review of postage meters,

31

USPS discovered that it had very little information about potential issues with CMRS accounts

— specifically "what those accounts were invested in and how they were protected."  Trial Tr.

(3/20/12 p.m.) at 62 (testimony of Mr. Kearney).  And the finishing "cement" on the plan to

make changes to the CMRS regulations, as Mr. Pedersen testified, see Trial Tr. (3/21/12) at 150,

followed a meeting with Ascom's then-President, Michael Allocca, where Mr. Allocca "stated

he had recently spoken with some bankers and they had told him how he could increase

substantially his interest on those assets held in the trust fund."  Id. at 142.  That statement

alarmed Mr. Pedersen

> [b]ecause the only way you can do that is by increasing risk, and
> these were funds that were short term in nature, destined for
> postage, and the only way you could increase returns on them
> would be to either increase your credit risk or to increase your
> interest rate risk, neither of which would have been appropriate.

Id. at 142-43; see also Trial Tr. (3/21/12) at 16-17 (Mr. Kearney, testifying that USPS was

"concerned that when part of their income was linked to interest, that they had a disincentive to

provide optimal service to the customers because they had an incentive to keep the money as

long as possible").

       The changes imposed by the 1995 CMRS regulations added the benefit of backing

customers' funds with the full faith and credit of the U.S. government.  See Trial Tr. (3/20/12

p.m.) at 63 (Mr. Kearney, testifying that "[b]y putting it in the treasury, the entire amount was

subject to the full faith and credit of the U.S. government").  In contrast, in the pre-1995

regulatory framework, at least some portion of those funds was not even insured by the Federal

Deposit Insurance Corporation.  See Trial Tr. (3/19/12 p.m.) at 29-30; see also DX 143, Neopost

Custodial Account Agreement with Comerica at NH003714, Apr. 15, 1994 ("[T]he funds are not insured by the Federal Deposit Insurance Corporation.").

### H. Implementation of the 1995 CMRS Regulations

#### 1. Neopost Goes First

At the time the 1995 CMRS regulations were promulgated, there were only four meter manufacturers in the market: Pitney Bowes; Neopost; Ascom; and Postalia.  Trial Tr. (3/19/12 a.m.) at 83.  Neopost was the first meter manufacturer to implement the 1995 CMRS regulatory changes.  Trial Tr. (3/19/12 p.m.) at 101.

Mr. Mahlstedt testified at trial that USPS asked Neopost to be the first meter manufacturer to implement the changes.  Id.  Mr. Mahlstedt responded that Neopost would do so, and would "do a good job of it," but that the company wanted something in return for going first. Id.  What Mr. Mahlstedt actually requested on behalf of Neopost and what USPS said in return, however, is unclear and was not established by a preponderance of the evidence at trial.  And Mr. Mahlstedt's testimony that USPS agreed to compensate Neopost in some way for being the first company to implement the 1995 CMRS regulatory changes is contradicted by other evidence admitted at trial, including Mr. Mahlstedt's own writings.

Mr. Mahlstedt testified that he had a meeting with Mr. Riley, USPS' then-Chief Financial Officer, in May 1995.  Trial Tr. (3/19/12 p.m.) at 102-03.  He testified that at that meeting he and Mr. Riley discussed Neopost being the first company to implement the 1995 CMRS regulatory changes.  Id.  As Mr. Mahlstedt first described it, he orally made clear to Mr. Riley that he

> wanted to be assured . . . that [Neopost] would receive exact
> treatment -- the same treatment as the other meter manufacturers so
> that we would come out financially the same, meaning, as though
> we had not lost our interest until everybody else lost theirs.  And if
> Pitney got anything out of it, because we knew there was a suit,
> that we would get some proportionate share.

Id. at 100-01.  Mr. Mahlstedt testified that his concern, as expressed to Mr. Riley, was about

"losing more money than anybody else" by going first in implementing the 1995 regulatory

changes.  Id. at 101.

Mr. Mahlstedt testified that Mr. Riley responded orally "that [Neopost] would be

treated equally with Pitney-Bowes."  Trial Tr. (3/19/12 p.m.) at 101; see id. at 112.  Mr.

Mahlstedt later testified that Mr. Riley implied "that it would not happen that we would lose

more interest than Pitney-Bowes"; Mr. Mahlstedt then added that Mr. Riley said that "if

Pitney-Bowes were awarded something, that we would get the same thing[.]"  Id. at 112; see also

PX 186, Affidavit of Neil Mahlstedt ("Mahlstedt Aff.") ¶ 9, June 2, 2010.

Mr. Mahlstedt memorialized his meeting with Mr. Riley in a letter dated May 11,

1995.  See DX 67, Letter from N. Mahlstedt to M. Riley at 1-2, May 11, 1995.  In that letter, Mr.

Mahlstedt did not reference Pitney Bowes' interest income specifically.  See id.  Nor did he

reference anything about being awarded any type of compensation proportionate to or equal to

that of Pitney Bowes.  Rather, he stated only that Neopost should not be the only meter

manufacturer to lose its interest income.  See id. at 1.  He stated:

> My concern is that [Neopost] could be the only meter manufacturer
> to lose its escrow income, if it proceeds with the move . . . while
> other manufacturers contest.  From our conversation, I gather the
> USPS will not let that happen.

34

> [Neopost] will comply with all USPS requirements and it will do
> so in a cooperative manner.  I believe we have made that clear
> from the beginning.

Id.  As Mr. Mahlstedt described it, his principal interest was equality: "we all keep or we all lose

our escrow accounts[.]"  Id.

Mr. Riley did not respond to Mr. Mahlstedt's letter.  Five months later, on

October 6, 1995, Mr. Mahlstedt wrote another letter to Mr. Riley, in which he expressly stated

that he had not yet received any commitment from USPS for any type of payment related to

CMRS.  He stated:

> I still feel compelled to contact you about the transfer of escrow
> accounts from Neopost to the USPS.  Neopost will experience
> about a twenty percent drop in profits through the loss of interest
> income, *with no commitment from the USPS for payment for our
> work*. . . .
>
> The Postal Service would be treating Neopost unjustly if it did not
> compensate us for our work.  And, the injustice would be even
> greater if Pitney Bowes was allowed to keep its escrow account
> income.

DX 76, Letter from N. Mahlstedt to M. Riley at 1-2, Oct. 6, 1995 (emphasis added).

One month later, on November 3, 1995, Mr. Mahlstedt wrote a letter to Mike

Coughlin, who was then the Deputy Postmaster General.  See DX 77, Letter from N. Mahlstedt

to M. Coughlin at 1, Nov. 3, 1995.  In that letter, Mr. Mahlstedt continued to request

compensation from USPS and said nothing about any agreement with Mr. Riley.  See id. at 1-2.

He stated:  "I urge you to allow Neopost to receive compensation for at least the work that it does

for the USPS in remote meter setting."  Id.  Mr. Coughlin did not respond to that letter.

In his letter to Mr. Riley in May of 1995, Mr. Mahlstedt set forth Neopost's proposed time frame for implementing the 1995 CMRS regulatory changes, in which Neopost would fully implement the changes sometime between January and March of 1996. See DX 67 at 2.  Mr. Mahlstedt testified at trial that every time Neopost asked for an extension in the time to convert, it was granted an extension.  See Trial Tr. (3/19/12 p.m.) at 114.  On January 21, 1996, Neopost transferred its customers' advance deposits for CMRS to USPS, before any other meter manufacturer did so.  See PX 163, Letter from S. Kearney to N. Mahlstedt at 1, Dec. 15, 1995; DX 81, Letter from N. Mahlstedt to M. Runyon at 1, May 3, 1996.

On May 3, 1996, several months after Neopost implemented the 1995 CMRS regulatory changes, Mr. Mahlstedt wrote to Marvin Runyon, who at that time was the Postmaster General.  See Trial Tr. (3/20/12 a.m.) at 14; DX 81 at 1.  In that letter, Mr. Mahlstedt continued to ask for compensation for being the first to implement the 1995 regulatory changes.  See DX 81 at 1.  And, again, Mr. Mahlstedt said nothing in that letter about any agreement with Mr. Riley regarding any compensation for being the first to implement the 1995 CMRS regulatory changes. In relevant part, Mr. Mahlstedt stated:

> Because we are the right size for experimenting and have a cooperative attitude we were the first company to transfer our escrow accounts, for remote meter resetting, to the USPS — early this year.  We came to grips with that USPS change early, accepted the fact that we would have some losses and cooperated from then on.
>
> But, going first means that we are the first to lose interest income. One competitor will not transfer the bulk of its accounts until June [of 1996] and another shortly thereafter.  That's if the dates do not slip. . . .

> In addition to being the only ones to lose this money we are also
> the only company to suffer from the costly mistakes that happen
> when a project this massive is undertaken for the first time. . . .
>
> It's not right that we should be forced to accept this without
> compensation while our competitors don't.  We're not requesting
> special treatment, only equal treatment with our competitors.

Id.

Mr. Runyon responded to Mr. Mahlstedt's letter on June 27, 1996, in which he

stated: "We are in the final stages of converting the remaining two meter manufacturers [to the

USPS trust fund deposit system].  The Board of Governors has voted unanimously not to

compensate any of the manufacturers for implementing this necessary change."  DX 82, Letter

from M. Runyon to N. Mahlstedt at 1, June 27, 1996.


## 2.  Ascom Follows Neopost

In implementing the regulatory changes made by the 1995 CMRS regulations,

Ascom was provided the additional time it requested within which to comply.  See Trial Tr.

(3/20/12 a.m.) at 75-79.  USPS originally informed Ascom that its compliance with the 1995

CMRS regulations "must be completed no later than December 21, 1995."  DX 114, Letter from

S. Kearney to M. Allocca at 1, Sept. 25, 1995.  Ascom, however, subsequently proposed that the

compliance date be extended until April 10, 1996.  See DX 119, Letter from M. Allocca to S.

Kearney at ASC 005443, Nov. 28, 1995.  USPS agreed to that proposal, extending Ascom's

compliance date to April 10, 1996.  See DX 120, Letter from S. Kearney to M. Allocca at 1, Dec.

15, 1995; see also Trial Tr. (3/20/12 a.m.) at 78.

During that extended compliance timeline, Ascom was allowed to continue to recoup interest income on its CMRS accounts.  See DX 120 at 1; see also Trial Tr. (3/20/12 a.m.) at 75-76.  Because of the implementation extensions granted to Ascom by USPS, it was permitted to earn interest income from its CMRS accounts for close to three months longer than Neopost did.

### 3.  Pitney Bowes Goes Last

It is undisputed that Pitney Bowes, like Neopost and Ascom, also lost the ability to collect interest income from commercial trustee bank accounts as a result of the 1995 CMRS regulatory changes.  See Pls. Findings & Conclusions at 76 n.28; see also Ganley Dep. at 149; Trial Tr. (3/19/12 p.m.) at 113-14.  But it is unclear from the record exactly when Pitney Bowes was required to implement the 1995 CMRS regulatory changes.  See Trial Tr. (3/19/12 p.m.) at 113-14.

The evidence suggests that USPS provided Pitney Bowes with more time than other meter manufacturers to implement the 1995 CMRS regulations because of Pitney Bowes' size and the number of postage meters that it had in the market at that time.  See Trial Tr. (3/20/12 a.m.) at 17 (because Pitney Bowes had more market share and more postage meters than Neopost, it "would take [Pitney Bowes] substantially more time" to comply with the 1995 CMRS regulations).  The Court infers from the evidence introduced at trial that Pitney Bowes implemented the 1995 CMRS regulations sometime after April 10, 1996 (when Ascom implemented the changes) and before December 19, 1997 (when Pitney Bowes filed suit against USPS).

*I.  Lawsuit and Settlement Between Pitney Bowes and USPS*

On December 19, 1997, Pitney Bowes filed suit against USPS, and the case was assigned to another judge of this Court.  See Pitney Bowes, Inc. v. USPS, 27 F. Supp. 2d 15 (D.D.C. 1998) (Urbina, J.).  The case was settled in July 1999; under the terms of the settlement, USPS paid Pitney Bowes $51,750,000.  PX 177, Settlement Agreement and Release at 4, July 30, 1999.  USPS and Pitney Bowes acknowledged that the settlement "provides Pitney Bowes with a portion of the financial benefit that Pitney Bowes claimed it had lost and the Postal Service had obtained as a result of the 1995 CMRS Regulations and allegedly in breach of the [Statement of Understanding.]"  Id. at 3-4.

*J.  Damages*

Plaintiffs presented the testimony and report of Dr. Abramson in support of their alleged damages as a result of the 1995 CMRS regulatory changes.  Plaintiffs contend that Dr. Abramson provided persuasive evidence with a reasonable degree of economic certainty that plaintiffs' economic damages, as of December 31, 2011, from the loss of interest income amount to $74,710,131.67.  See Pls. Findings & Conclusions at 57.  As stated above, plaintiffs expressly have disclaimed in this litigation any request for recovery of investment and development costs related to CMRS.  Trial Tr. (3/20/12 a.m.) at 59-60; see also Dkt. No. 213 at 11.

USPS contends that Dr. Abramson's analyses and, ultimately, his conclusions regarding damages are unreliable and invalid.  See USPS Findings & Conclusions at 55-66. Because the Court concludes that plaintiffs have failed to satisfy their burden on each of their

claims, the Court need not address the parties' disputes over the amount of damages allegedly suffered by plaintiffs.

## IV.  CONCLUSIONS OF LAW

### A.  Standard of Proof

Plaintiffs bear the burden of establishing each element of their claims by a preponderance of the evidence.  See Lozinsky v. Georgia Res. Mgmt., LLC, 734 F. Supp. 2d 150, 155 (D.D.C. 2010) (evaluating unjust enrichment claim "under the preponderance of the evidence standard"); Building Servs. Co. v. National R.R. Passenger Corp., 305 F. Supp. 2d 85, 92 (D.D.C. 2004) (referring to the preponderance of the evidence standard as the burden for a promissory estoppel claim); Palm Beach Isles Assocs. v. United States, 58 Fed. Cl. 657, 665 (Fed. Cl. 2003) ("The evidentiary standard for plaintiffs as to the alleged taking . . . is a preponderance of the evidence."); Robinson v. Nussbaum, 11 F. Supp. 2d 10, 15 (D.D.C. 1997) (evaluating contract claim under preponderance of the evidence standard); see also Grogan v. Garner, 498 U.S. 279, 286 (1991).

A preponderance of the evidence standard requires "that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact."  United States v. Smith, 267 F.3d 1154, 1161 (D.C. Cir. 2001); see also Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003).  The Court must "believe that the existence of a fact is more probable than its nonexistence before [it] may find in favor of the party who has the burden to persuade the [Court] of the fact's existence."  Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993).

### B.  Contract Claims (Count III)

Neopost alleges the existence of either an express oral contract or an implied-in-fact contract with USPS; Ascom alleges the existence of an implied-in-fact contract only.  See generally Pls. Findings & Conclusions at 74-95.  An implied-in-fact contract has the same legal effect as an express one.  Novak v. Seiko Corp., 37 Fed. App'x 239, 243 (9th Cir. 2002).  The only difference between the two "is the means by which the parties manifest their agreement."  Id. (quotations omitted).  "In an express contract, the parties manifest their agreement by their words, whether written or spoken," whereas "[i]n an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct."  Id. (quotations omitted); see Brunner v. United States, 70 Fed. Cl. 623, 626-27 (Fed. Cl. 2006) ("The difference between an express and an implied-in-fact contract is that the lack of ambiguity in offer and acceptance, . . . or meeting of the minds . . . is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.") (internal quotations and citation omitted).[6]

In assessing whether a contract exists, the Court applies an objective standard to the words or actions that allegedly gave rise to an agreement.  See Northland Capital Corp. v. Silver, 735 F.2d 1421, 1427 n.7 (D.C. Cir. 1984) ("The principle that objective manifestation of intent is controlling in contract formation is very well established.").  The elements of an express and an implied-in-fact contract are the same.  Goldings v. United States, 98 Fed. Cl. 470, 479 (Fed. Cl. 2011) ("The elements of a binding contract with the United States are identical for

---

[6]     As for Neopost's express contract claim, it is undisputed that Neopost did not sign any written agreement with USPS.

41

express and implied-in-fact contracts."). "'[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'" Bank of Am., FSB v. United States, 55 Fed. Cl. 670, 674 (Fed. Cl. 2003) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 17(a) (1979)). Thus, a contract "is an agreement characterized by 'an exchange of promises — through commitments to act or refrain from acting in a specified way — that are evidenced in a writing or are inferable from conduct.'" Id. (quoting Maher v. United States, 314 F.3d 600, 603 (Fed. Cir. 2002)); see Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. 264, 270 (Fed. Cl. 2002). "Such promises generally are expressed in the form of an offer and acceptance, in which each promise serves as the inducement for the other." Bank of Am., FSB v. United States, 55 Fed. Cl. 674-75. A promise may be express or implied "but it is to be distinguished from mere statements of intention, opinion, or prediction." Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. at 270; Cutler-Hammer, Inc. v. United States, 441 F.2d 1179, 1182 (Ct. Cl. 1971) ("In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention.").

Where, as here, a party alleges the existence of a contract with USPS, a federal agency, that party must establish the following elements: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind [USPS] in contract." Hoag v. United States, 99 Fed. Cl. 246, 253 (Fed. Cl. 2011) (quotations omitted); see BioFunction, LLC v. United States, 92 Fed. Cl. 167, 172-73 (Fed. Cl. 2010). A contract must "be sufficiently definite as to its material terms," which include, among other things, subject matter, payment terms, and duration.

Mero v. City Segway Tours of Washington DC, LLC., 826 F. Supp. 2d 100, 105 (D.D.C. 2011)

(quotations omitted); see LanQuest Corp. v. McManus & Darden LLP, 796 F. Supp. 2d 92, 102

(D.D.C. 2011).  All terms contemplated by the agreement "need not be fixed with complete and

perfect certainty for a contract to [be enforceable]."  LanQuest Corp. v. McManus & Darden

LLP, 796 F. Supp. 2d at 102 (quotations omitted) (alteration in original).  "To be enforceable,

however, the contract terms must be sufficiently definite so that the parties can be reasonably

certain as to how they are to perform."  Id. (quotations omitted).

> 1.  Alleged Oral or Implied-in-Fact Contract Between
>      Neopost and USPS Regarding Interest Income

The Court concludes that Neopost has failed to establish by a preponderance of

the evidence that Neopost and USPS entered into an express oral contract or an implied-in-fact

contract regarding the right to retain interest income as long as Neopost operated its CMRS.  The

primary question in this case is whether USPS made a binding promise to provide Neopost with

certain regulatory treatment — that is, the right to retain interest income as long as Neopost

operated its CMRS system.  As the Supreme Court has established, the government can and does

make promises and enter into contracts regarding its regulatory function.  See United States v.

Winstar Corp., 518 U.S. 839, 871-72, 894-95 (1996).  "Ordinary principles for contract

construction and breach that would be applicable to any contract between private parties" are

applied to claims regarding the existence and breach of contract with the government.  Id.; see

Fifth Third Bank of W. Ohio v. United States, 52 Fed. Cl. at 270.

As discussed, because Neopost alleges the existence of a contract with USPS, a

federal agency, it must establish the following elements by a preponderance of the evidence: "a

mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind [USPS] in contract."  Hoag v. United States, 99 Fed. Cl. at 253 (quotations omitted); see Rivera v. United States, --- Fed. Cl. ----, 2012 WL 2870208, at *6 (Fed. Cl. July 12, 2012).  Neopost has failed to demonstrate the existence of a contract with USPS because it has failed to meet at least three of the four elements of contract formation, all of which are required.

Neopost has not established that USPS made any promise or engaged in any acts by which USPS manifested its assent to an agreement whereby Neopost could collect interest income as long as Neopost operated its CMRS.  As the Court has found, Mr. Ganley never offered or promised anything regarding "how long [meter manufacturers] could receive interest income[.]"  Ganley Dep. at 114-15.  Mr. Ganley did not provide any of the meter manufacturers, including Neopost, with "any incentives . . . outside of the regulatory framework of the" then-existing 1979 "CMRS regulations as an incentive for entering into the CMRS system[.]"  Id. at 115.  Rather, Mr. Ganley told the meter manufacturers that they would have the same opportunities "under the regulations . . . that Pitney Bowes does."  Id. at 124; see id. at 146-47; see also Trial Tr. (3/19/12 a.m.) at 63 (Mr. Hillegass, testifying that Mr. Ganley informed him "regarding the CMRS system and the fact that the revenues were there, that we have the opportunity to earn revenue on the escrow account and on the setting fees").

As Mr. Ganley recalled his discussions with meter manufacturers regarding interest income, he "communicated with them probably through a number of conversations with each one of the companies" that CMRS "appeared to be an attractive system that they should be certainly looking at."  Ganley Dep. at 167.  But Mr. Ganley made clear that "that's as far as [he]

could do it, is to suggest to them that [CMRS] looked attractive to get into as a corporate

business decision."  Id.  Mr. Ganley, on behalf of USPS, therefore never made any statements "in

the form of an undertaking" regarding interest income; rather, his statements to the meter

manufacturers were "mere prediction[s]" or "statement[s] of opinion[s]."  Cutler-Hammer, Inc.

v. United States, 441 F.2d at 1182.  Mr. Ganley informed Neopost of nothing more than the

opportunity to take advantage of what the 1979 CMRS regulations permitted.  See Ganley Dep.

at 124, 146-47.  Where, as here, there is no evidence of USPS' contractual intent, "no promise

can be found, whether it be a promise to continue to regulate in a certain manner for a certain

period of time, a promise to insure against a change in the law, or otherwise."  Fifth Third Bank

of W. Ohio v. United States, 52 Fed. Cl. at 270.

> Neopost also has not established a "'lack of ambiguity in offer.'"  Rivera v.

United States, 2012 WL 2870208, at *6 (quoting City of El Centro v. United States, 922 F.3d

816, 820 (Fed. Cir. 1990)).  As just discussed, Mr. Ganley made no offer to Neopost regarding

how long they could receive interest income from the CMRS system.  Even assuming that

Mr. Ganley did make some form of promise to Neopost or manifested his agreement by some

type of conduct, a material term of that agreement — the duration of the right to collect interest

income — is unclear and has not been established by a preponderance of the evidence.

> Neopost's contractual claim necessarily depends on establishing that Pitney

Bowes and USPS entered into a contract, and that Neopost was then offered the same terms and

conditions as Pitney Bowes, without conditions or exceptions.  See, e.g., Pls. Findings &

Conclusions at 2.  As for Pitney Bowes' contract with USPS, Neopost states: "The undisputed

evidence demonstrates that an agreement was reached between Pitney Bowes and USPS that was

not reduced to writing that Pitney would receive the interest income from the Trust Accounts for developing and operating the CMRS." Id. at 76 n.28. The Court agrees with Neopost that the evidence shows that Pitney Bowes and USPS entered into an agreement regarding interest income. But the Court disagrees that the terms of that agreement were proved at trial.

Mr. Ganley, on whom plaintiffs' primarily rely for their evidence of a contract between Pitney Bowes and USPS, testified that USPS "ultimately agreed to allow [Pitney Bowes] to collect the interest income from the trust accounts." Ganley Dep. at 37. But Mr. Ganley did not provide any testimony as to the duration of Pitney Bowes' right to collect interest income, and there is no other credible evidence concerning the duration of the Pitney Bowes arrangement. It is unclear from Mr. Ganley's testimony whether Pitney Bowes' right to collect interest income continued as long as Pitney Bowes operated its CMRS; or whether that right continued only to the extent necessary to defray certain development and operational costs; or whether that right continued for some other period of time. Indeed, as Pitney Bowes itself described its proposal, generated earnings from CMRS would "be used to defray *some* of the [CMRS] systems costs." PX 40 at 1 (emphasis added). Consequently, even assuming that Mr. Ganley, on behalf of USPS, offered Neopost the right to collect interest income on the same terms as Pitney Bowes, a material term has not been established by a preponderance of the evidence.

Finally, Neopost has not established that Mr. Ganley, or his subordinate, Mr. Gardner, had implied actual authority to enter into a contract regarding interest income. "[A]nyone entering into an arrangement with the [g]overnment takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of

his authority." Jumah v. United States, 90 Fed. Cl. 603, 612 (Fed. Cl. 2009) (quotations

omitted); see also District of Columbia v. United States, 67 Fed. Cl. 292, 338 (Fed. Cl. 2005)

("[A] party contracting with the government is on constructive notice of the limits of the

[government agent's] authority, and cannot reasonably rely on representations to the contrary.")

(quotations omitted) (alteration in original).  Only actual authority, express or implied, can bind

the government.  Jumah v. United States, 90 Fed. Cl. at 612; see Doe v. United States, 95 Fed.

Cl. 546, 583 (Fed. Cl. 2010) (stating that "apparent authority will not suffice to hold the

[g]overnment bound by the acts of its agents") (quotations omitted).

        Neopost does not contend that Mr. Ganley had express actual authority to bind

USPS.  See Pls. Findings & Conclusions at 79 & n.29.  The question therefore is whether

plaintiffs have proved that Mr. Ganley had implied actual authority to bind USPS to the alleged

contract with Neopost.  Id. at 79.  "[I]mplied actual authority may exist only where contracting

authority is an integral part of the duties assigned to the government employee."  BioFunction,

LLC v. United States, 92 Fed. Cl. at 172; see Monument Realty LLC. v. Washington Metro. Area

Transit Auth., 535 F. Supp. 2d 60, 71 (D.D.C. 2008).  "Contracting authority is 'integral' when

an employee cannot perform [his or her] duties without it, and the authority is an essential or

necessary part of the employee's occupation."  BioFunction, LLC v. United States, 92 Fed. Cl.

at 172.

        In view of findings made above regarding Mr. Ganley's employment at USPS, the

Court concludes that contracting authority was not an integral part of the duties assigned to him.

Mr. Ganley had broad regulatory and compliance duties relating to postage meter operation, but

Mr. Ganley's regulatory duties, which included the ability to authorize and approve new

47

products, did not require the ability to contract.  See Arakaki v. United States, 71 Fed. Cl. 509,

516 (Fed. Cl. 2006) ("An employee's duties in supervising or managing specific contractor

activities or government functions may not carry the corresponding authority to enter into or

modify existing contracts in the name of the government."); Northrop Grumman Corp. v. United

States, 47 Fed. Cl. 20, 63 (Fed. Cl. 2000) (Contractual authority "in no way can be considered an

integral part of the duty of reviewing contractor compliance.") (quotations omitted).  That Mr.

Ganley was in charge of USPS's relationship with all meter manufacturers, and was the primary

liaison with those manufacturers, also does not give rise to contracting authority.  See H. Landau

& Co. v. United States, 20 Cl. Ct. 400, 402-05, 407 (Cl. Ct. 1990) (distinguishing responsibility

of business development — for example, helping firms develop; providing management and

technical assistance, if necessary; helping with marketing — from duties giving rise to

contractual authority).

    Furthermore, it was established at trial that Mr. Ganley's job duties did not extend

to responsibilities on the finance side of things.  Cf. H. Landau & Co. v. United States, 20 Cl. Ct.

at 407 (employee's business development job duties did not permit a finding of implied actual

authority to bind agency to contract because, among other things, "[t]he only duty [the employee]

had in connection with contract administration was to monitor special joint accounts and to

recommend whether payments should be authorized to the credit of a contractor") (emphasis in

original).  Mr. Ganley's responsibilities on issues of finance, such as the trust accounts and the

interest earned on them, were "[n]egligible."  Ganley Dep. at 111.  Even Mr. Ganley's

supervisor, Mr. Troy, was not within the chain of command that had supervision over the trust

48

accounts and the interest earned on those trust accounts.  Id. at 111.  Rather, the Finance

Department was responsible for overseeing compliance regarding trust accounts.  Id. at 85.

       And finally, Mr. Ganley himself testified that neither he nor Mr. Gardner entered

into or signed contracts on behalf of USPS.  See Ganley Dep. at 86; id. at 99; see also Trial Tr.

(3/21/12) at 99 (Mr. Ganley's successor, Mr. Wilkerson, testifying that he never entered into any

contracts on behalf of USPS).  That testimony certainly is persuasive evidence that runs contrary

to any conclusion that contracting authority was essential to Mr. Ganley's or Mr. Gardner's

responsibilities as USPS employees.  See BioFunction, LLC v. United States, 92 Fed. Cl. at 172

("Contracting authority is 'integral' when an employee cannot perform [his or her] duties without

it, and the authority is an essential or necessary part of the employee's occupation.").

       Neopost therefore has failed to establish that contracting authority was an integral

part of Mr. Ganley's or Mr. Gardner's responsibilities.  Consequently, the Court concludes that

neither Mr. Ganley nor Mr. Gardner had implied actual authority to enter into a contract with

Neopost on behalf of USPS.

  2.  Alleged Implied-in-Fact Contract Between Ascom and USPS Regarding Interest Income

       Ascom does not allege the existence of an express contract with USPS.  See Pls.

Findings & Conclusions at 93.  Instead, Ascom alleges only the existence of an implied-in-fact

contract with USPS giving Ascom the right to collect interest income as long as it operated its

CMRS system.  See id.  For the reasons just stated, see supra at 44-49, the Court concludes that

Ascom's implied-in-fact contract claim must fail.  First, Ascom, like Neopost, failed to establish

by a preponderance of the evidence a mutuality of intent to contract with USPS.  Second, even

49

assuming that USPS, through the actions of Mr. Ganley or Mr. Gardner, manifested some sort of

assent to Ascom giving rise to an agreement, a material term of that agreement — the duration of

the right to collect interest income — is unclear.  Finally, Ascom, like Neopost, failed to

establish that Mr. Ganley or Mr. Gardner had implied actual authority to contract on behalf of

USPS.

> 3.   Alleged Oral Contract Between Neopost and USPS for
> Implementing the 1995 CMRS Regulatory Changes

Neopost alleges the existence of a second, express oral contract.  According to

Neopost, USPS and Neopost entered into an express oral contract regarding the implementation

of the 1995 CMRS regulations.  See Pls. Findings & Conclusions at 96.  As Neopost describes it:

> When the 1995 Regulations were being implemented, USPS
> requested that Neopost be the first manufacturer to turn over the
> trust accounts because it was not as large as Pitney Bowes. . . .
>
> Neopost had no obligation to comply with this request and, by
> going first, Neopost would have to incur unique costs that would
> not be incurred by other meter manufacturers who followed.  In
> particular, Neopost would have to forego interest income earlier
> tha[n] other manufacturers, thereby losing the time value of those
> funds.  In addition, by serving as the "guinea pig" in this
> transaction, Neopost — and by extension, its customers — would
> be subject to unique costs and burdens associated with the initial
> implementation of the new system, including accounting errors,
> customer dissatisfaction and customer confusion.

Id.

According to Neopost, Mr. Mahlstedt and Mr. Riley entered into this second

alleged contract at a meeting in May of 1995.  See Pls. Findings & Conclusions at 96-97.

Neopost's evidence in support of this second contract claim rests primarily on the testimony of

Mr. Mahlstedt.  Id.

The Court concludes that Neopost has failed to establish by a preponderance of the evidence at least two necessary elements of their second contract claim.  Neopost has not established mutuality of intent to contract between itself and USPS.  One factor that courts consider "in determining intent to be bound is the parties' conduct *after* they reach an alleged oral agreement."  Steven R. Perles, P.C. v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (emphasis in original).  Although Mr. Mahlstedt claimed that Mr. Riley orally promised him some form of equal or proportionate treatment or compensation in May of 1995 in return for Neopost being the first company to implement the 1995 CMRS regulations, Mr. Mahlstedt subsequently wrote to Mr. Riley on October 6, 1995, and expressly stated that he had received "*no commitment from the USPS for payment for our work*."  DX 76 at 1 (emphasis added).  And notwithstanding the alleged existence of an oral contract in May of 1995, Mr. Mahlstedt continued to request compensation from USPS in letters dated November 3, 1995, see DX 77 at 2, and May 3, 1996.  See DX 81 at 1.  In those letters, Mr. Mahlstedt made no mention of an alleged oral contract formed with Mr. Riley in May of 1995.  Consequently, the Court concludes that Neopost has not established by a preponderance of the evidence mutuality of intent to contract.  See Miller v. Holzmann, 471 F. Supp. 2d 122, 125 (D.D.C. 2007) (concluding that no oral contract came into existence because, among other things, the parties "would not have continued to negotiate or spoken of finalizing their agreement in the future if they truly believed that they already had a contract").

Nor has Neopost established the existence of an unambiguous offer.  Even assuming that Mr. Riley promised Mr. Mahlstedt something in exchange for Neopost being the

51

first company to implement the 1995 CMRS regulatory changes, the terms of that offer are unclear and were not established by a preponderance of the evidence.  Mr. Mahlstedt testified at trial that he requested equal treatment with all the meter manufacturers, and that if Pitney Bowes received any compensation, then Neopost "would get some proportionate share."  Trial Tr. (3/19/12 p.m.) at 101.  Mr. Mahlstedt testified that Mr. Riley responded that Neopost "would be treated equally with Pitney Bowes."  Id. at 112.  Mr. Mahlstedt later testified that Mr. Riley implied "that it would not happen that [Neopost] would lose more interest than Pitney-Bowes," and that "if Pitney-Bowes were awarded something, that [Neopost] would get the same thing[.]" Id.  And in his letter to Mr. Riley memorializing the May 1995 meeting, Mr. Mahlstedt discussed his concern "that [Neopost] could be the only meter manufacturer to lose its escrow income, if it proceed with the move . . . while the other manufacturers contest."  DX 67 at 1.  As he described it in that letter, his principal interest was one of equality: "we all keep or we all lose our escrow accounts[.]"  Id.

Thus, a fair reading of Mr. Mahlstedt's testimony suggests at least three potential offers: Mr. Riley promised either (1) equal treatment with Pitney Bowes, without elaboration regarding what that means; or (2) equal treatment with all meter manufacturers in which all the manufacturers lose their ability to earn interest income, and an award of some proportionate share of any compensation received by Pitney Bowes; or (3) the same compensation awarded to Pitney Bowes.  Consequently, the Court concludes that Ascom has failed to establish the existence of an unambiguous offer from USPS to compensate Neopost for implementing the 1995 CMRS regulations.

### C.  Contract Implied-in-Law Claims  (Counts II, III in Part, VI, and VIII)

Ascom and Neopost each allege, in the alternative, the existence of a contract implied-in-law with USPS regarding an alleged right to retain interest income as long as the companies operated their CMRSs.  A contract implied-in-law is one "in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." Lumbermens Mut. Cas. Co. v. United States, 654 F.3d 1305, 1317 n.9 (Fed. Cir. 2011) (quotations omitted).  Implied-in-law claims include plaintiffs' claims in this litigation for unjust enrichment and *quantum meruit* under a quasi-contract theory, as well as plaintiffs' claims for promissory estoppel.  Notably, courts "tend not to allow either [of these] action[s] to proceed in the presence of an actual contract between the parties."  Vila v. Inter-American Inv. Corp., 570 F.3d 274, 280 (D.C. Cir. 2009).

### 1.  Unjust Enrichment and *Quantum Meruit* Under a Quasi-Contract Theory (Counts II, III in Part, and VIII)

The parties agree that the elements for an unjust enrichment claim and a *quantum meruit* claim are the same.  See USPS Findings & Conclusions at 46; Pls. Findings & Conclusions at 98 & n.36; see also Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 565 (D.C. Cir. 1999).  Those two claims proceed under a quasi-contract theory, see Oceanic Exploration Co. v. ConocoPhillips, Inc., Civil Action No. 04-0332, 2006 WL 2711527, at *20 (D.D.C. Sept. 21, 2006), requiring proof that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retain[ed] the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  National R.R. Passenger Corp. v. Veolia Transp. Servs., Inc., 791 F. Supp. 2d 33, 67 n.30 (D.D.C. 2011) (quotations omitted).

53

"Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another.  In such a case, the recipient of the benefit has a duty to make restitution to the other person if . . . it is unjust for [the recipient] to retain it." Griffith v. Barnes, 560 F. Supp. 2d 29, 34 (D.D.C. 2008) (quotations omitted) (alterations in original); see also Vila v. Inter-American Inv. Corp., 570 F.3d at 279-80.  Unjust enrichment claims are evaluated "on a case-by-case basis, considering the particular circumstances giving rise to the claim."  Peart v. D.C. Hous. Auth., 972 A.2d 810, 814 (D.C. 2009).

a.  Development of CMRS — Neopost and Ascom

To prevail on an unjust enrichment claim, plaintiffs must show that the services they performed "were beneficial to the recipient."  Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d at 565 (quotations omitted).  Here, the evidence shows that both Neopost's and Ascom's CMRS systems were beneficial to USPS in a more than incidental way.  It is undisputed that CMRS, as first invented by Pitney Bowes, increased customer convenience; reduced USPS employee workload; led USPS customers to use more postage because of convenience; and reduced meter fraud.  See Joint Stipulation of Facts ¶¶ 4-7.  Before plaintiffs' development of their CMRSs, USPS was concerned about Pitney Bowes' dominance in the postage meter market; plaintiffs' entrance into the market addressed that concern because it increased the number of meter manufacturers operating CMRSs and thereby increased competition.  See Ganley Dep. at 48-49.  USPS itself considered developing its own CMRS, but concluded that probably it was not cost effective to do so.  See, e.g., PX 6 at ASC 001031.  The evidence therefore shows that plaintiffs enabled USPS to enjoy the benefits of increased

54

competition in the CMRS industry without USPS having to develop its own system.

Plaintiffs also must establish that USPS retained the benefit that plaintiffs conferred.  They have.  USPS retains the benefits of increased competition to this day because plaintiffs continue to operate their CMRSs.

But plaintiffs have not established the third required element of an unjust enrichment or *quantum meruit* claim, that retention of the benefit by USPS is unjust.  Under the circumstances of this litigation, USPS' retention of the benefit is not unjust for two related reasons.  First, as the Court has found above, the changes set forth in the 1995 CMRS regulations were motivated by both cash management concerns and customer service and security concerns.  As for the latter, USPS realized that it had very little information about potential issues with CMRS accounts — specifically "what those accounts were invested in and how they were protected."  Trial Tr. (3/20/12 p.m.) at 62.  And the finishing "cement" on the plan to make changes to the 1979 CMRS regulations followed a meeting with Ascom's then-President, Michael Allocca, where Mr. Allocca made what USPS considered an alarming statement —  that "he had recently spoken with some bankers and they had told him how he could increase substantially his interest on those assets held in the trust fund."  Trial Tr. (3/21/12) at 150.  Furthermore, the changes imposed by the 1995 CMRS regulations added the benefit of backing customers' funds with the full faith and credit of the U.S. government.  See Trial Tr. (3/20/12 p.m.) at 63 (Mr. Kearney, testifying that "[b]y putting it in the Treasury, the entire amount was subject to the full faith and credit of the U.S. government").  In contrast, in the pre-1995 regulatory framework, at least some portion of those funds were not even insured by the Federal Deposit Insurance Corporation.  See Trial Tr. (3/19/12 p.m.) at 29; see also DX

143 at NH003714.  Thus, although USPS certainly was motivated in part by financial reasons, it

also had justifiable customer service and security related reasons to eliminate the commercial

trustee bank accounts.

Second, plaintiffs stress that, since the implementation of the 1995 regulations,

they "have continued to operate their CMRS systems and comply with all of their CMRS

obligations, including new obligations imposed by the 1995 Regulations, but have been

deprived of the significant compensation that induced them to enter the market in the first

place."  Pls. Findings & Conclusions at 100.  Plaintiffs, however, willingly continue to operate

their CMRS systems and continue to earn revenue from their CMRSs, notwithstanding the loss

of interest income from commercial trustee bank accounts.  Neopost continues to earn (1) meter

resetting fees, (2) fees on cash advances, and (3) monthly rental fees related to CMRS.  See

Trial Tr. (3/19/12 a.m.) at 67-68, Trial Tr. (3/19/12 p.m.) at 107-08.  And Ascom earns the same

three sources of revenues as Neopost as well as another — revenues from the sale of CMRS

bases.  See Trial Tr. (3/20/12 a.m.) at 64-66.  Upon consideration of USPS' motivations for

promulgating the 1995 CMRS regulations as well as plaintiffs' continuing receipt of revenues

from their CMRSs, the Court concludes that USPS' retention of the benefit from plaintiffs'

development and operation of CMRS is not unjust or inequitable.

b.  Implementation of the 1995 CMRS Regulations — Neopost Only

In its proposed findings of facts and conclusion of law, Neopost does not appear

to make an unjust enrichment claim regarding its decision to implement the 1995 CMRS

regulatory changes before the other meter manufacturers.  See Pls. Findings & Conclusions

at 98-102.   Assuming, however, that Neopost does make this claim, the Court concludes that it must fail because Neopost's decision to implement the 1995 CMRS regulatory changes did not confer any benefit on USPS.   And even if it did, Neopost has failed to establish that USPS retained any benefit that is unjust as a result of Neopost's implementation of the 1995 CMRS regulations.

### 2.   Promissory Estoppel (Count VI)

Promissory estoppel is recognized as a theory allowing recovery "'when there may have been a failure of proof of certain elements necessary to the formation of an express contract . . . if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice.'"   Bond v. U.S. Department of Justice, 828 F. Supp. 2d 60, 80 n.16 (D.D.C. 2011) (quotations omitted) (alteration in original); see Vila v. Inter-Am. Inv. Corp., 570 F.3d at 279-80.   It is an "inherently equitable doctrine," Moss v. Stockard, 580 A.2d 1011, 1035 (D.C. 1990), and may be invoked "only when 'injustice otherwise [would] not [be] avoidable.'"   Kauffman v. International Bhd. of Teamsters, 950 A.2d 44, 49 n.7 (D.C. 2008) (quoting Bender v. Design Store Corp., 404 A.2d 194, 196 (D.C. 1979)).

A claim for promissory estoppel requires proof of "(1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his [or her] detriment."   Parnigoni v. St. Columba's Nursery Sch., 681 F. Supp. 2d 1, 25 (D.D.C. 2010) (quotations omitted) (alteration in original).   As for the first element, it is established that although the "promise need not be as specific and definite as a contract, it must still be a promise with definite terms on which the promisor would expect the

promisee to rely." In re U.S. Office Prods Co. Sec. Litig., 251 F. Supp. 2d 77, 97 (D.D.C.

2003); see Myers v. Alutiiq Int'l Solutions, LLC, 811 F. Supp. 2d 261, 272 (D.D.C. 2011).

Regarding the second element, a plaintiff's reliance on a promise "'must have

been reasonable and justifiable.'" Willoughby v. Potomac Elec. Power Co., Civil Action

No. 94-1313, 1995 WL 761308, at *5 (D.D.C. Dec. 14, 1995) (quoting M.T. Bonk Co. v. Milton

Bradley Co., 945 F.2d 1404, 1408 (7th Cir. 1991). In other words, a plaintiff's reliance "must

have been 'expected and foreseeable' by the defendant." Id. (quoting M.T. Bonk Co. v. Milton

Bradley Co., 945 F.2d at 1408). "[R]eliance on an indefinite promise is unreasonable[.]"

Parnigoni v. St. Columba's Nursery Sch., 681 F. Supp. 2d at 26 (quotations omitted).

The third element of a promissory estoppel claim is that of injustice. A promisee

must have relied on a promise to his or her detriment such that the "circumstances requir[e] the

enforcement of the promise to avoid injustice." Donovan v. USPS, 370 F. Supp. 872, 892

(D.D.C. 1981); see Vila v. Inter-Am. Dev. Corp., 570 F.3d at 282. Whether there is detrimental

reliance depends on whether a plaintiff's reliance resulted in a detriment of a definite and

substantial nature. See Robinson v. The Detroit News, Inc., 211 F. Supp. 2d 101, 108 (D.D.C.

2002). When evaluating this injustice prong, courts consider, among other things,

> the reasonableness of the promisee's reliance, on its definite and
> substantial character in relation to the remedy sought, on the
> formality with which the promise is made, on the extent to which
> the evidentiary, cautionary, deterrent and channeling functions of
> form are met by the commercial setting or otherwise, and on the
> extent to which such other policies as the enforcement of bargains
> and the prevention of unjust enrichment are relevant.

RESTATEMENT (SECOND) OF CONTRACTS § 90 cmt. b (1981); see Vila v. Inter-Am. Inv. Corp.,

570 F.3d at 282 (citing and quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 cmt. b

(1981)).

a.  Development of CMRS — Neopost and Ascom

Neopost and Ascom each contend that the elements of promissory estoppel have been satisfied for their development of their CMRSs.  See Pls. Findings & Conclusions at 105. The Court disagrees for two reasons.

First, the Court concludes that plaintiffs have not established the existence of any promise, much less one with definite terms, regarding interest income.  See In re U.S. Office Prods Co. Sec. Litig., 251 F. Supp. 2d at 97 (stating that although the "promise need not be as specific and definite as a contract, it must still be a promise with definite terms on which the promisor would expect the promisee to rely").  As discussed above, Mr. Ganley never offered or promised anything regarding "how long they could receive interest income[.]"  Ganley Dep. at 114-15.  And Mr. Ganley testified that he did not provide the meter manufacturers with "any incentives . . . outside of the regulatory framework of the" then-existing 1979 "CMRS regulations as an incentive for entering into the CMRS system[.]"  Id. at 115.  Rather, Mr. Ganley told the meter manufacturers that they would have the same opportunities "under the regulations . . . that Pitney Bowes does."  Id. at 124; see id. at 146-47; see also Trial Tr. (3/19/12 a.m.) at 63.  Mr. Ganley suggested to the meter manufacturers that there was an opportunity that "looked attractive to get into as a corporate business decision."  Ganley Dep. at 167.  But Mr. Ganley never made any promise with definite terms to either Neopost or Ascom.

Second, even assuming that plaintiffs had established the existence of a promise with definite terms regarding interest income and that plaintiffs reasonably relied on that promise, the Court concludes that plaintiffs have failed to establish that injustice requires enforcement of that promise.  Although plaintiffs established at trial that they relied in part on

their belief that they would be entitled to recover interest income in "figuring out the cost justification for building the system," Trial Tr. (3/19/12 a.m.) at 64 (Neopost); <u>see</u> Trial Tr. (3/20/12 a.m.) at 34-35 (Ascom reviewed revenue streams in deciding to develop its CMRS), plaintiffs also understood that Pitney Bowes' CMRS presented a significant threat to their business. <u>See</u> DX 41at 2. Thus, the development of CMRS was viewed as a way to stay competitive in the postage meter market. As Mr. Ganley recognized, after Pitney Bowes developed CMRS, that system eventually became "the wave of the future" for postage meter resetting. Ganley Dep. at 122.

Plaintiffs developed their own CMRSs and earned interest income on the commercial trustee bank accounts for multiple years. Specifically, Neopost began offering CMRS to its customers around May 1990, Joint Stipulation of Facts ¶ 10, and collected interest on commercial trustee bank accounts until January 21, 1996, when Neopost transferred its customers' advance deposits for CMRS to USPS. <u>See</u> PX 163 at 1; DX 81 at 1. Therefore, for nearly six years, Neopost earned interest on commercial trustee bank accounts, as well as other forms of revenue: meter resetting fees, fees on cash advances, and monthly meter rental fees. And Neopost continues to earn meter resetting fees, fees on cash advances, and monthly rental fees.

Neopost presented no evidence that it has failed to make a profit or otherwise substantially benefit from its development and operation of CMRS. Under these circumstances, the Court concludes that the injustice prong has not been satisfied by Neopost.

Similarly, Ascom began offering its CMRS in 1988, Joint Stipulation ¶ 15, and continued to earn interest income from commercial trustee bank accounts until April 10, 1996.

See DX 120 at 1; see also Trial Tr. (3/20/12 a.m.) at 78.  Therefore, for about eight years, Ascom earned interest on commercial trustee bank accounts, as well as other forms of revenue: meter resetting fees; fees on cash advances; monthly meter rental fees; and revenue from the sale of CMRS bases.  And Ascom continues to earn meter resetting fees, fees on cash advances, monthly rental fees, and revenues from the sale of CMRS bases.

Ascom, like Neopost, presented no evidence that it has failed to make a profit or otherwise substantially benefit from its development and operation of CMRS.  Under these circumstances, the Court concludes that the injustice prong has not been satisfied by Ascom.

b.  Implementation of the 1995 CMRS Regulations — Neopost Only

In its proposed findings of facts and conclusions of law, Neopost does not appear to make a promissory estoppel claim regarding its decision to implement the 1995 CMRS regulatory changes before the other meter manufacturers did so.  See Pls. Findings & Conclusions at 102-08.  Assuming, however, that Neopost does make this claim, the Court concludes that it must fail because Neopost's decision to implement the 1995 CMRS regulatory changes was not based on any promise made by USPS.  Nor did Neopost establish the existence of injustice.[7]

_____

[7]    Before trial, USPS filed a motion *in limine* for sanctions relating to plaintiffs' "implied contract counts."  Dkt. No. 207 at 1.  USPS asserted that plaintiffs failed to produce certain documents in response to discovery requests and asked that the Court sanction plaintiffs' for this alleged discovery violation by dismissing plaintiffs' "implied contract counts," or, in the alternative, imposing an adverse inference against plaintiffs that the documents "were adverse to Plaintiffs' claims, and that Plaintiffs suffered no economic damages as a result of the promulgation of the 1995 regulations, and/or that there was no breach of the implied contract." Id.  Because the Court concludes that all of plaintiffs contractual and equitable claims fail, the Court will deny USPS' motion *in limine* for sanctions as moot.

*D.  Takings Claims (Count I)*

Neopost and Ascom each allege that USPS' promulgation of the 1995 CMRS regulations constitutes a taking of plaintiffs' private property for public use without just compensation in violation of the Fifth Amendment to the United States Constitution.  The Court disagrees with plaintiffs and concludes that plaintiffs' takings claims fail.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. CONST. amend. V.  This clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 315 (1987) (emphasis in original).  This clause therefore bars the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).

In order to prevail on a takings claim, a plaintiff "must first establish that it had a protectable property interest cognizable under the Fifth Amendment."  Foggy Bottom Ass'n v. D.C. Office of Planning, 441 F. Supp. 2d 84, 89 (D.D.C. 2006); see National Leased Hous. Ass'n v. U.S. Department of Hous. & Urban Dev., Civil Action No. 03-1509, 2007 WL 148829, at *11 (D.D.C. Jan. 16, 2007) ("The threshold inquiry in a takings analysis is to determine if the claimant has a property interest protected by the Fifth Amendment.").  Such property interests "'are created and their dimensions are defined by existing rules or understandings' arising from non-Constitutional sources."  National Leased Hous. Ass'n v. U.S. Department of Hous. & Urban Dev., 2011 WL 148829, at *11 (quoting Board of Regents v. Roth, 408 U.S. 564, 577

(1972)).  If a plaintiff satisfies this threshold inquiry, that plaintiff then must establish that a

governmental taking occurred.  See Foggy Bottom Ass'n v. D.C. Office of Planning, 441 F.

Supp. 2d at 88-89.

      The Court previously rejected USPS' argument that because of the regulatory

nature of the postage meter industry, plaintiffs, as a matter of law, can make no Fifth

Amendment takings claim.  As the Court stated in its December 2, 2011 Opinion and Order:

> The regulated nature of the postage meter industry is not "a
> talisman that automatically prevents [the] vesting" of a property
> interest.  Cienega Gardens v. United States, 331 F.3d 1319, 1334
> (Fed. Cir. 2003) ("[T]he abrogation by legislation of clear,
> unqualified contract rights requires a remedy, *even in a highly
> regulated industry*, . . . because the contracts embodied the
> commitments of the contracting parties.") (emphasis added) (citing
> United States v. Winstar Corp., 518 U.S. 839, 896-97 (1996)); see
> Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1219
> (Fed. Cir. 2005) (agreeing that "voluntarily choosing to enter a
> regulated industry does not, by itself, deprive a person of a Fifth
> Amendment property interest"); see also Huntleigh USA Corp. v.
> United States, 63 Fed. Cl. 440, 447 (Fed. Cl. 2005) (distinguishing
> American Pelagic Fishing Co., L.P. v. United States, 379 F.3d
> 1363 (Fed. Cir. 2004), and concluding that plaintiff's "property
> rights, its contracts, goodwill, and going-concern value . . . . cannot
> be illusory just because they concern activities subject to pervasive
> government control"); Norman v. United States, 63 Fed. Cl. 231,
> 265 (Fed. Cl. 2004) ("[T]he fact that a private property owner is in
> a highly-regulated field, does not necessarily mean that such
> property owner *never* has a reasonable investment-backed
> expectation in its right to develop and utilize its property.")
> (emphasis in original).

Memorandum Op. & Order at 5, Dec. 2, 2011.

      In its summary judgment opinion, the Court characterized plaintiffs' takings

claims as transfer-of-principal claims that did not effect a direct confiscation by USPS of any of

plaintiffs' interest income.  Ascom Hasler Mailing Sys., Inc. v. USPS, 815 F. Supp. 2d at 175.

Consequently, the Court concluded that plaintiffs' takings claims must be assessed under the

three-part balancing test applicable to *ad hoc* regulatory takings set forth in <u>Penn Central</u>

<u>Transportation Co. v. City of New York</u>, 438 U.S. 104 (1978).  <u>See</u> <u>Ascom Hasler Mailing Sys.,</u>

<u>Inc. v. USPS</u>, 815 F. Supp. 2d at 175-76; <u>see also</u> Memorandum Op. & Order at 4, Dec. 2, 2011.

To constitute a regulatory taking, the government action must "(1) affect a

property interest and (2) go 'too far' in so doing (i.e. amount to a deprivation of all or most

economic use or a permanent physical invasion of property)."  <u>Full Value Advisors, LLC v. SEC</u>,

633 F.3d 1101, 1109 (D.C. Cir. 2011).  The parties disagree about whether plaintiffs had a

cognizable property interest in the interest income from the trust accounts, a matter the Court

acknowledged but did not decide in its earlier opinion.  <u>See</u> <u>Ascom Hasler Mailing Sys., Inc. v.</u>

<u>USPS</u>, 815 F. Supp. 2d at 174-76.  And it need not decide that question here either, because the

Court concludes that even if USPS' action affected plaintiffs' cognizable property interests,

USPS did not go "too far" in doing so.

"In determining how far is too far," <u>Full Value Advisors, LLC v. SEC</u>, 633 F.3d

at 1109, a court considers three primary factors, as set forth by the Supreme Court in <u>Penn</u>

<u>Central</u>: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the

regulation has interfered with distinct investment-backed expectations"; and (3) "the character of

the governmental action."  <u>Penn Cent. Transp. Co. v. City of New York</u>, 438 U.S. at 124; <u>see</u>

<u>Full Value Advisors, LLC v. SEC</u>, 633 F.3d at 1109; <u>see also</u> <u>Lingle v. Chevron U.S.A. Inc.</u>,

544 U.S. 528, 538-40 (2005).  No one factor is dispositive; all three must be considered to

determine "whether the application of a particular regulation to particular property 'goes too

far.'"  <u>Palazzolo v. Rhode Island</u>, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring) (quoting

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922)).  As the D.C. Circuit has stated, "[t]he meaning of the three factors identified in Penn Central has been amplified by the [Supreme] Court, both in Penn Central and in later cases."  District Intown Props. Ltd. v. District of Columbia, 198 F.3d 874, 879 (D.C. Cir. 1999).

Turning to the first of the three Penn Central factors, the economic impact of a regulation may be measured in several different ways, including by:  looking to the market value of a property, see Hodel v. Irving, 481 U.S. 704, 714 (1987); looking to whether the regulation makes a certain business or operation "commercially impracticable," Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495-96 (1986); looking to the possibility of other economic uses besides that which was foreclosed by the regulation at issue, see Andrus v. Allard, 444 U.S. 51, 66 (1979); and examining the ability to earn a reasonable rate of return, see Penn Central Transp. Co. v. City of New York, 438 U.S. at 136.  District Intown Props. Ltd. v. District of Columbia, 198 F.3d at 879.  A claimant "must put forth striking evidence of economic effects to prevail even under [this] ad hoc inquiry."  District Intown Props. Ltd. v. District of Columbia, 198 F.3d at 883 (citing Penn Central Transp. Co. v. City of New York, 438 U.S. at 131 (reviewing the Court's decisions upholding regulations despite diminution in a property's value of more than 75 percent)); see George Washington Univ. v. District of Columbia, 391 F. Supp. 2d 109, 113 (D.D.C. 2005).

No doubt the economic impact of the 1995 CMRS regulatory changes on plaintiffs was substantial.  It is undisputed that those regulations reduced the amount of principal in the trustee bank accounts to zero; consequently, as a result of the 1995 CMRS changes, plaintiffs no longer collected any interest income from those trustee bank accounts.  And the

evidence introduced at trial made clear that interest income was a substantial source of revenue for plaintiffs.  See, e.g., DX 136 at NH002791-92 (showing Ascom's revenue and operating expenses from 1992 to 1997).  It also is undisputed, however, that plaintiffs continue to collect other not-insignificant sources of revenue from the operation of CMRS.  See supra at 28, 56; see also DX 136 at NH002791-92.

        As discussed above, plaintiffs continue to this day to collect meter resetting fees; fees on cash advances; monthly rental fees; and revenues from the sales of CMRS bases.  And, after the implementation of the 1995 CMRS regulations, plaintiffs avoided certain costs that previously were included in their operation of CMRS: (1) "bank services or bank management fees" — that is, "the fees that the banks charge for managing"; and (2) "a bond requirement that the parties had to meet," and "costs associated with procuring a bond."  Trial Tr. (3/26/12 a.m.) at 4 (Dr. Abramson, plaintiffs' expert, testifying regarding avoided costs); see also DX 136 at NH002791-92.  Plaintiffs offered no evidence at trial that they now are unable to earn a reasonable return on the CMRSs.  See Penn Central Transp. Co. v. City of New York, 438 U.S. at 136 (despite enactment of statute, evidence showed Penn Central could still profit from Terminal and obtain "reasonable return" on its investment).  In view of the other economic uses of CMRS, the Court is not persuaded by the evidence presented that the 1995 CMRS regulations go "too far" so as to amount to a deprivation of all or most economic use of plaintiffs' CMRSs.  Full Value Advisors, LLC v. SEC, 633 F.3d at 1109 (quotations omitted); see also District Intown Props. Ltd. v. District of Columbia, 198 F.3d at 883 (citing Penn Central Transp. Co. v. City of New York, 438 U.S. at 131).

As for the second Penn Central factor, it is established that "[a] reasonable investment-backed expectation 'must be more than a unilateral expectation or an abstract need.'" District Intown Props. Ltd. v. District of Columbia, 198 F.3d at 879 (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984)).  As the Supreme Court stated in Penn Central, claimants cannot establish a takings claim "simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development."  Penn Central Transp. Co. v. City of New York, 438 U.S. at 130; see also Tennessee Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 457 (6th Cir. 2009).

In determining whether a reasonable investment-backed expectation exists, one relevant consideration is the extent of government regulation within an industry.  See, e.g., Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 128 (1st Cir. 2009) ("It is true that [plaintiff's] investment-backed expectations are tempered by the fact that it operates in the highly regulated hospital industry."); Tennessee Scrap Recyclers Ass'n v. Bredesen, 556 F.3d at 457 (concluding that "regulatory context" — that is, the long regulated nature of scrap dealers — "undercuts the reasonableness of the scrap dealers' reliance") (citing Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. at 645); McGuire v. United States, 97 Fed. Cl. 425, 442 (Fed. Cl. 2011) (stating that "the regulatory regime certainly will shape whether [a claimant's] expectation was reasonable" in assessing a takings claim); Burlington N. R.R. Co. v. United Transp. Union, 822 F. Supp. 797, 802 (D.D.C. 1991) ("As a general matter, in an area as heavily regulated as the railroads and in which Congress has repeatedly demonstrated its willingness to legislate solutions to labor disputes, any expectancy would seem unreasonable if not naive."); Transohio Savings Bank v. Director, Office of Thrift Supervision, Civil Action

No. 90-1678, 1991 WL 201178, at *9 (D.D.C. Aug. 1, 1991) ("Plaintiffs, by virtue of their participation in a comprehensively regulated industry, can hardly claim 'distinct investment-backed expectations.'").

In sum, those who do business in a regulated field have a heavy burden when objecting that a subsequent change in the regulatory scheme intended to achieve a legitimate governmental purpose interferes with their investment-backed expectations.  See Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. at 645-46; Connolly v. PBGC, 475 U.S. 211, 227 (1986); see also Franklin Mem'l Hosp. v. Harvey, 575 F.3d at 128 ("heavy governmental regulation may diminish a property owner's expectations"); Cienega Gardens v. United States, 331 F.3d at 1350 ("A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments.").

But the fact that a claimant participates in a highly regulated field "does not necessarily mean that such property owner *never* has a reasonable investment-backed expectation in its right to develop and utilize its property."  Norman v. United States, 63 Fed. Cl. at 265 (emphasis in original); see supra at 62-63; see also Colorado Springs Prods. Credit Ass'n v. Farm Credit Admin., 967 F.2d 648, 655 n.8 (D.C. Cir. 1992).  "The range of expectations that is reasonable may be reduced in proportion to the amount of regulation, but this is not a blanket rule that disqualifies parties' expectations without inquiry."  Cienega Gardens v. United States, 331 F.3d at 1350.

The evidence before the Court shows that USPS never promised or offered plaintiffs anything regarding how long they would be able to collect interest on commercial

trustee bank accounts.  Mr. Ganley provided no incentives to plaintiffs outside of the regulatory

framework of the then-existing 1979 CMRS regulatory framework, and he never told them how

long they would or could receive interest income.  Ganley Dep. at 114-15.  Furthermore, as

USPS correctly points out, the postage meter industry is heavily regulated, and both the CMRS

system itself and the ability to collect interest income on customers' advance deposits were

created solely as a result of, and at all times subject to, USPS' regulatory powers.  See USPS

Findings & Conclusions at 53-54.

      On the other hand, there is nothing in the record to suggest that it was reasonably

foreseeable to plaintiffs that USPS would change its regulations to eliminate the trust accounts,

and, thereby, plaintiffs' ability to collect interest income on the deposits in those accounts.

Indeed, the 1979 CMRS regulations, under which plaintiffs' entered into the CMRS market,

remained substantively unchanged for 16 years, until the promulgation of the 1995 CMRS

regulations that eliminated the trustee bank accounts.  See Cienega Gardens v. United States,

331 F.3d at 1348 (some regulatory changes are "outside of the realm of the reasonably

expected"); see also United Nuclear Corp. v. United States, 912 F.2d 1432, 1436 (Fed. Cir. 1990)

(fact that leases would be subject to future regulations does not mean plaintiff fairly can be said

to have anticipated new policy requiring tribal approval of mining plans to leases entered into six

years earlier).

      In view of the facts found above, the Court concludes that plaintiffs had a

reasonable investment-backed expectation that they would be entitled to collect interest income

from commercial trustee bank accounts for some not-insignificant period of time.  But for how

long is unclear; at best, the credible evidence at trial suggests that plaintiffs reasonably could

believe only that they would be able collect interest income until such time as they were able to offset their expenses in developing and operating their CMRSs.  See supra at 44-46, 59.  And as noted above, in this litigation plaintiffs expressly have disclaimed any request for damages based on its investment and development costs related to CMRS.  See supra at 20, 23.

Finally, as to the third Penn Central factor, "the central question is whether the regulation advances a common good or public purpose."  George Washington Univ. v. District of Columbia, 391 F. Supp. 2d at 113-14 (quotations omitted); see Loretto v. Teleprompter Manhattan CATV Corp., 548 U.S. 419, 426 (1982) (substantial regulation of owner's use of his own property upheld where deemed necessary to promote the public interest").  On the basis of the evidence presented, the Court concludes that the 1995 CMRS regulatory changes ultimately were intended to and do promote the common good and public purpose.

According to plaintiffs, "the record . . . demonstrates that the trust account and the manufacturers' right to receive interest income was eliminated for *purely* financial reasons — *i.e.*, to shore up USPS' poor financial condition."  Pls. Findings & Conclusions at 122.  USPS has a similar categorical view, but in the opposite direction; USPS asserts that plaintiffs "failed to produce *any* evidence that the decision to change the CMRS regulations was a 'money grab' as alleged by plaintiffs."  USPS Findings & Conclusions at 54 (emphasis added).  Both sides are wrong.

USPS' decision to promulgate the 1995 CMRS regulations had a financial component to it.  As discussed, James Grant, a member of Mr. Kearney's staff, drafted a memorandum, dated January 7, 1994, in which he addressed the CMRS changes in purely financial terms.  See PX 133 at 1.  As Mr. Grant stated:

> The proposed cash management changes would provide the USPS with an investable balance of $294,400,000.  This balance managed within the Postal Service Fund, during FY 1993, would have realized $19,165,440 in interest income.  The newly acquired lockbox bank account would become an explicit expense of $1,454,000.  The result would have been net income generation of $17,711,440.

> Since possession of the trust fund represents a permanent increase in cash or a reduction in debt, the income generation is not a one time event.  Therefore, giving consideration to future CMRS program growth and historical interest rates the estimated new present value of this change, discounted at 6%, over the next 20 year period could exceed $300 million.

Id.; see Trial Tr. (3/20/12 p.m.) at 22.

USPS attempted to minimize that $300 million figure at trial and in its proposed findings of fact, relying on the testimony of Mr. Pedersen to assert that "the projected increase in income over a twenty (20) year period . . . amounted to less than two (2) days revenue to the Postal Service."  USPS Findings & Conclusions at 26.  That comparison means little, however, because Mr. Grant's memorandum addressed "net income generation" after expenses, PX 133 at 1 — that is, profit; Mr. Pedersen, in contrast, was talking about USPS' daily revenue, but said nothing about daily profit after expenses.  See Trial Tr. (3/21/12) at 141.  Consequently, as the Court found above, without any evidence to the contrary, the Court concludes that the possibility of a net income generation of $300 million over 20 years *was* a significant factor leading to the promulgation of the 1995 CMRS regulations.

But the credible evidence before the Court shows that promulgation of the 1995 CMRS regulations *also* was motivated by security and customer service concerns.  As discussed, USPS was concerned with postage meter fraud generally.  That concern traced back to early 1993 when the Postal Inspection Service notified Ms. Gibert's organization that it could

no longer rely on physical inspection of meters to determine if they had been tampered with because the Postal Inspection Service had identified a case of meter tampering that was not discernable by the naked eye.  See Trial Tr. (3/21/12) at 110.  Ms. Gibert testified that this discovery "sent shock-waves through our whole organization" since meters were a very big source of revenue for USPS.  Id.

As for CMRS specifically, each witness asked at trial about any known security breaches related to the cash management component of CMRS stated that he or she was unaware of any.  Nevertheless, as part of its comprehensive review of postage meters, USPS discovered that it had very little information about potential issues with CMRS accounts — specifically "what those accounts were invested in and how they were protected."  Trial Tr. (3/20/12 p.m.) at 62.  The finishing "cement" on the plan to make changes to the CMRS regulations, as Mr. Pedersen testified, see Trial Tr. (3/21/12) at 150, followed a meeting with Ascom's then-President, Michael Allocca, where Mr. Allocca said he spoke with bankers about how to increase substantially the interest on the principal held in the trust fund.  Id. at 142.  That statement alarmed Mr. Pedersen

> [b]ecause the only way you can do that is by increasing risk, and
> these were funds that were short term in nature, destined for
> postage, and the only way you could increase returns on them
> would be to either increase your credit risk or to increase your
> interest rate risk, neither of which would have been appropriate.

Id. at 142-43; see also Trial Tr. (3/21/12) at 16-17 (Mr. Kearney, testifying that USPS was "concerned that when part of their income was linked to interest, that they had a disincentive to provide optimal service to the customers because they had an incentive to keep the money as long as possible").

72

And finally, the changes imposed by the 1995 CMRS regulations added the benefit of backing customers' funds with the full faith and credit of the United States government.  In contrast, in the pre-1995 regulatory framework, at least some portion of those funds was not even insured by the Federal Deposit Insurance Corporation.  Under these circumstances, the Court concludes that the character of USPS' action was one that promoted the common good more than it attempted to shore up its financial condition.

Having considered the three <u>Penn Central</u> factors in view of the facts that the Court found above, the Court concludes that the 1995 CMRS regulations did not effect a taking of plaintiffs' property, and that plaintiffs' takings claims therefore must fail.  Simply stated, the 1995 CMRS regulations did not "go too far."  <u>Full Value Advisors, LLC v. SEC</u>, 633 F.3d at 1109 (quotations omitted).

## V.  CONCLUSION

For the foregoing reasons, the Court will enter judgment for defendant on Counts I, II, III, VI, and VIII of plaintiffs' complaints; will deny as moot defendant's oral motion to strike the testimony of Edmond B. Goggin; and will deny as moot defendant's motion *in limine* for sanctions.  As Order and Judgment consistent with this Opinion, Findings of Fact, and Conclusions of Law will issue this same day.

SO ORDERED.


/s/ _____
PAUL L. FRIEDMAN
DATE:  August 14, 2012                    United States District Judge

73